SARAH E. TROMBLEY
JAMES D. RENNER
FRANCESCA L. BARTOLOMEY
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
202-435-9735
sarah.trombley@cfpb.gov
james.renner@cfpb.gov
francesca.bartolomey@cfpb.gov

*Attorneys for Plaintiff Consumer
Financial Protection Bureau*

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, <br><br> *Plaintiff,* <br><br> v. <br><br> ACIMA HOLDINGS, LLC, ACIMA DIGITAL, LLC (F/K/A ACIMA CREDIT, LLC, D/B/A ACIMA LEASING), and AARON ALLRED, <br><br> *Defendants.* | COMPLAINT <br><br> Case No. 2:24-cv-00525-DBB <br><br> Judge David Barlow |

The Consumer Financial Protection Bureau (Bureau) brings this action against

Defendants Acima Holdings, LLC (Acima Holdings), Acima Digital, LLC (f/k/a Acima

Credit, LLC, d/b/a Acima Leasing) (Acima Credit) (collectively, with Acima Solutions,

LLC, Acima Companies or Acima), and Aaron Allred (Allred), and alleges the following:

<u>INTRODUCTION</u>

1.      The Acima Companies and Acima's founder and former chief executive officer, Aaron Allred, have used their so-called "virtual rent-to-own" product—through which Acima Credit nominally purchases household goods selected by consumers from independent merchant partners and then purports to "lease" the goods to consumers, usually for a 12-month term—to ensnare vulnerable consumers with poor or limited credit in a financial obligation that ends up costing them more than *twice* the original retail price.

2.      The Acima Companies and Allred have obscured the nature and terms of their product from consumers, using misleading marketing and abusive enrollment practices and effectively locking consumers into exorbitant financing for the full "lease" term by making it difficult to terminate the agreements. They have then compounded consumers' harm by reporting inaccurate information about this financing to consumer reporting agencies (CRAs).

3.      The Acima Companies and Allred designed this product with the intention of avoiding consumer protection laws governing both credit *and* leases. While these tactics have confused and injured consumers, they have not immunized Acima Credit, Acima Holdings, or Allred from liability. As Acima Credit's name suggests, the Acima Companies have indeed offered and extended credit, and Acima Credit, Acima Holdings, and Allred are liable for violating consumer protection laws in connection with the estimated as many as 5 million financing agreements entered since 2015.

4.     *Marketing*. In numerous instances, Acima Credit has marketed its product to consumers as credit, offering the opportunity to pay off the purchase of consumer goods over three months or a year. Only later did many of the consumers learn from Acima Credit that the Acima Companies called the agreements they entered into a "lease," and that at the end of the term consumers would pay approximately twice the purchase price to own the goods unless they utilized an "early purchase option" or returned the goods pursuant to Acima Credit's onerous requirements. Acima Credit also deceptively marketed its 90-day "early purchase option" with misleading statements indicating it was offering an interest-free 90-day loan or 90-day purchase for a small pre-determined fee. And Acima Credit has failed to properly train and adequately monitor its merchant partners nationwide—often small sellers of household goods—who have in turn marketed this confusing and opaque product using similarly misleading language.

5.     *Enrollment*. For most of the years that Acima Credit has operated, it has used an application process designed to interfere with the consumer's ability to understand the nature and cost of the product. Without presenting the terms or (until recently) identifying its product as a supposed "lease," Acima Credit has first required the consumer to apply for Acima's "financing" and then select the goods for purchase. Only at check-out did Acima Credit finally provide the consumer with an agreement that it claims is a lease. But even then, Acima Credit has interfered in various ways with the consumer's ability to understand the meaning of this label, presenting the agreement through a hard-to-read mobile application that has physically obscured the fine print

through various formatting and design features. This process has left many consumers misinformed or otherwise misled about Acima Credit's product, with many believing they have taken out standard credit, often a 90-day interest-free loan.

6. ***Ensnaring Consumers***. Consumers who thought they could escape the exorbitant cost of an Acima Credit agreement by returning the goods—as Acima Credit had promised they could—have found that Acima Credit built a returns system designed to make it absurdly difficult to do so. Through approximately 2021, fewer than 1% of all Acima Credit consumers ever returned their goods. And, to make it even harder for consumers to disentangle themselves, at the time consumers enter the financing agreement, Acima Credit requires the consumers to authorize automatic payments from their checking accounts. Although the agreements theoretically allowed consumers to change their form of payment later on, Acima Credit has often misled consumers, stating that they could not do so.

7. ***Credit Reporting***. From at least May 2017 and continuing for at least several years, Acima Credit has furnished to CRAs consumer information relating to each agreement, but its policies and procedures have been insufficient to ensure the accuracy and integrity of the information it reports. In fact, Acima Credit has reported inaccurate information about its consumers, some of which may have negatively affected their credit and ability to obtain future financing. Further, when a consumer has alleged fraud or identity theft, Acima Credit has illegally refused to investigate unless the consumer submitted a police report. Acima Credit has also failed to properly notify consumers when reporting negative information, and, depending on how its

product is construed, may have illegally obtained and utilized consumer reports to target potential borrowers.

8.      The Bureau brings this action under sections 1036(a) and 1054 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5536(a) and 5564; section 108(a) of TILA, 15 U.S.C. § 1607(a), and its implementing Regulation Z, 12 C.F.R. part 1026; section 918(a) of the Electronic Fund Transfer Act (EFTA), 15 U.S.C. § 1693o(a)(5), and its implementing Regulation E, 12 C.F.R. part 1005; and section 621(b)(1)(H) of the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681s(b)(1)(H), and its implementing Regulation V, 12 C.F.R. part 1022, to stop unlawful conduct, to rescind or reform the terms of Acima's agreements with consumers, to obtain redress for affected consumers and an appropriate penalty, and to obtain all other appropriate relief.

<u>JURISDICTION AND VENUE</u>

9.      This Court has subject-matter jurisdiction over this action because it is brought under Federal consumer financial law, 12 U.S.C. § 5564(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C § 1345.

10.     Venue is proper in this district because Acima Credit and Acima Holdings are located, reside, and do business here and because Allred resides here. 12 U.S.C. § 5564(f).

PLAINTIFF

11.     The Bureau is an independent agency of the United States charged with enforcing "Federal consumer financial laws." 12 U.S.C. § 5491(a).

12.     The Bureau is authorized to initiate proceedings in its own name and through its own attorneys to address violations of Federal consumer financial law, including the CFPA, TILA and Regulation Z, EFTA and Regulation E, and FCRA and Regulation V. 12 U.S.C. §§ 5481(12), (14), 5564(a)-(b), 5565.

DEFENDANTS

13.     Acima Digital, LLC (Acima Credit[1]), which currently does business as Acima Leasing, is a Utah LLC, and was formerly known as Acima Credit, LLC, Simple Leasing, Simple Finance, LLC, and Simple RTO, LLC.

14.     Acima Holdings, LLC (Acima Holdings) is a Utah LLC that, since 2018, has owned 100% of Acima. It is a wholly-owned subsidiary of nonparty Rent-A-Center East, Inc. (RAC or Rent-A-Center), which acquired Acima Holdings in 2021.

15.     Nonparty Acima Solutions, LLC (Acima Solutions) was a Utah LLC created in 2018. Acima Credit owned 100% of Acima Solutions. Acima Solutions was merged into Acima Digital in December 2023.

16.     Together, Acima Credit, Acima Holdings, and Acima Solutions are referred to as "the Acima Companies" or "Acima."

17.     The Acima Companies operated, and Acima Credit and Acima Holdings continue to operate, as a common enterprise. The Acima Companies shared, and Acima

---

[1] Acima Credit changed its name to Acima Digital in December 2021.

Credit and Acima Holdings continue to share, the same directors and officers, and operated, or, with respect to Acima Credit and Acima Holdings, continue to operate, out of the same addresses. Acima Credit held, and with respect to itself and Acima Holdings, continues to hold, all debts and all assets for the Acima Companies. Acima Holdings has undertaken and Acima Solutions undertook no independent activities.

18.     An act by one entity constitutes an act by each entity comprising the common enterprise. Acima Credit and Acima Holdings are thus each jointly and severally liable for the acts and practices alleged below.

19.     Aaron Allred is a Utah resident and a founder of Acima Credit, as well as the former CEO of the Acima Companies.

ALLRED'S ROLE AT ACIMA

20.     Acima Credit was founded by Allred and a close friend under the name "Simple Finance" in 2013. In late 2016, it became known as Acima Credit, a name Allred chose.

21.     Allred provided all of the initial funding for Acima Credit and continued to hold millions in personal loans to Acima until the Rent-A-Center acquisition.

22.     From the creation of Acima Holdings through 2021, Allred sat on and controlled the Acima Holdings board of directors.

23.     Allred served as Acima Credit's first CEO and led the company through 2020, when he briefly stepped back. He returned to work before the acquisition by Rent-A-Center and continued after it, first as Chief Revenue Officer, then, after an executive reshuffle in March 2022, Executive Vice President. For the post-acquisition period

during which Allred held this position, Acima's corporate representative described Allred as "the person who makes the major decisions for Acima and is the final decisionmaker." He moved into an advisory role as a consultant some time in spring 2023 and finally ended employment with the company in approximately February 2024.

24.     Allred testified that in Acima Credit's early years, he "d[id] everything from sales to customer service to cleaning the bathroom."

25.     As Acima Credit developed, Allred was closely involved in design, marketing, and enrollment of consumers in its product and with setting Acima policy.

26.     Even as the Acima Companies grew, Allred testified, he was "still involved in [corporate] decisions, whether they be key or critical or important decisions or whether they be… playing referee on an issue that was escalated."

## ACIMA CREDIT CHARGES MANY CONSUMERS MORE THAN 200% OF RETAIL PRICES FOR HOUSEHOLD GOODS

27.     Since approximately late 2013, and ultimately in forty-six states, Acima has offered financing, which it denotes as a purported lease or "virtual rent-to-own" product, primarily for durable household goods to consumers.

28.     Acima has offered this financing primarily through partnerships with smaller merchants and regional chains selling such goods.

29.     After consumers were approved for a particular purchase amount by Acima Credit, Acima Credit then purported to purchase the consumers' chosen goods from the merchant partner and entered into financing for the goods with the consumer.

30.     Acima Credit has denoted its contracts as (most commonly) two-week renewable "leases" between Acima Credit and consumers that resulted in consumer

ownership of the goods if renewed for a year. However, Acima often described this contract internally, in its audited financial statements, to consumers, and to consumer reporting agencies as a twelve-month contract. Even some Acima Credit contracts explicitly identified the "term" as "365 days."

31.     In calculating the cost of its financing, Acima Credit generally incorporates an initial markup from the retail price into the base, and then applies a multiplier of approximately 200% to determine the total cost of the product to the consumer if the consumer renews for the full contract term, which is generally a year (Full Term Cost).

32.     Consumers are generally required to make an initial payment at contract initiation. While terms sometimes vary, a "renewal" payment of approximately 1/26 of the remaining Full Term Cost is then typically due every two weeks for a year, unless the contract is terminated. To terminate the contract, the consumer has to either (a) return the goods pursuant to Acima Credit's restrictions and requirements or accept an "early settlement option" (ESO) in lieu of a return, or (b) enter into an approved "early purchase option," through which the consumer pays an additional fee or a portion of the remaining Full Term Cost. If a consumer ceases making "renewal" payments without terminating the contract, Acima Credit effectively charges a daily holdover fee (equivalent to what the consumer would owe under the contract), along with late fees, until the consumer becomes current, returns the goods, or has been assessed the Full Term Cost. Acima does not repossess goods.

33. Consumers who continue financing for the full projected contract term pay approximately 200% of the sum of the retail price and the markup to own the goods. This includes a sizable finance charge.

34. In most states, the contract assigns the risk of loss or damage of the goods during the contract period to the consumer, and consumers are entirely responsible for the goods, including repairs, while they are in their possession.

35. Allred was involved in determining the economic structure of the agreements and reviewed at least some language in the agreements.

ALLRED DESIGNED AND ADVERTISED ACIMA CREDIT'S PRODUCT AS CREDIT

36. Allred and his team designed Acima Credit's product to function and be marketed as credit.

37. Allred and other Acima employees repeatedly referred to Acima in internal documents as a lender and Acima's product as credit.

38. Acima Credit has sometimes portrayed its financing as credit in marketing materials aimed at consumers.

39. Prompted by Acima Credit's training and marketing materials, and using some materials supplied by Acima Credit, Acima Credit's merchant partners have sometimes advertised Acima's financing as credit or with language indicating that it is credit.

40. In marketing materials that Acima Credit mailed to consumers using prescreened lists it obtained from CRAs, Acima Credit stated it was making a "firm offer of credit."

41. Allred was personally involved in developing this marketing campaign, even emailing individual store owners to offer them the chance to participate in what he described as a "firm offer of credit."

42. Many consumers have understood from Acima Credit's advertising and advertising by Acima Credit's merchant partners that Acima was offering credit.

43. Many consumers understood from this advertising that Acima Credit offered a 90-day zero-interest credit option.

44. Allred provided feedback on, reviewed, and approved consumer-facing marketing materials.

THE FINANCING APPLICATION PROCESS

45. Initially, consumers applied for financing with Acima through a merchant terminal.

46. Since approximately 2017, consumers have ordinarily applied for financing with Acima through a mobile application process.

47. Consumers have frequently learned of Acima Credit's product from advertising materials Acima Credit provided to the merchants to display in their stores or to use on social media. These materials have sometimes presented the product in ways indicating that it was credit and often did not mention the word "lease" or did so only in fine-print footnotes. Until approximately February 2020, when consumers texted to Acima a store-specific code provided on in-store materials to initiate the application process on their phones, they received a response like "Click . . . to apply for

financing with [merchant's name]." Up to that date, the response did not mention the word "lease" and often did not mention Acima at all.

48.     Merchants could also send consumers a link to begin the mobile application process directly or provide one in a social media ad.

49.     When consumers clicked the link, until 2020, they were taken directly to a financing application, without any further explanation of Acima's financing. In late 2020, Acima Credit added a series of "what is a lease?" disclosure screens.

50.     Once consumers entered their personal and (for most merchants, mandatory) bank account information, Acima Credit either approved or denied them for some amount of money to use at the merchant partner for any goods (within Acima Credit's policies) that the consumer later selected. Consumers who chose goods that cost significantly less than the amount they were approved were sometimes invited by Acima to return to the original store to choose goods to bring them closer to their original approval amount, an option known as "open to buy."

51.     Until Acima Credit began using the "what is a lease?" disclosure screens in late 2020, Acima Credit did not explain the terms of the agreement at the time of being approved for a particular amount of money (or provide a copy).

52.     After consumers picked out their goods, they usually signed their agreement electronically. The process for signing agreements electronically has evolved significantly over time.

53.     During the initial period when consumers applied via the merchant's computer, consumers were not sent a copy of the agreement before signing. Rather, they

were sent a numerical code which they were asked to enter in a box on the merchant's computer to "sign" the agreement. This meant that unless the merchant took steps to show them the terms of their agreement on the merchant's computer, consumers might not see the agreement at all or have a reasonable opportunity to review it or get a copy of it before signing.

54.     Acima Credit then shifted to having the majority of consumers sign their agreements on their own mobile phones, in a process that has changed multiple times over the years.

55.     In versions of the mobile application process from approximately 2017 to approximately 2021, a signature screen popped up over a greyed-out background of the contract. The consumer had to click a "hide" button to dismiss this screen to even be able to read the contract before signing.

56.     In other versions from 2018, a signature screen combined with "key terms" popped up over the contract background, sometimes with a link that said, "Click here to see full lease."

57.     The "key terms" popup was headed "Sign Lease Agreement," or had a header with similar language, and listed the periodic payment, payment frequency, and total payments, but did not state the retail price or the actual cost of financing (i.e., the Full Term Cost minus the retail price), nor did it explain an extraordinary jump (discussed below) in cost to the consumer built into the contract once the 90-day purchase period had expired.

58.     If the consumer clicked through the key-terms popup, they were presented with the full agreement in tiny font and a box to enter their name in to sign the agreement.

59.     If it was even possible to do so, there was never a conspicuous or easy-to-find mechanism for the consumer to download, print, or save the agreement before signing.

60.     Starting in or around 2022, the agreement was presented without any obscuring pop-ups, but still in small font on a mobile phone.

61.     Even in cases when the consumer could and did read the agreement, it was difficult to discern the terms, which obscured the true cost of the product.

62.     In early versions of the agreement, the agreement sometimes contained a box near the top in bold and slightly larger font that disclosed "INVOICE AMOUNT /NUMBER OF PAYMENTS/LEASE PAYMENT AMOUNT/TOTAL OF PAYMENTS FOR OWNERSHIP/90-DAY BUYOUT AMOUNT," but did not disclose the actual cost of financing.

63.     In other earlier versions of the agreement, Acima Credit instead scattered these terms in the first few paragraphs of the agreement, either in the standard font and Roman type or in a slightly larger font and bold type; for at least one state, terms included "Cost of Rental."

64.     Later (starting in 2018 for some, but not all, states), a separate box in bolder type on its own page was added which did mention "Cost of Rental," but, importantly, calculated it based on the "Acima Cash Price," which was not the retail

price, but rather the retail price plus Acima Credit's initial markup, thus obscuring the actual cost of financing.

65.     In approximately late 2018 to early 2019 (depending on the state), Acima Credit added a first page to the lease which stated, in larger, bolded type: "Information and Acknowledgement of Lease-Purchase Agreement/This transaction is a lease-purchase or rental-purchase agreement ('Agreement') with Acima Credit, LLC ('Acima'), or its subsidiary. This is not a loan or credit transaction. The Agreement includes a 90-Day (3-month, in California,) Early Purchase Option. This Early Purchase Option may be an amount greater than the merchant's sale price and not 'same as cash.'" However, the mechanisms of the application process described above delayed and minimized consumers' opportunities to see this disclosure.

66.     Consumers who had received financing from Acima could receive a copy of their agreements only by either contacting Acima Credit to request a paper copy by mail or, later, logging into Acima Credit's customer portal to download a copy.

67.     Acima Credit did not disclose to consumers the amount financed, the finance charge, or the annual percentage rate.

68.     While Acima Credit requires merchants to submit (or create online) invoices for the goods as part of the financing process, it does not require that the invoices identify the goods in detail (e.g., the model for a television set or the size of a mattress).

69.     Merchant invoices generally identify the consumer, not Acima Credit, as the purchaser of the goods.

70.     Allred was familiar with the Acima Credit mobile application process and with the disclosures on the Acima Credit contracts.

<u>THE 90-DAY PURCHASE OPTION: "90 DAYS SAME AS CASH"</u>

71.     Acima Credit has offered consumers a few "early purchase options," which enabled them to terminate their contracts by making a lump-sum payment of a specified percentage of the remaining Full Term Cost.

72.     First, consumers could exercise a "90-day option" within 90 days (in California, three months) of entering into the contract.

73.     Acima Credit advertised this option through at least 2020 as a "90 day same as cash" or "90 day cash option" or "for only $10 [or similar] fee." However, in fact, the price of the option included both the initial markup from the retail price applied to all purchases, generally from $40-$75, and a fee for exercising this option, initially $10.

74.     Many consumers used the 90-day option as a means of buying goods and paying for them over three months.

75.     In fact, through late 2019, of all consumers who successfully acquired goods with Acima financing, approximately 62% used the 90-day option.

76.     Allred knew that this option was sometimes advertised or described to merchants as "90 day same as cash" or "90 day cash option" or "$10 [or similar] fee."

77.     After the 90-day option expired, in order to terminate the contract through an "early purchase option," the consumers had to pay approximately 55-85% of the remaining Full Term Cost, meaning that in most cases consumers, even those who

tried to pay off in only the fourth month of the contract, would still be paying well over the retail price for the goods.

ACIMA OBSTRUCTED RETURNS

78.     Acima Credit has represented both orally and in writing that consumers who wanted to end their contracts could easily do so at any time (or, until 2017, after an initial 60 days) by returning the goods.

79.     Through approximately 2021, Acima Credit also told some consumers that Acima Credit would pick up returned goods from consumers, although it appears that Acima Credit ceased doing pickups of any goods in about January 2017 and had not resumed through at least approximately 2021.

80.     In order to begin a return (and thus the termination of the contract), Acima Credit has demanded pictures of the goods, sometimes multiple rounds of them.

81.     Then, through at least 2021, Acima Credit claimed, "Unfortunately, we do not have a pickup team in your area."

82.     Acima Credit then offered consumers an expensive "early settlement option" (ESO) of a substantial percentage of the remaining Full Term Cost in exchange for the consumers keeping the goods.

83.     If a consumer accepted an ESO offer, Acima Credit terminated the lease, but reported to the CRAs a negative code, "AU," which means "settled for less than owed." Acima Credit did not always inform the consumer about this negative reporting when steering consumers into an ESO.

84.     Acima Credit also prohibited consumers who entered into ESOs from financing any further purchases with Acima.

85.     For most consumers who still wanted to end their agreements but declined ESOs, Acima Credit then demanded that they identify nonprofits to which to donate the goods. Acima Credit did not terminate the lease until it had received confirmation that the consumer had donated the item, which had to include a donation receipt identifying Acima as the donor, even though Acima did not seek to claim any tax benefits for these donations.

86.     Acima Credit expected consumers to find donation recipients and transport the goods themselves.

87.     Consumers frequently found it impractical to do so, especially with mattresses, and complained about it to Acima Credit.

88.     For consumers who sought to return smaller, "higher-value" items, Acima Credit instructed them to mail in the goods.

89.     Acima Credit did not permit consumers to return only part of a purchase, even though consumers often bought items such as furniture sets or multiple pieces of jewelry at once.

90.     Acima Credit also did not permit consumers to return damaged goods, even if the goods were damaged at the time they were received by the consumer.

91.     Until approximately late 2022, Acima Credit did not permit consumers who made returns to use Acima in the future.

92.     Fewer than 1% of all Acima Credit consumers through approximately 2021 ended up returning their goods.

93.     Internally, at least up to the Rent-A-Center acquisition, the Acima Companies treated returned items as having no residual value.

94.     Allred and Acima knew that some of the kinds of goods most commonly financed by Acima were of particularly low value once used.

95.     Acima Credit has treated the "higher-value" mailed-in goods as having "supremely immaterial value" and would auction them off internally, pawn them, or discard them.

96.     While Acima Credit pursued collections against consumers who stopped making payments and did not return the goods or otherwise settle with the company, it did not attempt to repossess the goods, another indication that the Acima Companies did not value or have an interest in actually possessing them.

97.     Allred has authorized or been aware of Acima Credit's return policies since its founding.

<u>ACIMA FAILED TO ADEQUATELY TRAIN AND MONITOR
ITS MERCHANT PARTNERS</u>

98.     While Acima Credit does do some of its own advertising, it has relied heavily on its merchant partners to pitch its financing in-store.

99.     Acima Credit frequently works with local independent stores and small chains that have often had high employee turnover.

100.    When evaluating applications by merchants to become partners with Acima Credit, Acima Credit ordinarily has not considered anything other than whether

the company offered what Acima classified as "leasable" items and "whether the checks on the . . . basic identity and existence of the company come back clean." Indeed, Acima Credit has boasted of usually requiring only 24 hours to approve a merchant and "same day activation."

101.    The agreements between Acima Credit and its merchant partners contained this or similar language: "[Acima] is a provider of Lease/Purchase Services ('Services') to consumers and Merchant wishes to offer the Services to eligible customers of Merchant and Merchant wishes to allow its customers the option of utilizing the Services . . . [Acima] agrees to provide the Services for Merchant's selected customers and agrees to provide the Services to eligible customers."

102.    The agreements never explicitly stated that Acima Credit was purchasing the goods from the merchant partner.

103.    The agreements referred to Acima Credit's payments to merchants as "funding."

104.    Many of the agreements required that the merchant pay a per transaction fee to Acima Credit.

105.    Acima Credit's deceptive marketing and training materials, along with inadequate training generally, created the likelihood that merchants would market the product inaccurately.

106.    Merchant training materials have focused on the logistics of creating agreements rather than the specifics of the Acima Credit product.

107.	Merchant training videos sometimes described consumers as purchasing goods from merchants using Acima financing.

108.	The merchant training "manual" through approximately July 2019 characterized the product as a "loan/lease," referred to a "90-day CASH option," and describes early purchase options as "buy out[s]."

109.	References to a "90-day cash option" occur in communications with merchants through at least 2020.

110.	Meanwhile, advertising to merchants used the term "credit."

111.	Allred personally reviewed or approved many of Acima Credit's merchant marketing and training materials.

112.	Although it encouraged merchants to advertise its product themselves, Acima Credit also did not sufficiently monitor how the merchants did so, enabling the dissemination of deceptive materials.

113.	It was only in at the earliest late 2019 that Acima Credit began circulating a document to at least some merchants called "How to Talk Acima," which instructed them not to use language like "90 Days Same as Cash" or "Finance/Credit"—even though it was still using "Credit" in its own name.

114.	Until late 2019, Acima Credit lacked a system or other resources to monitor how the merchants advertised Acima's product, resulting in a review of retailer's marketing materials on only "an ad-hoc basis."

115.     Through at least 2021, Acima Credit was aware that merchants often misrepresented Acima's financing product, sometimes through repeating the deceptive statements in the materials Acima used to market to and train merchants.

116.     In addition to the many deceptive advertisements turned up by internal review, Acima Credit received many complaints over the years and through at least 2020 that consumers did not understand that Acima Credit purportedly regarded the product as a lease, what the total cost of the goods over the course of the full agreement term would be, and how the early purchase option worked.

117.     Yet Acima Credit rarely, if ever, terminated merchants for using deceptive advertisements or misleading consumers.

118.     Through at least late 2020, Allred had final authority over whether a merchant partner continued to work with Acima Credit.

<u>AUTOPAY AND ACH/EFT</u>

119.     Through at least 2021, when entering an agreement with Acima Credit, consumers had to authorize payment through preauthorized electronic fund transfers (EFTs) via recurring debits from their bank account, through either ACH or (for favored merchants) a debit card. As Allred wrote, "We will force them to sign the [ACH] acceptance [included in the agreement] or we will not do the lease."

120.     From at least 2015-2017, when consumers' ACH (and possibly also debit card) payments failed, Acima informed them by email, "Payment by ACH is required for all regular payments, as agreed to in your lease."

121.     The email templates containing this language were sent to Allred for his review.

122.     In at least 2018 through 2020, when consumers' ACH (and possibly also debit card) payments failed, Acima Credit informed them by email, "As part of your lease, you agreed to provide us with a valid checking account. . . . Failure to provide a valid checking account represents an immediate default under your lease agreement."

123.     Allred reviewed and provided extensive comments on the set of templates that included the emails containing this language.

124.     Through at least 2017, if a consumer attempted to change the bank account from which Acima Credit was authorized to withdraw via ACH (and possibly also debit card), as long as Acima Credit believed the original account to still be in good standing, Acima Credit instructed customer service representatives, "[Y]ou MUST tell the customer the following 'In the event that payments are returned from the new ACH, we will keep the prior checking account on file per your lease agreement as a back up form of payment.'" In other words, Acima Credit did not actually permit consumers to fully revoke ACH authorization for any given account.

125.     When a consumer turned off autopay, Acima Credit stated to the consumer that they were contractually obligated to maintain autopay. This remained Acima's practice through at least early 2021.

126.     In fact, pursuant to Acima Credit's written agreements, consumers are technically permitted to cancel the recurring ACH or debit card authorization after the

consumer's first renewal payment. They are also not required to maintain an authorization on any particular account.

<u>ACIMA'S FURNISHING AND PRESCREENED LISTS ACTIVITIES</u>

127.    Since at least May 2017, Acima Credit has furnished consumer information about millions of agreements to CRAs for inclusion in a consumer report. Acima Credit has furnished a variety of information for each contract, including account type, highest creditor loan amount, term duration, scheduled monthly payment amount, current balance, amount past due, and "special comments."

128.    In numerous ways, Acima Credit failed to establish and implement reasonable written policies and procedures regarding the accuracy and integrity of the information relating to consumers that it furnished CRAs. For instance:

   a.   Acima Credit furnished consumer information for at least several months before Acima developed the required written policies and procedures.

   b.   Acima's Credit Reporting Guide (the Guide) contained instructions for the furnishing of incorrect information. For instance, the Guide directed Acima to report as outstanding a balance that had not accrued.

   c.   Acima Credit's policies and procedures have not adequately instructed how to conduct reasonable and timely investigations when consumers submit direct or indirect disputes, as defined by FCRA and Regulation V (Direct Dispute and Indirect Dispute). They have failed to identify what factors should be considered to conduct a reasonable

investigation of different types of disputes, and they have lacked

provisions to ensure disputes are resolved within the time period

required by law. Further, they have impermissibly conditioned a

reasonable investigation of an allegation of fraud or identity theft on

the consumer's submission of a police report.

129.    On numerous occasions, Acima Credit furnished inaccurate consumer

information to CRAs, such as inaccurate information about the consumer's loan

amount, scheduled monthly payment, and credit balance. Acima Credit knew the

information it reported did not conform to the reality of its consumers' accounts.

130.    Acima Credit did not clearly and conspicuously specify to consumers an

address for submitting a notice of inaccurate information.

131.    On numerous occasions when a consumer submitted a Direct or Indirect

Dispute, Acima Credit failed to conduct a reasonable investigation that included a

review of all relevant information provided by the consumer or CRA. For instance, when

a consumer alleged fraud or identity theft, Acima Credit failed to investigate unless the

consumer submitted a police report.

132.    Since at least May 2017, Acima Credit has also reported negative

information about consumers' delinquencies, late payments, insolvency, or other forms

of default, including when consumers were past-due on a payment or that a consumer

who entered into an ESO had settled for less the outstanding balance. Acima Credit

failed to adequately notify consumers when reporting this negative information. Prior to

approximately June 27, 2017, Acima Credit provided consumers no written notice prior

to or within 30 days of the negative reporting. After that, Acima Credit provided written notification that it may furnish negative information to some, but not all, consumers about whom it furnished negative information.

133. Finally, between at least 2015 and 2019, Acima Credit obtained numerous "prescreened" lists from CRA(s), based on certain criteria Acima Credit specified, that provided information about consumers who had not authorized these reports, such as their names, contact information, creditworthiness and credit standing. Acima Credit then targeted at least hundreds of thousands of consumers with marketing and solicitation materials using these lists.

134. Allred was directly involved with and knowledgeable about Acima Credit's prescreened list practices. He first "authorized" Acima Credit's policies and procedures governing prescreened lists and signed the CRA contract(s) enabling the activity. He then directed and supervised Acima Credit's retrieval and use of particular prescreened lists.

THE FEDERAL CONSUMER FINANCIAL LAWS

THE CFPA

135. Sections 1031 and 1036 of the CFPA prohibit a "covered person" from committing or engaging in any "unfair, deceptive, or abusive act or practice" in connection with "any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

136.    The CFPA defines "covered person" to mean "any person that engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6).

137.    The CFPA defines "financial product or service" to include "extending credit and servicing loans." 12 U.S.C. § 5481(15)(A)(i).

138.    The CFPA defines "credit" to mean "the right granted by a person to a consumer to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment for such purchase." 12 U.S.C. § 5481(7).

139.    The Acima Companies have extended "credit" because Acima's agreements have allowed consumers "to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment for such purchase."

140.    In the alternative, the Acima Companies have offered credit, including by leading consumers to reasonably believe that they were offering to allow the consumer to purchase property or services and defer payment for such purchase. The Acima Companies have thus "offered" a consumer financial product or service. *See* 12 U.S.C. § 5531(a).

141.    Acima Credit and Acima Holdings are thus "covered persons."

142.    Allred is a "related person" under the CFPA, and thus also a "covered person." 12 U.S.C. § 5481(25)(B), (C).

143.    An act or practice is deceptive under the CFPA if (1) there is a representation, omission, or practice that (2) is likely to mislead consumers acting reasonably under the circumstances and (3) the representation, omission, or practice is material.

144. An act or practice is unfair under the CFPA if (1) the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and (2) such substantial injury is not outweighed by countervailing benefits to consumers or to competition.

145. An act or practice is abusive under the CFPA if it, among other things, "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service." 12 U.S.C. § 5531(d)(1).

EFTA AND REGULATION E

146. EFTA provides that "No person may . . . condition the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers." 15 U.S.C. § 1693k.

147. Regulation E similarly provides that "No financial institution or other person may condition an extension of credit to a consumer on the consumer's repayment by preauthorized electronic fund transfers[.]" 12 C.F.R. § 1005.10(e)(1).

148. Regulation E defines "person" as "a natural person or an organization, including a corporation, government agency, estate, trust, partnership, proprietorship, cooperative, or association." 12 C.F.R. § 1005.2(j).

149. Regulation E defines "preauthorized electronic fund transfer" as "an electronic fund transfer authorized in advance to recur at substantially regular intervals." 12 C.F.R. § 1005.2(k).

150. Acima Credit and Acima Holdings meet the definition of "person" in Regulation E.

151.    The preauthorized electronic fund transfers (EFTs) that Acima extracted from consumers' bank accounts via ACH and debit card debits meet the definition of "preauthorized electronic fund transfer" in Regulation E.

TILA AND REGULATION Z

152.    TILA defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f).

153.    Under Regulation Z, a "creditor" includes "a person who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments (not including a down payment), and to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract." 12 C.F.R. § 1026.2(a)(17).

154.    Acima Credit and Acima Holdings meet the definition of "creditor" under TILA and Regulation Z because:

   a.   they extended credit to at least tens of thousands of consumers every year;

   b.   their contracts featured a "finance charge," as they resulted in consumers' generally paying more than double the cash price of the financed merchandise or service over the standard 12-month payment period, and that cost was imposed directly or indirectly by Acima as an incident to the extension of credit, 12 C.F.R. § 1026.4(a);

   c.   consumers made more than four installment payments to Acima pursuant to their contracts; and

d. the obligation was initially payable, on the face of Acima's contracts, to Acima.

155. TILA and Regulation Z define "credit sale" as a "sale in which the seller is a creditor." 15 U.S.C. § 1602(h); 12 C.F.R. § 1026.2(a)(16).

156. To the extent they are a "seller," Acima Credit and Acima Holdings are a "seller" because they purchase merchandise or services from their merchant partners, which they then sell to consumers through their consumer contracts.

157. Regulation Z's definition of "credit sale" includes contracts "(unless terminable without penalty at any time by the consumer) under which the consumer: (i) agrees to pay as compensation for use a sum substantially equivalent to, or in excess of, the total value of the property and service involved; and (ii) will become (or has the option to become), for no additional consideration or for nominal consideration, the owner of the property upon compliance with the agreement." 12 C.F.R. § 1026.2(a)(16).

158. From 2013 to at least 2021, Acima consumers: (1) agreed to pay as compensation for use a sum substantially equivalent to, or in excess of, the total value of the goods involved; and (2) would become (or had the option to become), for no additional consideration or for nominal consideration, the owner of the goods upon compliance with the agreement.

159. From 2013 to at least 2021, the Acima Companies were a creditor whose agreements with consumers qualified as "credit" and (to the extent they are a "seller") "credit sales" under TILA and Regulation Z. 12 C.F.R. § 1026.2(a)(14), (16).

160.    FCRA and Regulation V impose on "furnishers" requirements and prohibitions concerning the implementation of policies and procedures, the reporting of inaccurate information, and the investigation of Direct and Indirect Disputes. 15 U.S.C. § 1681s-2; 12 C.F.R. § 1022.42-.43(a). Since at least May 2017, Acima Credit has been a "furnisher" under FCRA and Regulation V because it "furnish[ed] information relating to consumers to one or more consumer reporting agencies for inclusion in a consumer report." 12 C.F.R. § 1022.41(c).

161.    FCRA further requires "financial institutions" that extend credit and regularly furnish information to a nationwide consumer reporting agency to provide consumers certain notification when furnishing negative information. 15 U.S.C. § 1681s-2(a)(7)(A)(i), (B). Since they began operations, the Acima Companies have been a "financial institution" within the meaning of FCRA because they extended credit. *See* 15 U.S.C. §§ 1681s-2(a)(7)(G)(ii), 6809(3)(A); 12 U.S.C. § 1843(k)(4)(A); 12 C.F.R. § 1016.3(l)(1).

162.    FCRA defines a "consumer report" to include: "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (A) credit or insurance to be used primarily for personal,

family, or household purposes; (B) employment purposes; or (C) any other purpose authorized under section 1681b [(section 604)]." 15 U.S.C. § 1681a(d)(1).

163.    The Acima Companies purchased from CRA(s) prescreened lists containing information about consumers, including their names, contact information, and credit worthiness and credit standing. These lists were therefore "consumer reports" under FCRA. 15 U.S.C. § 1681a(d)(1).

164.    FCRA prohibits "persons" from using or obtaining a consumer report (including a prescreened list) unless the person obtains it for a permissible purpose and the purpose is certified by the prospective user of the report. 15 U.S.C. § 1681b(f). Acima Credit, Acima Holdings, and Allred are "persons" under FCRA. 15 U.S.C. § 1681a(b).

<u>DEFENDANTS' VIOLATIONS OF LAW</u>

<u>COUNT I: DECEPTIVE ACTS OR PRACTICES IN VIOLATION OF THE CFPA</u>
(Against Acima Credit, Acima Holdings, and Allred)

*The Acima Companies and Allred used the misleading phrases "90 days same as cash" and similar in advertisements for its financing.*

165.    The Bureau incorporates and re-alleges by reference Paragraphs 17-18, 19-26, 71-77, and 135-145.

166.    From 2015 to at least 2020, the Acima Companies marketed their product directly to consumers as though it was a 90-day loan with no interest or a minimal fee, using phrases like "90 day option," "90 days same as cash," "90 day cash option," or "for only [$fee]," without providing any further explanation of Acima's "rental-purchase" or "lease-purchase" financing.

167. The Acima Companies' use of these phrases in their advertisements was material and likely to mislead consumers acting reasonably under the circumstances as to the nature of the financing arrangement.

168. During his employment Acima, Allred participated directly in or had the authority to control this conduct and was or should have been aware of it.

169. As a result, Acima Credit, Acima Holdings, and Allred engaged in deceptive acts or practices, in violation of sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

## COUNT II: DECEPTIVE ACTS OR PRACTICES IN VIOLATION OF THE CFPA
### (Against Acima Credit, Acima Holdings, and Allred)

*The Acima Companies and Allred deceptively represented to consumers that their contracts required the maintenance of "autopay."*

170. The Bureau incorporates and re-alleges by reference Paragraphs 17-18, 19-26, 119-126, and 135-145.

171. Until at least 2020, the Acima Companies represented to some consumers attempting to discontinue autopay that their contracts required maintaining it.

172. In fact, consumers were contractually permitted to discontinue autopay after their first payment.

173. Until at least 2017, the Acima Companies represented to some consumers who sought to update the account from which their autopay was withdrawn that they were required to maintain their prior account as a "backup."

174. In fact, consumers were not required under Acima contracts to maintain on file any "backup" accounts with ACH authorizations.

175. These statements were material and likely to mislead consumers acting reasonably under the circumstances as to their rights under their contracts with Acima.

176. During his employment at Acima, Allred participated directly in the conduct of representing that consumers were contractually required to maintain autopay or had the authority to control this conduct and was or should have been aware of it.

177. As a result, Acima Credit, Acima Holdings, and Allred engaged in deceptive acts or practices, in violation of sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

## COUNT III: UNFAIR ACTS OR PRACTICES IN VIOLATION OF THE CFPA
### (Against Acima Credit and Acima Holdings)

*The Acima Companies obstructed consumers' ability to revoke ACH authorizations.*

178. The Bureau incorporates and re-alleges by reference Paragraphs 17-18, 119-126, and 135-145.

179. Until at least 2017, the Acima Companies represented to some consumers who sought to update the account from which their autopay was withdrawn that they were required to maintain their prior account as a "backup."

180. This practice caused substantial injury to consumers by misleading them about their ability to revoke ACH authorizations, causing them to have to maintain money in accounts they no longer wanted to use or experience nonsufficient-funds fees.

181. This harm was not reasonably avoidable by consumers because they could not prevent the Acima Companies from making unauthorized withdrawals from previously-authorized accounts.

182.    This substantial injury is not outweighed by countervailing benefits to consumers or to competition.

183.    As a result, Acima Credit and Acima Holdings engaged in unfair acts or practices, in violation of sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a), (c), 5536(a)(1)(B).

<u>COUNT IV: DECEPTIVE ACTS OR PRACTICES IN VIOLATION OF THE CFPA</u>
(Against Acima Credit, Acima Holdings, and Allred)

*The Acima Companies and Allred misrepresented consumers' ability to return goods and the means by which returns could be accomplished.*

184.    The Bureau incorporates and re-alleges by reference Paragraphs 17-18, 19-26, 78-97, and 135-145.

185.    From at least 2015 to the present, the Acima Companies represented that consumers may terminate their agreements at any time (or, initially, after a 60-day initial period) by returning the goods. Until approximately 2021, the Acima Companies also sometimes represented that Acima (acting through a third party) would pick up goods consumers wished to return.

186.    In fact, the Acima Companies created barriers to returns. Goods could not be returned at all under certain circumstances, and returns were not practically possible for many types of items. From approximately January 2017 through at least approximately 2021, the Acima Companies did not pick up goods from consumers.

187.    The Acima Companies' description of its return policies and procedures was material and likely to mislead consumers acting reasonably under the circumstances as to the availability of returns.

188.    During his employment at Acima, Allred participated directly in or had the authority to control this conduct and was or should have been aware of it.

189.    The Acima Companies' description of its return policies and procedures was material and likely to mislead consumers acting reasonably under the circumstances as to the availability of returns. As a result, Acima Credit, Acima Holdings, and Allred engaged in deceptive acts or practices, in violation of sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

COUNT V: UNFAIR ACTS OR PRACTICES IN VIOLATION OF THE CFPA
(Against Acima Credit, Acima Holdings, and Allred)

*The Acima Companies and Allred created unfair barriers to returns.*

190.    The Bureau incorporates and re-alleges by reference Paragraphs 17-18, 19-26, 78-97, and 135-145.

191.    From at least 2015 to the present, the Acima Companies have created several barriers to returns.

192.    Goods could not be returned at all under certain circumstances, and returns were not practically possible for many types of items.

193.    These practices caused substantial injury to consumers by making it considerably more difficult to return goods.

194.    This harm was not reasonably avoidable by consumers because they were not informed in advance of these requirements and did not necessarily have the ability to fulfill them.

195.    This substantial injury is not outweighed by countervailing benefits to consumers or to competition.

196.    During his employment at Acima, Allred participated directly in or had the authority to control this conduct and was or should have been aware of it.

197.    As a result, Acima Credit, Acima Holdings, and Allred engaged in unfair acts or practices, in violation of sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a), (c), 5536(a)(1)(B).

### COUNT VI: UNFAIR ACTS OR PRACTICES IN VIOLATION OF THE CFPA
(Against Acima Credit, Acima Holdings, and Allred)

*The Acima Companies and Allred provided deceptive statements to and failed to adequately train and monitor their merchant partners.*

198.    The Bureau incorporates and re-alleges by reference Paragraphs 17-18, 19-26, 98-118, and 135-145.

199.    From at least 2015 to at least 2020, the Acima Companies provided deceptive and inadequate advertisements and training to merchants that created the likelihood merchants would misrepresent the terms of the agreements, mislead consumers about the ease of returns, and create confusion about whether the product was a lease or credit.

200.    From at least 2015 to at least 2019, the Acima Companies did not sufficiently monitor how the merchants independently advertised the product, enabling the dissemination of deceptive materials.

201.    From at least 2015 to at least 2020, the Acima Companies were aware that merchants often misrepresented the nature and terms of Acima's financing product.

202.    These practices caused substantial injury to consumers by misleading them about the price and other terms of the product and their ability to terminate the

contract, resulting in consumers' making significantly greater payments than anticipated.

203. This harm was not reasonably avoidable by consumers because they could not prevent the merchants' deceptive marketing, and Acima's application process interfered with consumers' understanding of the agreement.

204. This substantial injury is not outweighed by countervailing benefits to consumers or to competition.

205. During his employment at Acima, Allred participated directly in or had the authority to control this conduct and was or should have been aware of it.

206. As a result, Acima Holdings, Acima Credit, and Allred engaged in unfair acts or practices, in violation of sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a), (c), 5536(a)(1)(B).

COUNT VII: ABUSIVE ACTS OR PRACTICES IN VIOLATION OF THE CFPA
(Against Acima Credit, Acima Holdings, and Allred)

*The Acima Companies and Allred materially interfered with consumers' ability to understand the terms and conditions of their agreements through their mobile application and contracting process.*

207. The Bureau incorporates and re-alleges by reference Paragraphs 17-18, 19-26, 45-70, and 135-145.

208. From at least approximately 2015 to the present, the Acima Companies designed and implemented a mobile application and contracting process that materially interfered in numerous ways with consumers' ability to understand that Acima purported that its product was a lease, how much it cost, and what the financial consequences of not electing the 90-day purchase option were. Among other things, the

process: (1) directed the consumer to the application through statements that misrepresented the nature of the product; (2) deprived consumers of the opportunity to even see the terms and conditions until the check-out process; (3) made it difficult for the consumer to read the agreement; and (4) obscured the cost of the product.

209. During his employment at Acima, Allred participated directly in or had the authority to control this conduct and was or should have been aware of it.

210. As a result, Acima Credit, Acima Holdings, and Allred engaged in abusive acts or practices, in violation of sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a), (d)(1), 5536(a)(1)(B).

<u>COUNT VIII: DECEPTIVE ACTS OR PRACTICES IN VIOLATION OF THE CFPA</u>
(Against Acima Credit, Acima Holdings, and Allred)

*In the alternative, if Acima did not extend credit, then the Acima Companies and Allred misrepresented the product as credit.*

211. The Bureau incorporates and re-alleges by reference Paragraphs 17-18, 19-26, 36-44, and 135-145.

212. The Acima Companies' marketing indicated that their product was credit, including by allowing consumers to purchase property and delay payment for it.

213. If the Acima Companies did not extend credit within the meaning of 12 U.S.C. § 5481(15)(A)(i), then their marketing and advertising was deceptive.

214. If the Acima Companies did not extend credit within the meaning of 12 U.S.C. § 5481(15)(A)(i), this marketing was material and likely to mislead consumers acting reasonably under the circumstances about the nature, terms, and price of Acima's financing.

215.     During his employment at Acima, Allred participated directly in or had the authority to control this conduct and was or should have been aware of it.

216.     As a result, if the Acima Companies did not extend credit within the meaning of 12 U.S.C. § 5481(15)(A)(i), then Acima Holdings, Acima Credit, and Allred engaged in deceptive acts or practices, in violation of sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

COUNT IX: PROVIDING SUBSTANTIAL ASSISTANCE IN VIOLATING THE CFPA
(Against Allred)

*Allred provided substantial assistance to the Acima Companies in their deceptive, unfair, and abusive acts or practices.*

217.     The Bureau incorporates and re-alleges by reference Paragraphs 17-18, 19-26, 36-126, and 135-145.

218.     Section 1036(a)(3) of the CFPA prohibits any person from "knowingly or recklessly provid[ing] substantial assistance to a covered person or service provider in violation of the provisions of section 1031" and states that "the provider of such substantial assistance shall be deemed to be in violation of that section to the same extent as the person to whom such assistance is provided." 12 U.S.C. § 5536(a)(3).

219.     The Acima Companies engaged in deceptive, unfair, and abusive acts or practices, as alleged in Counts I-VIII.

220.     Allred knew, or recklessly avoided knowing, of the deceptive, unfair, and abusive acts or practices the Acima Companies engaged in, as alleged in Counts I-II and IV-VIII. Allred directly engaged in or oversaw, among other things, the design of the economic structure of Acima's product, the determination of the product's contractual

terms, the marketing of the product to and communications with consumers and merchant partners, the management of merchant partners, the enrollment of consumers in the product, and the servicing of the product.

221.     Allred provided substantial assistance to Acima Credit and Acima Holdings in their deceptive, unfair, and abusive acts or practices, in violation of section 1036(a)(3) of the CFPA. 12 U.S.C. § 5563(a)(3).

## COUNT X: VIOLATIONS OF TILA AND REGULATION Z
(Against Acima Credit and Acima Holdings)

*The Acima Companies failed to provide required disclosures in connection with their agreements.*

222.     The Bureau incorporates and re-alleges by reference Paragraphs 17-18, 36-44, 67, and 152-159.

223.     TILA and Regulation Z require creditors to provide consumers with specified disclosures for closed-end credit transactions. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17, 1026.18.

224.     Among other requirements, the Regulation prescribes the format of the disclosures, as well as disclosure of certain terms themselves, such as the annual percentage rate and finance charge. 12 C.F.R. §§ 1026.17, 1026.18.

225.     From at least 2013 to the present, the Acima Companies were creditors whose financing qualified as "credit" under TILA and Regulation Z, and their agreements with consumers were therefore subject to TILA and Regulation Z's disclosure requirements. *See* 12 C.F.R. § 1026.2(a)(14).

226. From at least 2013 to the present, to the extent that they are a "seller," the Acima Companies were creditors whose financing qualified as "credit sales" under TILA and Regulation Z, and their agreements with consumers were therefore subject to TILA and Regulation Z's disclosure requirements. *See* 12 C.F.R. § 1026.2(a)(16).

227. Since at least 2013, the Acima Companies have not provided such disclosures before consummation of the agreements.

228. As a result, Acima Credit and Acima Holdings violated TILA and Regulation Z. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17, 1026.18.

## COUNT XI: VIOLATIONS OF THE CFPA BY VIOLATING TILA AND REGULATION Z
(Against Acima Credit and Acima Holdings)

*The Acima Companies violated the CFPA by violating TILA and Regulation Z.*

229. The Bureau incorporates and re-alleges by reference Paragraphs 17-18, 36-44, 67, and 152-159.

230. The CFPA defines "Federal consumer financial law" to include TILA and its implementing Regulation Z. 12 U.S.C. § 5481(14).

231. Under the CFPA, covered persons' violations of Federal consumer financial laws are violations of section 1036 of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

232. As a result, the Acima Companies' violations of TILA and Regulation Z, as described in Count X, constitute violations of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

## COUNT XII: VIOLATIONS OF EFTA AND REGULATION E
(Against Acima Credit and Acima Holdings)

*The Acima Companies impermissibly conditioned the extension of credit on consumers' repayment by preauthorized EFTs.*

233. The Bureau incorporates and re-alleges by reference Paragraphs 17-18, 119-126, and 146-151.

234. Since at least 2015, Acima's contracts have required most consumers to authorize recurring ACHs or debit card payments from their bank accounts for the "renewal" payments. Consumers were not contractually permitted to withdraw this authorization until after making the first renewal payment.

235. With this requirement, the Acima Companies impermissibly conditioned the extension of credit on repayment by preauthorized electronic fund transfers.

236. As a result, Acima Credit and Acima Holdings violated EFTA and Regulation E. 15 U.S.C. § 1693k; 12 C.F.R. § 1005.10(e)(1).

<u>COUNT XIII: VIOLATIONS OF THE CFPA BY VIOLATING EFTA<br>AND REGULATION E</u>
(Against Acima Credit and Acima Holdings)

*The Acima Companies violated the CFPA by violating EFTA and Regulation E.*

237. The Bureau incorporates and re-alleges by reference Paragraphs 17-18, 119-126, and 146-151.

238. The CFPA defines "Federal consumer financial law" to include EFTA and its implementing Regulation E. 12 U.S.C. § 5481(14).

239. Under the CFPA, covered persons' violations of Federal consumer financial law are violations of section 1036 of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

240. As a result, Acima Credit's and Acima Holdings' violations of EFTA and Regulation E, as described in Count XII, constitute violations of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

<u>COUNT XIV: VIOLATIONS OF FCRA AND REGULATION V</u>
(Against Acima Credit and Acima Holdings)

*The Acima Companies failed to establish and implement reasonable written policies and procedures concerning the accuracy and integrity of consumer information that it furnished.*

241.    The Bureau incorporates and re-alleges by reference Paragraphs 17-18, 127-134, and 160-164.

242.    FCRA and Regulation V require a furnisher to establish and implement reasonable written policies and procedures regarding the accuracy and integrity of the consumer information that it furnishes to a CRA, and further provide that the policies and procedures must be appropriate to the nature, size, complexity, and scope of each furnisher's activities. 15 U.S.C. §§ 1681, *et seq.*; 12 C.F.R. § 1022.42(a).

243.    Section 1022.42(b) of Regulation V requires furnishers to consider the guidelines in Appendix E of Regulation V in developing appropriate policies and procedures and to incorporate them where appropriate. 12 C.F.R. § 1022.42(b).

244.    Appendix E of Regulation V provides that a furnisher's policies and procedures should be reasonably designed to promote the furnishing of accurate information and the reasonable investigation of disputes. 12 C.F.R. § 1022, App. E.

245.    Since at least May 2017, the Acima Companies have furnished consumer information about millions of consumer agreements that they serviced during this period.

246.    Given the size, complexity, and scope of the Acima Companies' furnishing activities, the Acima Companies have, since at least May 2017, failed to establish or implement reasonable written policies and procedures regarding the accuracy and

integrity of the consumer information that they furnished to consumer reporting agencies, in violation of Regulation V, 12 C.F.R. § 1022.42(a).

247.    As a result, Acima Credit and Acima Holdings violated FCRA and Regulation V. 15 U.S.C. §§ 1681, *et seq.*; 12 C.F.R. § 1022.42(a), (b).

COUNT XV: VIOLATIONS OF FCRA
(Against Acima Credit and Acima Holdings)

*The Acima Companies furnished inaccurate information.*

248.    The Bureau incorporates and re-alleges by reference Paragraphs 17-18, 127-134, and 160-164.

249.    Section 623(a)(1)(A) of FCRA prohibits a furnisher from reporting to a CRA any consumer information the furnisher knows or has reasonable cause to believe is inaccurate. 15 U.S.C. § 1681s-2(a)(1)(A).

250.    Since at least May 2017, the Acima Companies have furnished inaccurate information about millions of consumers to CRAs. The inaccurate information included information about the loan type and amount and the consumer's outstanding balance.

251.    The Acima Companies knew or had reasonable cause to believe that the information was inaccurate because they were aware that it did not conform to the reality of their consumers' accounts, such as the terms of their agreements or their outstanding balances.

252.    As a result, Acima Credit and Acima Holdings violated FCRA. 15 U.S.C. § 1681s-2(a)(1)(A).

## COUNT XVI: VIOLATIONS OF FCRA
### (Against Acima Credit and Acima Holdings)

*The Acima Companies failed to conduct reasonable investigations.*

253.    The Bureau incorporates and re-alleges by reference Paragraphs 17-18, 127-134, and 160-164.

254.    Section 623(a)(8)(E)(i)-(ii) of FCRA and its implementing provisions in Regulation V require a furnisher to conduct a reasonable investigation of a Direct Dispute that includes a review of all relevant information provided by the consumer with the dispute notice. 15 U.S.C. § 1681s-2(a)(8)(E)(i)-(ii); 12 C.F.R. § 1022.43(a), (e)(1)-(2).

255.    Similarly, section 623(b)(1)(A)-(B) of FCRA requires a furnisher to conduct a reasonable investigation of an Indirect Dispute that includes a review of all relevant information provided by the CRA. 15 U.S.C. § 1681s-2(b)(1)(A)-(B).

256.    Since at least May 2017, the Acima Companies have failed to conduct reasonable investigations of numerous Direct and Indirect Disputes, including refusing to conduct a reasonable investigation of any dispute where a consumer alleged fraud or ID theft and did not submit a police report.

257.    Acima Credit and Acima Holdings therefore violated sections 623(a)(8)(E)(i)-(ii) and 623(b)(1)(A)-(B) of FCRA, 15 U.S.C. § 1681s-2(a)(8)(E)(i)-(ii), (b)(1)(A)-(B), and 12 C.F.R. § 1022.43(a), (e)(1)-(2), by failing to conduct reasonable investigations of numerous Direct and Indirect Disputes.

## COUNT XVII: VIOLATIONS OF FCRA
### (Against Acima Credit and Acima Holdings)

*The Acima Companies failed to adequately notify consumers when furnishing negative information.*

258.    The Bureau incorporates and re-alleges by reference Paragraphs 17-18, 127-134, and 160-164.

259.    Whenever a financial institution like Acima furnishes negative information concerning a customer's delinquencies, late payments, insolvency, or any form of default to a CRA, it must provide written notification of the furnishing to the consumer "prior to, or no later than 30 days after, furnishing the negative information." 15 U.S.C. § 1681s-2(a)(7)(A)(i), (B). But after providing such notice, the financial institution may furnish "additional negative information . . . with respect to the same transaction, extension of credit, account, or customer without providing additional notice to the customer." 15 U.S.C. § 1681s-2(a)(7)(A)(ii).

260.    Prior to approximately June 27, 2017, the Acima Companies failed to provide consumers any notice alerting them to the furnishing of negative information.

261.    Since then, the Acima Companies have failed to provide the requisite notice to consumers who had not been past due but about whom the Acima Companies nonetheless furnished negative information, such as about an ESO.

262.    As a result, Acima Credit and Acima Holdings violated FCRA by failing to notify consumers when furnishing negative information. 15 U.S.C. § 1681s-2(a)(7)(A)-(B).

## COUNT XVIII: VIOLATIONS OF FCRA
### (Against Acima Credit, Acima Holdings, and Allred)

*In the alternative, the Acima Companies and Allred unlawfully obtained and used prescreened lists.*

263.    The Bureau incorporates and re-alleges by reference Paragraphs 17-18, 19-26, 127-134, and 160-164.

264.    FCRA prohibits persons from using or obtaining a consumer report unless the person obtains it for a permissible purpose and the purpose is certified by the prospective user of the report. 15 U.S.C. § 1681b(f).

265.    FCRA provides that a person lacks a permissible purpose to obtain or use a prescreened consumer report unless, among other things, the consumer authorizes the CRA to provide such report to such person, or the person provides the consumers it contacts using the report with "a firm offer of credit or insurance." 15 U.S.C. § 1681b(c).

266.    Between at least 2015 and 2019, Acima obtained numerous "prescreened" lists from CRA(s), based on certain criteria Acima specified, that provided information about consumers who had not authorized these reports.

267.    Further, if the Acima Companies have not extended credit, then the marketing and solicitation materials that Acima sent to prospective consumers using prescreened lists did not include a firm offer of credit or insurance, and thus the Acima Companies did not have a permissible purpose for obtaining or using the prescreened lists.

268.    During his employment at Acima, Allred participated directly in or had the authority to control this conduct and was or should have been aware of it.

269.     As a result, if the Acima Companies did not extend credit, then Acima Credit, Acima Holdings, and Allred used or obtained consumer reports without a permissible purpose, in violation of FCRA. 15 U.S.C. § 1681b(c), (f).

## COUNT XIX: VIOLATIONS OF THE CFPA BY VIOLATING FCRA AND REGULATION V

(Against Acima Credit, Acima Holdings, and Allred)

*The Acima Companies and Allred Violated the CFPA by Violating FCRA and Regulation V.*

270.     The Bureau incorporates and re-alleges by reference Paragraphs 17-18, 19-26, 127-134, and 160-164.

271.     The CFPA defines "Federal consumer financial law" to include FCRA and its implementing Regulation V. 12 U.S.C. § 5481(14).

272.     Under the CFPA, covered persons' violations of Federal consumer financial law are prohibited. 12 U.S.C. § 5536(a)(1)(A).

273.     As a result, Acima Credit's and Acima Holdings' violations of FCRA and Regulation V, as described in Counts XIV-XVIII, and Allred's violations of FCRA, as described in Count XVIII, constitute violations of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

## DEMAND FOR RELIEF

274.     The Bureau requests that the Court, as permitted by 12 U.S.C. § 5565:

a.  Permanently enjoin Acima Credit, Acima Holdings, and Allred from committing future violations of the CFPA, EFTA and Regulation E, TILA and Regulation Z, and FCRA and Regulation V in connection with the advertising, marketing to merchants, enrollment process, terms, servicing, and reporting of their financing agreements;

b. Grant additional injunctive relief as the Court may deem just and proper;

c. Award monetary relief, including but not limited to rescission or reformation of the agreements; the refund of monies paid; restitution; disgorgement or compensation for unjust enrichment; and the payment of damages;

d. Award the Bureau civil money penalties;

e. Award the Bureau the costs of bringing this action; and

f. Award such other and additional relief as the Court may determine to be just and proper.

Dated: July 26, 2024

Respectfully submitted,

Eric Halperin
*Enforcement Director*

Thomas Kim
*Deputy Enforcement Director*

Susan Torres
*Assistant Litigation Deputy*

/s/ Sarah E. Trombley
Sarah E. Trombley
James D. Renner
Francesca L. Bartolomey
*Senior Litigation Counsels*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
202-435-9735
sarah.trombley@cfpb.gov
james.renner@cfpb.gov

francesca.bartolomey@cfpb.gov