Matthew P. Previn*
Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6049
Facsimile: (212) 551-0201
*admitted pro hac vice

Bradley J. Bondi*
Paul Hastings LLP
2050 M Street NW
Washington, DC 20036
Telephone: (202) 551-1700
Facsimile: (202) 303-7049
*admitted pro hac vice

Benson L. Hathaway, Jr. (Bar No. 4219)
Alyssa Nielsen (Bar No. 18066)
KIRTON McCONKIE
50 East South Temple, 4th Floor
P.O. Box 45120
Salt Lake City, Utah 84145-0120
Telephone: (801) 328-3600
bhathawa@kmclaw.com
anielsen@kmclaw.com

*Counsel for Defendants Acima Digital, LLC and Acima Holdings, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Plaintiff,<br><br>v.<br><br>ACIMA HOLDINGS, LLC, ACIMA DIGITAL, LLC (F/K/A ACIMA CREDIT, LLC, D/B/A ACIMA LEASING), and AARON ALLRED,<br><br>Defendants. | **DEFENDANTS ACIMA DIGITAL, LLC AND ACIMA HOLDINGS, LLC'S MOTION TO DISMISS**<br><br>Case No. 2:24-CV-00525-DBB<br><br>Judge David B. Barlow<br><br>Magistrate Judge Cecilia M. Romero |

Pursuant to Federal Rules of Civil Procedure 12(b)(6) and DUCivR 7-1(a), Defendants Acima Digital, LLC and Acima Holdings, LLC hereby respectfully move the Court to dismiss the CFPB's complaint in its entirety. Pursuant to DUCivR 7-1(a)(1), the foregoing motion (the "Motion") is supported by the following memorandum of law.

4903-4104-3719.v1

**TABLE OF CONTENTS**

RELIEF SOUGHT AND GROUNDS THEREFOR ................................................................ 1

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 4

ARGUMENT ...................................................................................................................... 8

I.   The CFPB's Current Funding Mechanism Is Unconstitutional and Not in Accordance with the Law. ........................................................................................................... 8

II.  The CFPB Does Not Have Statutory Authority To Regulate Acima's Lease-To-Own Transactions. ...................................................................................................... 11

    A.   Acima's Lease-To-Own Transactions Are Not "Credit" Transactions Under the CFPA, the TILA, and the EFTA. .................................................................... 12

    B.   Acima's Lease-To-Own Transactions Are Not the "Functional Equivalent" of Purchase Finance Arrangements under the CFPA. ............................................ 18

    C.   Acima's Lease-To-Own Transactions Are Not "Credit Sales" Under the TILA and its Implementing Regulation Z. .................................................................... 18

    D.   Acima Is Not a "Financial Institution" Under The FCRA. .................................. 22

III. The CFPB's Sudden Reinterpreation of the CFPA, the TILA, the EFTA, and Section 1681s-2(a)(7) of the FCRA Violated Acima's Due Process Right to Fair Notice ........... 23

IV.  The Court Should Dismiss Counts I–VIII Because the Complaint Fails To Allege Plausibly Any Deceptive, Unfair, or Abusive Practices. ................................................... 25

    A.   The CFPB Fails To Allege Plausibly that Acima's "90 Day Same As Cash" Marketing Is Deceptive (Count I). ..................................................................... 25

    B.   The CFPB Fails To Allege Plausibly That Acima Deceptively Represented to Customers an Obligation To Maintain "Autopay" (Counts II and III). ................. 27

    C.   The CFPB Fails To Allege Plausibly that Acima Deceptively Misrepresented Consumers' Ability To Return Goods or Created Unfair Barriers to Returns (Counts IV and V). ....................................................................................... 29

    D.   The CFPB Fails To Allege Plausibly that Acima Made Unfairly Deceptive Statements to or Failed To Train and Monitor Its Third Party Retailers (Count VI). ........................................................................................................ 30

    E.   The CFPB Fails To Allege Any Abusive Acts or Practices with Respect to Acima's "Text To Apply" Process (Count VII). ................................................. 31

4903-4104-3719.v1

F.    The CFPB Fails To Allege that Acima Misrepresented Its Lease-To-Own Transactions as Credit (Count VIII). ........................................................ 33

V.    Even if the TILA Applied to Acima's Lease-to-Own Transactions, Acima Made All Possible Disclosures Required by the TILA (Counts X and XI). ..................................... 33

VI.   The CFPB's Claims Are Time Barred In Part. ................................................... 34

CONCLUSION ................................................................................................................... 35

4903-4104-3719.v1

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................................7, 32

*Aslam v. U.S. Dep't of State*,
2023 WL 6163969 (D. Utah Sept. 21, 2023)............................................................4

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................7, 8, 26, 30

*Cent. Rents, Inc. v. Johnson* (*In re Johnson*),
203 B.R. 498 (Bankr. S.D. Ga. 1996) ................................................................21, 23

*CFPB v. Active Network, LLC*,
No 4:22-cv-00898-ALM (E.D. Tex. Oct. 7, 2024), ECF No. 51............................11

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
601 U.S. 416 (2024)..........................................................................................3, 8, 10

*CFPB v. Commonwealth Equity Grp.*,
LLC, 554 F. Supp. 3d 202 (D. Mass. 2021)............................................................25

*CFPB v. Frederick J. Hanna & Assocs., P.C.*,
114 F. Supp. 3d 1342 (N.D. Ga. 2015) ..................................................................27

*CFPB v. Gordon*,
819 F.3d 1179 (9th Cir. 2016) ................................................................................27

*CFPB v. Intercept Corp.*,
2017 WL 3774379 (D.N.D. Mar. 17, 2017) ........................................27, 28, 31, 32

*CFPB v. ITT Educ. Servs., Inc.*,
219 F. Supp. 3d 878 (S.D. Ind. 2015)................................................................31, 35

*CFPB v. Prime Marketing Hldgs., LLC*,
2016 WL 10516097 (C.D. Cal. Nov. 15, 2016)......................................................25

*CFPB v. Snap Fin. LLC*,
2024 WL 3625007 (D. Utah Aug. 1, 2024) ..................................................... *passim*

*CFPB v. SoLo Funds, Inc.*,
2024 U.S. Dist. LEXIS 189410 (C.D. Cal. Oct. 17, 2024)......................................12

4903-4104-3719.v1

*Chamber of Com. of U.S.A v. CFPB*,
   691 F. Supp. 3d 730 (E.D. Tex. 2023),
   *appeal docketed*, No. 23-40650 (5th Cir. Nov. 8, 2023) ..........................................................18

*Christopher v. SmithKline Beecham Corp.*,
   567 U.S. 142 (2012).............................................................................................................24, 25

*Clark v. Martinez*,
   543 U.S. 371 (2005).....................................................................................................................11

*Dodson v. Remco Enter., Inc.*,
   504 F. Supp. 540 (E.D. Va. 1980) ...............................................................................................21

*Dorton v. Kmart Corp.*,
   229 F. Supp. 3d 612 (E.D. Mich. 2017)..................................................................................14, 15

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016).....................................................................................................................24

*F.C.C. v. Fox TV Stations, Inc.*,
   567 U.S. 239 (2012).....................................................................................................................23

*FTC v. DIRECTV, Inc.*,
   2018 WL 3911196 (N.D. Cal. Aug. 16, 2018) ...........................................................................28

*FTC v. Freecom Comms., Inc.*,
   401 F.3d 1192 (10th Cir. 2005) ...................................................................................................25

*FTC v. LendingClub Corp.*,
   2018 WL 11436309 . (N.D. Cal. Oct. 3, 2018).............................................................................27

*Fuller v. Rent-A-Ctr., Inc.*,
   2020 WL 12772102 (W.D. Okla. Dec. 28, 2020)........................................................................14

*In re Hanley*,
   135 B.R. 311 (C.D. Ill. 1990) ................................................................................................20, 21

*Harold v. TMC Enter., LLC*,
   2016 WL 6069023 (W.D. Va. Oct. 17, 2016)...............................................................................16

*High Desert Relief, Inc. v. United States*,
   917 F.3d 1170 (10th Cir. 2019) .....................................................................................................9

*Homeway Rentals v. Martin* (*In re Martin*),
   64 B.R. 1 (Bankr. S.D. Ga. 1984)................................................................................................21

*Hughes Aircraft Co. v. Jacobson*,
   525 U.S. 432 (1999)......................................................................................................................12

iv

*Ill. v. Alta Colls., Inc.*,
  2014 WL 4377579 (N.D. Ill. Sept. 4, 2014) ...............................................................31

*Kisor v. Wilkie*,
  588 U.S. 558 (2019).....................................................................................................12

*Liberty Leasing Co. v. Machamer*,
  6 F. Supp. 2d 714 (S.D. Ohio 1998) ...........................................................................14

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024).................................................................................................12

*Maul v. Aaron's, Inc.*,
  2013 WL 12090304 (W.D. Okla. Mar. 19, 2013)........................................................14

*New Mexico v. DOI*,
  854 F.3d 1207 (10th Cir. 2017) ...................................................................................17

*Norton v. Ute Indian Tribe of the Uintah*,
  862 F.3d 1236 (10th Cir. 2017) .....................................................................................5

*Off. of Pers. Mgmt. v. Richmond*,
  496 U.S. 414 (1990).....................................................................................................10

*Ortiz v. Rental Mgmt., Inc.*,
  65 F.3d 335 (3d Cir. 1995)......................................................................................19, 20

*PHH Corp. v. CFPB*,
  839 F.3d 1 (D.C. Cir. 2016),
  *reinstated in relevant part on reh'g en banc*, 881 F.3d 75 (D.C. Cir. 2018),
  *abrogated on other grounds*, *Seila L. LLC v. CFPB*, 591 U.S. 197 (2020).......................24, 25

*In re Powers*,
  983 F.2d 88 (7th Cir. 1993) .........................................................................................23

*Reeside v. Walker*,
  52 U.S. 272 (1850).................................................................................................10, 11

*Remco Enter., Inc. v. Houston*,
  9 Kan. App. 2d 296 (1984) ..........................................................................................21

*Ridge at Red Hawk, L.L.C. v. Schneider*,
  493 F.3d 1174 (10th Cir. 2007) ...................................................................................30

*In re Roberts*,
  620 B.R. 336 (Bankr. D. N.M. 2020) ..........................................................................23

v

4903-4104-3719.v1

*Seila L. LLC v. CFPB*,
  591 U.S. 197 (2020) .................................................................................................. 11

*Starks v. Rent-A-Ctr.*,
  1994 WL 577974 (D. Minn. May 16, 1990) ............................................................. 20

*Texas v. Colony Ridge, Inc.*,
  No. H-24-0941 (S.D. Tex. Oct. 11, 2024), ECF No. 61 ........................................... 11

*Town of Dutch John v. Daggett Cnty.*,
  367 F. Supp. 3d 1290 (D. Utah 2019) ...................................................................... 22

*In re Vistaprint Corp Mktg. & Sales Prac. Litig.*,
  2009 WL 2884727 (S.D. Tex. Aug. 31, 2009),
  *aff'd sub nom. Bott v. Vistaprint USA Inc.*, 392 F. App'x 327 (5th Cir. 2010) ........ 26

*West Virginia v. EPA*,
  597 U.S. 697 (2022) .................................................................................................. 17

*In re Yarbrough*,
  211 B.R. 654 (Bankr. W.D. Tenn. 1997) ................................................................. 23

**Rules**

Fed. R. Civ P. 9(b) ............................................................................................................ 25

**Statutes**

12 U.S.C. § 1843(k) .......................................................................................................... 22

12 U.S.C. § 1843(k)(4) ..................................................................................................... 23

12 U.S.C. § 5481(7) ............................................................................................... 13, 14, 15

12 U.S.C. § 5481(15)(A)(ii) .............................................................................................. 18

12 U.S.C. § 5497(a)(1) ...................................................................................................... 11

12 U.S.C. §5497(e)(1) ....................................................................................................... 11

15 U.S.C. § 1602(f) ................................................................................................. 13, 14, 15

15 U.S.C. § 1602(h) .......................................................................................................... 19

15 U.S.C. § 1640(e) .......................................................................................................... 35

15 U.S.C. § 1681s-2(a)(7)(G)(ii) ...................................................................................... 22

15 U.S.C. § 1693a(2) ........................................................................................................ 17

4903-4104-3719.v1

15 U.S.C.§ 1693a(9) ........................................................................................................16

15 U.S.C. § 1693k ...........................................................................................................13

15 U.S.C. § 1693m(g) ......................................................................................................35

15 U.S.C. § 6809 .............................................................................................................22

815 Ill. Comp. Stat. Ann. 655/1 (2018) ...........................................................................7

Cal. Civ. Code § 1812.622(d) ...........................................................................................7

Cal. Civ. Code § 1812.623 ................................................................................................7

Cal. Civ. Code § 1812.624 ................................................................................................7

N.Y. Pers. Prop. Law § 501 ..............................................................................................7

N.Y. Pers. Prop. Law § 503 ..............................................................................................7

Tex. Bus. & Com. Code § 92.052 .....................................................................................7

Tex. Bus. & Com. Code § 92.053(1) .................................................................................7

Utah Code Ann. § 15-8-4(1) ..............................................................................................7

Utah Code Ann. § 15-8-6(1) ..............................................................................................7

**Regulations**

12 C.F.R. § 1005.2(f) .........................................................................................13, 14, 15, 16

12 C.F.R. § 1026.2(a)(16) ................................................................................................19

12 C.F.R. § 1026.2(a)(16)(i) ............................................................................................20

12 C.F.R. § 1026.2(a)(16)(ii) ...........................................................................................21

12 C.F.R. § 1026.18 .....................................................................................................21, 34

**Other Authorities**

*5.8 Retained Earnings, Fin. Statement Acct. Guide*, PricewaterhouseCoopers ..........................8, 9

*CFPB Taskforce on Fed. Consumer Fin. Law*, Report Vol. I ........................................................3

CFPB, Official Staff Commentary on Regulation Z, 12 C.F.R. § 1026.18-1(i)
    (May 14, 2024) ...........................................................................................................35

Consent Order, *CFPB v. Main S. Pers. Fin., Inc.* (June 2, 2020) ...............................................29

*Earnings*, Oxford Dictionary of Accounting (45th ed. 2016)...........................................................8

Nasdaq, *Glossary of Stock Market Terms*, EBITDA,
    https://tinyurl.com/4e8wtpmx (last visited Dec. 16, 2024) (May 31, 2024).............................9

Press Release, Fed. Rsrv., *Fed Rsrv. Bd. Announces Rsrv. Bank Income and
    Expense Data and Transfers to the Treasury for 2022*.................................................................9

Press Release, Fed. Rsrv., *Fed. Rsrv. Bd. Releases Ann. Audited Fin. Statements*
    (last updated Mar. 26, 2024)......................................................................................................9

Press Release, Red. Rsrv., *Fed. Rsrv. Bd. Releases Ann. Audited Fin. Statements*
    (last updated Mar. 24, 2023)......................................................................................................9

4903-4104-3719.v1

**RELIEF SOUGHT AND GROUNDS THEREFOR**

Defendants Acima Digital, LLC and Acima Holdings, LLC (collectively, "Acima") move to dismiss the claims asserted against them in the First Amended Complaint (ECF 31) ("FAC") for five reasons: (i) the Consumer Financial Protection Bureau's ("CFPB") current funding method violates both the Appropriations Clause and the Dodd-Frank Act, and the CFPB, therefore, has no legal authority to initiate this enforcement action; (ii) the CFPB lacks the statutory authority under the Consumer Financial Protection Act ("CFPA"), the Truth in Lending Act ("TILA"), the Electronic Fund Transfer Act ("EFTA"), and Section 1681s-2(a)(7) of the Fair Credit Reporting Act ("FCRA") to bring an enforcement action against Acima's lease-to-own transactions; (iii) the CFPB's claims against Acima under those statutory provisions violate Acima's constitutional due process rights; (iv) the CFPB has failed to allege adequately that Acima engaged in any prohibited conduct under the CFPA and the TILA with respect to Counts I–VII and X–XI; and (v) the CFPB's claims under the TILA and the EFTA (Counts X and XII) are time-barred in part.

**INTRODUCTION**

This action is the second attempt by the CFPB to overstep the bounds of its constitutional and statutory authority and to claim regulatory power over state-regulated lease-to-own transactions that are beyond its jurisdiction. In recent and substantially identical litigation against another lease-to-own company, another court in this District already has ruled that this power grab by the CFPB is illegal. *See CFPB v. Snap Fin. LLC*, 2024 WL 3625007, at *5–15 (D. Utah Aug. 1, 2024). Following that directly on-point authority, this Court should do the same.

Acima has operated in the highly regulated lease-to-own industry for over a decade. Just like the defendants in *Snap*, Acima offers consumers flexible, short-term (one month at the longest) and renewable lease-to-own agreements, which allow consumers to take possession of household merchandise and other durable goods—such as furniture, appliances, or computers—that Acima

1

4903-4104-3719.v1

purchases from third-party retailers and leases to consumers. In Acima's lease-to-own transactions, unlike in a credit or financing transaction, consumers do not need to purchase the goods or become the owner at the point of sale, do not need to use credit to finance a purchase, and do not incur debt or any long-term obligation. Instead, consumers enter into a short-term renewable (at the customer's option) lease agreement with Acima, make an initial lease payment, and have an option to retain possession of the merchandise by renewing the lease for another short term. If a consumer does not wish to keep the merchandise, the consumer can terminate the lease at any time without penalty. All of this information is disclosed in advance to consumers.

None of the indicia of a credit transaction is present. Acima does *not* act as a lender, and Acima does *not* extend "credit" under its lease-to-own agreements. Acima's customers do *not* receive a right to defer payment of a debt. Nevertheless, the CFPB has alleged that Acima's lease-to-own agreements and related practices violate the CFPA (Count(s) I–VIII, XI, XIII, and XIX),[1] the TILA (Count X), and the EFTA (Count XII)—all of which grant the CFPB authority to regulate *only credit transactions* and not state law-governed lease-to-own transactions at issue here. Based on its expanded and improper definition of "credit," the CFPB also accuses Acima of violating Section 1681s-2(a)(7) of the FCRA (Count XVII), but that section covers only financial institutions, which Acima is decidedly not.

This Court should reject the CFPB's baseless attempt to expand its jurisdiction well beyond constitutional and statutory limits and dismiss this case with prejudice for at least five reasons.

*First*, the CFPB lacks authority to bring this enforcement action because the CFPB's funding mechanism currently violates both the Appropriations Clause and the CFPB's funding statute, the Dodd-Frank Act. The CFPB's "funding is . . . subject to the requirements of the

---

[1] This Motion does not address Count IX, which is brought only against defendant Aaron Allred.

Appropriations Clause," which requires "'Appropriation[s] made by Law.'"  *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425 (2024) (quoting U.S. Const. art. I, § 9, cl. 7).  But no law permits the CFPB's current funding scheme.  The Dodd-Frank Act "authorizes the [CFPB] to draw public funds from a particular source—'the combined *earnings* of the Federal Reserve System[.]'"  *Id.* at 435 (emphasis added) (quoting 12 U.S.C. §§ 5497(a)(1), (2)(A)–(B)).  But there are currently *no* earnings of the Federal Reserve System upon which to draw because the Federal Reserve has not made a profit since 2022.  The CFPB is instead being funded from the Federal Reserve's deficit, which is not authorized by the plain language of the governing law.

*Second*, the relevant provisions of the CFPA, the TILA, and the EFTA apply only to lenders that offer "credit."  Acima is not a lender and does not offer "credit" within the meaning of these statutes.  Likewise, Section 1681s-2(a)(7) of the FCRA applies only to "financial institutions," which Acima is not.  A court in this District already has rejected as improper the CFPB's substantially similar attempt to extend its authority under the CFPA, the TILA, and the EFTA over lease-to-own transactions, finding they do not constitute "credit" and are not "credit sale[s]" within the meaning of these statutes.  *See Snap*, 2024 WL 3625007, at *5–8, *12–13.  The CFPB's second attempt in the instant case is equally flawed and should be dismissed for the same reasons.

*Third*, even if the CFPB's reinterpretation of "credit" or "financial institution" could be squared with the CFPA, the TILA, the EFTA, and the FCRA (and it cannot), the CFPB's decision to extend its authority over Acima's lease-to-own business violates Acima's constitutional due process rights.  As recently as 2021, the CFPB's own public guidance stated that "[s]trictly speaking, rent-to-own transactions are not credit" within the meaning of these statutes.  *CFPB Taskforce on Fed. Consumer Fin. Law*, Report Vol. I at 215 (Jan. 2021),

3

https://tinyurl.com/mr283dfs (hereinafter "CFPB Taskforce Report").[2]　Not until the CFPB brought an enforcement action against Snap Finance LLC in 2023 did Acima (and the rest of the industry) suddenly learn that the CFPB intended to assert, in contravention of its enabling statutes, that "credit" covers lease-to-own transactions.　Thus, Acima had no constitutionally adequate notice of the CFPB's shifting statutory reinterpretation.

*Fourth*, even if the CFPB permissibly could regulate Acima's lease-to-own transactions (it cannot), Counts I–VIII and X–XI still should be dismissed because the CFPB has failed to allege sufficiently that Acima engaged in any conduct prohibited by the CFPA and the TILA.

*Fifth*, the CFPB's TILA and EFTA claims are time-barred in part.

## FACTUAL BACKGROUND

Acima improves the quality of life of its customers by providing them with the opportunity to obtain ownership of high-quality, name-brand household products and other durable goods under flexible, short-term lease-to-own agreements with no long-term obligation.　The state-regulated, multibillion-dollar lease-to-own industry, which dates back to the 1970's, serves many millions of customers—including customers who have limited access to credit and customers who value the flexibility of lease-to-own transactions.　Acima provides short-term renewable lease agreements in compliance with comprehensive state laws that have long recognized them as distinct from credit transactions and provided a separate comprehensive regulatory structure.

In each lease-to-own transaction, after a customer applies and is approved, Acima purchases and takes ownership of the selected item.　The customer then executes a contract, called a Rental Purchase Agreement ("RPA"), memorializing the lease-to-own transaction.　*See* Ex. A

---

[2] The Court may take judicial notice of this document because it is posted on the CFPB's official public website and is not offered for the truth of its contents. *See Aslam v. U.S. Dep't of State*, 2023 WL 6163969, at *9 n.115 (D. Utah Sept. 21, 2023).

4903-4104-3719.v1

(RPA).[3]  After execution of the RPA, Acima then leases the product to the customer in exchange for the customer making lease payments over short-term renewal periods lasting a week to a month.

At each renewal period, as disclosed to the customer upfront, the customer has the option to renew the lease agreement and make another lease payment or to terminate the RPA and have no further payment obligations to Acima.  *Id.* at 1.  After the initial lease period, the customer can terminate the agreement at any time without a penalty, even if the customer is behind on prior lease payments.  *Id.*  The CFPB's allegation that Acima's RPAs "ensnare vulnerable consumers . . . in a financial obligation" lasting "usually for a 12-month term," FAC ¶ 1, is simply false—Acima imposes *no* financial obligation on consumers other than to make the agreed-upon lease payment under each short-term lease period until either the customer chooses to obtain ownership or terminates the RPA, as disclosed in the RPA.[4]  Acima's RPAs also contain an "Early Purchase Option."  Ex. A at 1.  Under this option, during a specified timeframe (often, within the first 90 days after a customer begins making lease payments), a customer can elect to acquire ownership by paying a pre-disclosed amount.  After the initial timeframe expires, a consumer may still elect to acquire ownership at a discount by paying a percentage of the remaining total of payments.

Under Acima's lease agreements, customers make periodic rental payments in advance of the rental period for continued use of Acima's leased property.  Acima does not extend financing or charge interest under these agreements.

The terms of the lease-to-own transaction are disclosed in the RPA, which Acima provides to customers for their review and signature before executing the transaction.  The RPA makes clear

---

[3] This Court may consider Acima's RPA in resolving this Motion.  *See Norton v. Ute Indian Tribe of the Uintah*, 862 F.3d 1236, 1245 n.3 (10th Cir. 2017) ("a document central to the plaintiff's claim and referred to in the complaint may be considered in resolving a motion to dismiss, at least where the document's authenticity is not in dispute[]") (citation omitted).

[4] The CFPB's reference to a "12-month term" is also false.  There is no 12-month lease term.  The term of the lease is generally one week to at most one month.

that it is not a loan, and Acima has not extended credit to the customer.  In bolded and underlined text, the RPA states:  "**This transaction is a rental-purchase agreement ("Agreement") . . . <u>This is not a loan or credit transaction</u>.**"  Ex. A at 1 (emphasis in original).  The RPA also states (in bold capital letters) that Acima retains ownership of the goods:  "**Ownership and Nature of Agreement: WE OWN THE PROPERTY.**"  *Id.* at 3 (emphasis in original).

The RPA clearly states the customer's right to terminate:  "You may terminate the Agreement at any time, without penalty, and stop unaccrued renewal payments by returning the property to Acima and paying any past due renewal payments."  *Id.* at 1.  The RPA also details the early purchase option at the top of the first page in bolded text: "**The Agreement includes a {EARLY_PURCHASE_OPTION_TERM} Early Purchase Option. This Early Purchase Option may be an amount greater than the retailer's sale price and not 'same as cash.'**"  *Id.* (emphasis in original).  Lastly, certain of Acima's lease transactions, primarily for goods that may require installation or delivery, may include limited services as part of the overall lease transaction that are incidental to providing the customer with those leased goods in a usable manner, such as delivery and installation costs.  Agreements for these types of items carry the same terms, rights, and obligations as lease transactions for items that do not require delivery or installation.

Lease-to-own transactions, such as Acima's, have existed and have been regulated by state law for decades.  At least 46 states and the District of Columbia currently have specific lease-to-own laws that impose comprehensive regulations on lease-to-own transactions.  These statutes range from policing the language that lease-to-own companies must use in their notices and disclosures to customers,[5] to fixing both cash prices and total rent-to-own prices,[6] to setting

---

[5] *See, e.g.*, Tex. Bus. & Com. Code § 92.052; N.Y. Pers. Prop. Law § 501; Cal. Civ. Code § 1812.623; 815 Ill. Comp. Stat. Ann. 655/1 (2018); and Utah Code Ann. § 15-8-6(1).
[6] *See, e.g.*, N.Y. Pers. Prop. Law § 503 (regulating "maximum cash price").

specifications on fees and payments.[7]  In addition, state lease-to-own laws specifically distinguish lease-to-own transactions from credit by expressly excluding credit from their scope.[8]

Despite the existence of comprehensive state regulatory regimes regulating lease-to-own transactions and the clear bounds of the CFPB's statutory authority that exclude jurisdiction over such transactions, the CFPB brought an enforcement lawsuit against Acima on July 26, 2024, accusing it of violating the CFPA, the TILA, the EFTA, and the FCRA.  On September 27, 2024, the CFPB filed its FAC, which does not cure the fundamental constitutional and statutory infirmities with its lawsuit.  Accordingly, the Court should dismiss all claims against Acima.

## **LEGAL STANDARD**

To survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "[L]abels and conclusions" and "naked assertion[s]" devoid of "further factual enhancement" are not enough. *Twombly*, 550 U.S. at 555, 557.  Likewise, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  Instead, a complaint must contain "enough factual matter (taken as true)" to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56.

---

[7] *See, e.g.*, Tex. Bus. & Com. Code § 92.053(1) (requiring that charges in addition to periodic payments "be reasonably related to the service performed"); Cal. Civ. Code § 1812.624 (proscribing certain fees); and 815 Ill. Comp. Stat. Ann. 655/1 (2018) (same).

[8] *See, e.g.*, Cal. Civ. Code § 1812.622(d) (A "'Rental-purchase agreement' shall not be construed to be, nor be governed by, and shall not apply to . . . [a] consumer credit contract."); Utah Code Ann. § 15-8-4(1) ("Rental purchase agreements that comply with this chapter are not governed by the laws relating to: (a) a security interest as defined in Subsection 70A-1a-201(2)(ii); or Utah Code Page 2 (b)Title 70C, Utah Consumer Credit Code, except that Sections 70C-7-102 through 70C-7-104 and 70C-2-205 shall apply to lessors as defined in this chapter to the same extent as they apply to creditors under Title 70C, Utah Consumer Credit Code.").

**ARGUMENT**

I.    **THE CFPB'S CURRENT FUNDING MECHANISM IS UNCONSTITUTIONAL AND NOT IN ACCORDANCE WITH THE LAW.**

The Court should dismiss this entire lawsuit because the FAC suffers from a critical, foundational defect: the CFPB's current funding mechanism is both constitutionally and statutorily invalid.  In other words, even if the CFPB could assert viable claims against Acima's lease-to-own transactions (and, as explained below, it cannot), it may not pursue those claims in this lawsuit using funds that have been requisitioned in violation of the Constitution's Appropriation Clause and the CFPB's enabling statute, the Dodd-Frank Act.

The Supreme Court has confirmed that the CFPB's "funding is . . . subject to the requirements of the Appropriations Clause." *Cmty. Fin. Servs*, 601 U.S at 425.  And the Appropriations Clause requires that executive agencies be funded by "[a]ppropriation[s] made by Law." *Id.* (quoting U.S. Const. art. I, § 9, cl. 7).  Here, that law is the Dodd-Frank Act, which, as the Supreme Court explained, "authorizes the [CFPB] to draw public funds from a particular source—'the combined *earnings* of the Federal Reserve System.'" *Id.* at 435 (quoting 12 U.S.C. §§ 5497(a)(1), (2)(A)–(B)) (emphasis added).  Those "combined earnings" are "surplus funds in the Federal Reserve System [that] would otherwise be deposited into the general fund of the Treasury." *Id.* at 425 (citation omitted).  In other words, the earnings that must fund the CFPB (if at all) are the Federal Reserve's revenues *in excess of its expenditures*.

"Earnings" is defined regularly as net income or profit in dictionaries and under generally accepted accounting principles.  *See Earnings*, Oxford Dictionary of Accounting (45th ed. 2016) (defining "earnings" as "[t]he net income or profit of a business"); *5.8 Retained Earnings, Fin. Statement Acct. Guide*, PricewaterhouseCoopers, https://tinyurl.com/4er6t478 ("Retained *earnings* represents the earned capital of the reporting entity. . . that develops and builds up over

8

time from *profitable operations*.  It consists of all undistributed *income* that remains invested . . . .") (emphasis added).  Likewise, when determining earnings before interest, taxes, depreciation, and amortization (the "EBITDA" metric in accounting and financial modeling), "earnings" necessarily refers to profit.  *See, e.g.*, Nasdaq, *Glossary of Stock Market Terms*, EBITDA, https://tinyurl.com/4e8wtpmx (last visited Dec. 16, 2024) (May 31, 2024) (defining "earnings" as the "operating and nonoperating profit before the deduction of interest and income taxes").

The CFPB's current funding, therefore, is not drawn from its authorized source—the Federal Reserve's earnings—because there are *no* profits of the Federal Reserve System upon which to draw.  The Federal Reserve has not made a profit since 2022 because of the rise in interest rates, and has been operating at a loss for the past two years.  *See* Press Release, Fed. Rsrv., *Fed. Rsrv. Bd. Releases Ann. Audited Fin. Statements* (last updated Mar. 26, 2024), https://tinyurl.com/5xayzb38 (indicating that the Federal Reserve System's 2023 deficit was $114.3 billion); Press Release, Fed. Rsrv., *Fed. Rsrv. Bd. Releases Ann. Audited Fin. Statements* (last updated Mar. 24, 2023), https://tinyurl.com/2xnjtywc ("CFPB 2022 Fin. Statements Press Release") ("During 2022, the Reserve Banks . . . first suspended weekly remittances to the Treasury and began accumulating a deferred asset, which totaled $16.6 billion by the end of the year.").[9]  Thus, the Federal Reserve's expenses have exceeded its revenue and no funds exist that would otherwise be destined for deposit into the Treasury's general fund.  Instead, the CFPB has drawn funding from the Federal Reserve's *deficit* account.  *See* Press Release, Fed. Rsrv., *Fed Rsrv. Bd. Announces Rsrv. Bank Income and Expense Data and Transfers to the Treasury for 2022* (last updated Jan. 13, 2023), https://tinyurl.com/ymrzcsfp ("the Reserve Banks were assessed . . . $0.7 billion to fund the operations of the [CFPB]"); CFPB 2022 Fin. Statements Press Release

---

[9] It is well established that courts may "take judicial notice of official government publications."  *High Desert Relief, Inc. v. United States*, 917 F.3d 1170, 1175 n.1 (10th Cir. 2019) (citation omitted).

("audited financial statements of the Reserve Banks" include "assessments of $2.8 billion for Board expenses, currency costs, and the operations of the [CFPB]").

Payments "in direct contravention of the federal statute" violate the Appropriations Clause. *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990).  No extra-statutory funding is permitted where "Congress has appropriated no money for the payment[s]" because "[a]ny exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Id.* at 424-25; *see also Reeside v. Walker*, 52 U.S. 272, 291 (1850) (refusing to order payment of a claim against the United States in view of "the want of any appropriation by Congress to pay th[at] claim").[10]

Here, no statute authorizes the Federal Reserve to incur debt in order to ensure that the CFPB continues to operate.  Nor could a statute do so, because the Appropriations Clause does not permit Congress to fund an executive agency not from the general Treasury fund (or revenue that would go into that fund) but on another agency's credit card.  The CFPB's unique, statutorily authorized funding mechanism—designed to avoid the need for annual appropriations—is only constitutional insofar as it permits the CFPB to draw funds from money the Federal Reserve would have otherwise deposited into the Treasury—the Federal Reserve's "earnings." *Cmty. Fin. Servs.*, 601 U.S. at 425.  When that statutorily designated source remains dry (as it is now), the CFPB's funding has not been "sanctioned" by Congress, *Reeside*, 52 U.S. at 291, and is therefore unconstitutional.

During periods where the Federal Reserve has no earnings, nothing prevents the CFPB from asking Congress to change the law or to seek an authorization (through a special authorization

---

[10] This requirement applies not only to "'all the taxes raised from the people,'" but also to "'revenues arising from other sources.'" *Richmond*, 496 U.S. at 427 (internal citation omitted).  Accordingly, "not a dollar of" public money "can be used in the payment of anything not thus previously sanctioned" by Congress, because "[a]ny other course would give to the fiscal officers a most dangerous discretion." *Reeside*, 52 U.S. at 291.

10

or a supplemental appropriation), but the CFPB has not done so.  The Dodd-Frank Act expressly contemplates that the CFPB may seek additional funding where it provides that if the "sums available to the [CFPB]" from the Federal Reserve are "not . . . sufficient to carry out [its] authorities," the CFPB may seek appropriations directly from Congress.  12 U.S.C. §5497(e)(1).[11]

Absent a change in law or another authorization request, Congress has appropriated no other money for funding the CFPB; it expressly designated in the Dodd-Frank Act that the CFPB will be funded only from the Federal Reserve's *earnings*.  By funding the CFPB from the Federal Reserve's *debt*, the CFPB is violating its own enabling statute.[12]  As such, any action that the CFPB takes using such unappropriated funds—such as prosecuting this lawsuit—is unlawful.  In these circumstances, where the CFPB's funding is both unconstitutional and unauthorized by Congress, the "appropriate disposition would be to reverse . . . and dismiss the case." *Seila L. LLC v. CFPB*, 591 U.S. 197, 233 (2020).[13]

## II.    THE CFPB DOES NOT HAVE STATUTORY AUTHORITY TO REGULATE ACIMA'S LEASE-TO-OWN TRANSACTIONS.

"When the meaning of a statute [is] at issue," it is the "role" of the judiciary "to interpret the act of Congress, in order to ascertain the rights of the parties." *Loper Bright Enters. v.*

---

[11] The CFPB may argue that this reading of the statute would require it to "predict" future shortfalls, but that is precisely how agency funding appropriations typically work—an agency reports to Congress indicating how much money it needs and then Congress appropriates some or all of the requested amount.  Just because the CFPB's typical funding mechanism is through the Federal Reserve's surplus does not mean that the CFPB is excused from standard norms and practices (and it has statutory authority to seek additional direct appropriations).

[12] Under the canon of constitutional avoidance, which "allows courts to avoid the decision of constitutional questions," *Clark v. Martinez*, 543 U.S. 371, 381 (2005) (emphasis omitted), the Court here may decide this issue on statutory grounds by ruling that the CFPB's current funding scheme violates the congressional mandate that it is to be funded only from the Federal Reserve's "earnings."  12 U.S.C. § 5497(a)(1).

[13] The CFPB may seek to rely on three recent decisions that rejected similar challenges to the CFPB's funding, but these decisions are not informative. *CFPB v. Active Network, LLC,* No 4:22-cv-00898-ALM (E.D. Tex. Oct. 7, 2024), ECF No. 51 at 3, provided no reasons for denying a similar request to dismiss.  In *Texas v. Colony Ridge, Inc.*, No. H-24-0941 (S.D. Tex. Oct. 11, 2024), ECF No. 61 at 9, *memorandum and recommendation adopted* (S.D. Tex. Nov. 26, 2024)—a State of Texas CFPA enforcement action in which the CFPB is not a party—the court ruled that, unlike Acima here, the defendant failed to "explain how funding for … an agency is tied to its lawful ability to act."  Finally, in *CFPB v. SoLo Funds, Inc.*, 2024 U.S. Dist. LEXIS 189410, *5–6 (C.D. Cal. Oct. 17, 2024), the court similarly provided no explanation for rejecting the funding challenge, stating only that it was "not persuaded … that the [CFPB's] source of funding—even if illegitimate—is grounds for dismissal."

4903-4104-3719.v1

*Raimondo*, 144 S. Ct. 2244, 2257 (2024) (citation omitted).  Where agency action is concerned, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the [Administrative Procedures Act] requires."  *Id.* at 2273.  That "analysis begins with 'the language of the statute,'" and if "the statutory language provides a clear answer, it ends there as well."  *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) (citations omitted).  Similarly, where an agency regulation implementing a statute is clear, "[t]he regulation then just means what it means—and the court must give it effect, as the court would any law."  *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019).

Here, the statutes underpinning the CFPB's claims against Acima expressly define the meaning of the terms "credit," "credit sale," and "financial institution" in a way that excludes lease-to-own transactions.  By stretching the meaning of these terms beyond what the statute would bear, the CFPB has acted beyond the express bounds of its statutorily limited authority.  Accordingly, Counts I–VIII, X–XIII, XVII, and XIX should be dismissed with prejudice.

## A.    Acima's Lease-To-Own Transactions Are Not "Credit" Transactions Under the CFPA, the TILA, and the EFTA.

The CFPB's claims under the CFPA (Counts I–VIII, XI, XIII, and XIX), TILA (Count X), and EFTA (Count XII) should be dismissed with prejudice because the CFPB's jurisdiction under these statutes extends only to "credit" transactions, and Acima's lease-to-own transactions do not meet those statutes' express definition of "credit."

The CFPA, the TILA, and the EFTA each permit the CFPB to regulate "credit" transactions.  The CFPA and the TILA expressly define the term "credit."  Under the CFPA, "credit" means "the right granted by a person to a consumer to [1] defer payment of a debt, [2] incur debt and defer its payment, or [3] purchase property or services and defer payment for such purchase."  12 U.S.C. § 5481(7).  Similarly, the TILA defines credit to mean "the right granted by

12

a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f). The EFTA prohibits "condition[ing] the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers[,]" 15 U.S.C. § 1693k, but the statute does not define credit expressly. The EFTA's implementing Regulation E, however, provides a definition of "credit" that is nearly identical to that set out in the CFPA and the TILA: "'credit' means the right granted by a financial institution to a consumer to defer payment of debt, incur debt and defer its payment, or purchase property or services and defer payment therefor." 12 C.F.R. § 1005.2(f).

Courts interpreting these (or similar) definitions of "credit" have held uniformly that lease-to-own transactions are excluded from the scope of the statutory term. For example, the only other time that the CFPB has attempted to stretch the meaning of "credit" to encompass lease-to-own transactions similar to those Acima offers, a court in this District rejected that effort and dismissed substantially identical claims by the CFPB, finding that substantially similar lease-to-own transactions do not meet the definition of "credit" under the CFPA, the TILA, and the EFTA. *See Snap*, 2024 WL 3625007, at \*14 (lease-to-own transactions "do[] not meet the statutory definition of credit under the CPFA because [they] did not give consumers any right to defer the payment of debt, incur debt and defer its payment, or purchase goods or services and defer payment therefor"). In other contexts, courts also have held consistently that lease-to-own transactions do not create credit obligations. *See, e.g.*, *Fuller v. Rent-A-Ctr., Inc.*, 2020 WL 12772102, at \*3 (W.D. Okla. Dec. 28, 2020) (dismissing, for failure to state a claim, the allegation that a lease-to-own transaction "would qualify as a credit transaction under the ECOA [Equal Credit Opportunity Act]"); *Maul v. Aaron's, Inc.*, 2013 WL 12090304, at \*3 (W.D. Okla. Mar. 19, 2013) (same);

13

*Dorton v. Kmart Corp.*, 229 F. Supp. 3d 612, 625 (E.D. Mich. 2017) (same); *Liberty Leasing Co. v. Machamer*, 6 F. Supp. 2d 714, 717, 719 (S.D. Ohio 1998) (same).

The CFPB attempts to circumvent these express definitions (which act as statutory limits on its authority) by contending that Acima's lease-to-own transactions allegedly "function and [are] marketed as credit." FAC ¶ 38. This effort cannot withstand scrutiny because Acima's lease-to-own transactions do not meet any of these statutory definitions of "credit."

By their very terms, Acima's lease-to-own agreements (i.e., RPAs) do not cause a customer to "incur debt" or otherwise "defer [the] payment of a debt." 12 U.S.C. § 5481(7) (CFPA); 15 U.S.C. § 1602(f) (TILA); 12 C.F.R. 1005.2(f) (EFTA). As the CFPB acknowledges, Acima's RPAs require customers to pay for Acima's lease item in advance of each renewal period. *See* FAC ¶ 32; Ex. A at 3. Customers also expressly retain the contractual right to terminate their agreement at any time without penalty. The RPA provides: "An Initial Rent Payment . . . is due when this Agreement is signed, and additional (1) Renewal Payments . . . are due . . . thereafter while the Agreement remains in force. . . . [and] are made ***in advance***." Ex. A at 3 (emphasis added).

Because lease payments are made "in advance," customers do not incur "debt" that they will have to pay off in the future. Instead, as with any lease, customers pay for the contemporaneous use of an item and have no obligation to make future payments unless and until they renew the lease term, at which point they will make the additional term payment in full. Such an arrangement does not constitute credit. *See Snap*, 2024 WL 3625007, at *7 (lease-to-own agreements did not extend credit where they "provided for substantially contemporaneous exchange of value," "[c]onsumers paid for 60-day periods of possession of the leased property," and "[u]pon executing the legacy lease, consumers did not bind themselves 'in all circumstances'

14

to pay the total lease amount") (quoting *Machamer*, 6 F. Supp. 2d at 717); *see also Dorton*, 229 F. Supp. 3d at 625 (lease-to-own transactions are not credit because they are "payments made as a 'contemporaneous exchange of consideration for the right of *possession* and *use* of the equipment'") (quoting *Machamer*, 6 F. Supp. 2d at 717). Thus, Acima's lease-to-own transactions do not meet this definition of "credit."

Acima's RPAs also do not enable customers to "purchase property . . . and defer payment" for such purchase. 12 U.S.C. § 5481(7) (CFPA); 12 C.F.R. § 1005.2(f) (EFTA).[14] Under the express terms of Acima's RPAs, Acima maintains ownership of the property at all times and relinquishes ownership only upon full payment by the customer for the property under the lease terms by virtue of the customer's exercise of an early purchase option or completion of all payments after renewal for a specified number of lease terms. *See* Ex. A at 1 ("Acima is the owner of the property until you have executed one of the purchase terms contained within the Agreement"); *id.* at 3 ("**Ownership and Nature of Agreement: WE OWN THE PROPERTY**") (emphasis in original). The RPA expressly states that ownership does not transfer to the customer until all payments are made in full; merely making some (but not all) of the minimum periodic renewal payments does not result in the customer owning the product. Ex. A at 2 ("Total of Payments . . . . You must pay this amount to own the property[.]"). Accordingly, Acima's lease-to-own transactions are not "credit" under this definition as well.

The CFPB's allegation that Acima provides some leases that include certain limited incidental services as part of the lease transaction makes no difference to this analysis. *See* FAC ¶ 35 (alleging, with respect to Acima's leases for goods and incidental services, that "it is not possible to return a service"). As with all RPAs, a customer makes payments contemporaneously

---

[14] This additional type of credit transaction is omitted from the definition of "credit" under the TILA. *See* 15 U.S.C. § 1602(f).

with the use of the good and receipt of the necessary incidental service (i.e., delivery or installation) for the customer to use and enjoy the leased item, and maintains no obligation to make future payments. When a customer terminates a lease, the entire transaction is terminated. The plain language of these lease agreements is the same as with all Acima RPAs, and those transactions are not credit. *See, e.g.*, *Harold v. TMC Enter., LLC*, 2016 WL 6069023, at *3 (W.D. Va. Oct. 17, 2016) (interpreting the "plain terms of [the] clause of the contract" to determine liability under state consumer protection law).

Acima's lease-to-own transactions are not "credit" transactions for yet another reason: the EFTA's implementing Regulation E defines "credit" as a "right granted by a financial institution to a consumer," 12 C.F.R. § 1005.2(f), but Acima is not a financial institution. The EFTA defines a "financial institution" as "a State or National bank, a State or Federal savings and loan association, a mutual savings bank, a State or Federal credit union, or any other person who, directly or indirectly, holds an account belonging to a consumer." 15 U.S.C.§ 1693a(9). An "account" is further defined as "a demand deposit, savings deposit, or other asset account (other than an occasional or incidental credit balance in an open end credit plan as defined in section 1602(i) of this title), as described in regulations of the CFPB, established primarily for personal, family, or household purposes, but such term does not include an account held by a financial institution pursuant to a bona fide trust agreement." 15 U.S.C. § 1693a(2). None of these categories applies to Acima. Acima is not a "bank, savings association, or credit union," nor has it ever represented itself to be one. Acima also does not "directly or indirectly hold an account belonging to a consumer," as that term is defined in both the statute and the implementing regulation, and the CFPB has not alleged otherwise (because it cannot).

16

If Congress intended to grant the CFPB authority to regulate lease-to-own transactions, preempting state regulatory authority, it would have said so expressly.  "Extraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle device[s].  Nor does Congress typically use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (internal quotation marks and citations omitted).  Rather, "[t]he agency instead must point to 'clear congressional authorization' for the power it claims." *Id.* (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)); *see also New Mexico v. DOI*, 854 F.3d 1207, 1224 (10th Cir. 2017) (a court "'must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency'") (footnote and citation omitted).

The lease-to-own industry is regulated comprehensively by the states, in addition to the Federal Trade Commission's general consumer protection oversight, and has been for decades.  Had Congress intended to grant the CFPB authority to take enforcement actions within this tightly regulated space, it would have clearly said so.  By attempting now to reinterpret the term "credit" and unilaterally assert regulatory jurisdiction over Acima's lease-to-own transactions without any (much less clear) congressional indication for authority, the CFPB is acting in contravention of the statutory scheme.  Courts have not hesitated to foreclose attempts by the CFPB to take expansive action without expressly delegated congressional authority.  *See, e.g.*, *Chamber of Com. of U.S.A v. CFPB*, 691 F. Supp. 3d 730, 740-43 (E.D. Tex. 2023) (the CFPB's attempt to regulate "discrimination" as an unfair, deceptive, or abusive act or practice under the CFPA exceeded its statutory authority), *appeal docketed*, No. 23-40650 (5th Cir. Nov. 8, 2023).  This Court should similarly reject the CFPB's attempted power-grab.

17

Acima's lease-to-own transactions are not credit within the meaning of the CFPA, the TILA, and the EFTA as a matter of law. The Court should therefore dismiss Counts I–VIII, X–XIII and XIX with prejudice.

### B. Acima's Lease-To-Own Transactions Are Not the "Functional Equivalent" of Purchase Finance Arrangements under the CFPA.

The CFPB's claims under the CFPA also should be dismissed because Acima's lease-to-own transactions are not the "functional equivalent of a purchase finance arrangement." FAC ¶ 152 (citing 12 U.S.C. § 5481(15)(A)(ii)). Under the CFPA, financial products or services are "the functional equivalent of purchase finance arrangements, if . . . the initial term of the lease is at least 90 days; and . . . at the inception of the initial lease, the transaction is intended to result in ownership of the leased property to be transferred to the lessee." 12 U.S.C. § 5481(15)(A)(ii). Acima's RPAs meet neither of these required criteria. *First*, the initial term of the lease is not "at least 90 days." Acima's RPAs contain initial terms of typically one week or at most one month, and never longer than sixty days. Indeed, the CFPB does not allege—because it cannot—that any of Acima's RPAs have an initial term of at least 90 days. *Second*, customers do not purchase products at the inception of the lease, nor do they acquire ownership unless and until they make all of the specified optional lease renewal payments or exercise an early purchase option. The Court should dismiss the CFPB's CFPA claims on this basis as well. *See Snap*, 2024 WL 3625007, at *11 (rejecting the CFPB's "invitation" to "search for functional equivalents of purchase finance agreements" within lease-to-own transactions) (citing 12 U.S.C. § 5481(15)(A)(ii)).

### C. Acima's Lease-To-Own Transactions Are Not "Credit Sales" Under the TILA and its Implementing Regulation Z.

The CFPB's TILA claim (Count X) and its derivative CFPA claim (Count XI) also should be dismissed because Acima's lease-to-own transactions do not meet the required definition of "credit sales" under the TILA and Regulation Z. FAC ¶ 171 (citing 12 C.F.R. § 1026.2(a)(14)).

4903-4104-3719.v1

It is undisputed that "TILA only applies to 'credit sales.'" *Ortiz v. Rental Mgmt., Inc.*, 65 F.3d 335, 338 (3d Cir. 1995). Under TILA's implementing Regulation Z, which tracks the language of the statute, a credit sale "means a sale in which the seller is a creditor," and includes a bailment or lease (unless terminable without penalty at any time by the consumer) under which the consumer:

> (i) Agrees to pay as compensation for use a sum substantially equivalent to, or in excess of, the total value of the property and service involved; and
>
> (ii) Will become (or has the option to become), for no additional consideration or for nominal consideration, the owner of the property upon compliance with the agreement.

12 C.F.R. § 1026.2(a)(16); *see also* 15 U.S.C. § 1602(h). Acima's lease-to-own transactions do not meet this definition for at least three reasons.

*First*, under the TILA, a lease cannot be a "credit sale" if it has no termination penalty. *See* 12 C.F.R. § 1026.2(a)(16). The CFPB has not alleged (nor can it) that any of Acima's RPAs have a termination penalty, which alone forecloses the applicability of the TILA. FAC ¶ 171 (alleging that Acima's lease-to-own transactions are "credit sales" but not alleging that they contain any penalty for termination). Nor could the CFPB cure this pleading deficiency because Acima's RPAs expressly give customers the right to "terminate th[e] Agreement at any time *without penalty* by returning the Property in accordance with our directions, and by paying us any delinquent Renewal Payments, plus Other Charges due." Ex. A at 4 (emphasis added). The RPAs define "Other Charges" as any applicable processing fee, costs of lost, destroyed, or damaged property, repossession costs, collection costs, re-delivery costs, returned payment fee, and late payment charges—none of which is a "termination penalty" because none is triggered by failing to renew. *Id.* at 3. The CFPB acknowledges this much in the FAC: "[t]o terminate the contract, the consumer had to . . . return the goods pursuant to [Acima's] . . . requirements." FAC ¶ 32. Thus, the CFPB does not—because it cannot—allege that Acima imposes a termination penalty.

19

Without a termination penalty, TILA does not apply.  *See Ortiz*, 65 F.3d at 342 ("Regulation Z can have meaning only if the term 'penalty' is construed to refer to additional charges imposed upon termination of the agreement.  In this case there are no additional charges."); *In re Hanley*, 135 B.R. 311, 313 (C.D. Ill. 1990) (same); *Starks v. Rent-A-Ctr.*, 1994 WL 577974, at *5 (D. Minn. May 16, 1990) (same).

*Second*, in addition to being unable to allege that any of Acima's RPAs impose a termination penalty, the CFPB also cannot plausibly allege that Acima's customers "agree[d] to pay as compensation for use a sum substantially equivalent to, or in excess of, the total value of the property and service involved."  12 C.F.R. § 1026.2(a)(16)(i).  The CFPB merely parrots the language of the regulation, *see* FAC ¶ 171, but supplies no factual allegations that Acima's lease-to-own transactions meet this portion of the definition of "credit sale."  That is because the express language of Acima's RPAs would defeat any such allegation.

The customer is free to terminate the lease at any time after the initial period, with no obligation to make future lease payments, representing only a fraction of the total value of the purchase price of the property.  As the *Snap* court explained, "a lease that permits termination after an initial period is not a credit sale under Regulation Z because the 'compensation for use' a consumer owes to a seller is only a fraction of "a sum substantially equivalent to, or in excess of, the total value of the property and service involved."  2024 WL 3625007, at *13 (citing 12 C.F.R. § 1026.2(16)).  Other courts agree.  *See Cent. Rents, Inc. v. Johnson* (*In re Johnson*), 203 B.R. 498, 502 (Bankr. S.D. Ga. 1996); *Dodson v. Remco Enter., Inc.*, 504 F. Supp. 540, 543 (E.D. Va. 1980).

*Third*, the CFPB cannot allege plausibly that Acima's customers would own the product "for no additional consideration or for nominal consideration . . . upon compliance with the agreement."  12 C.F.R. § 1026.2(a)(16)(ii).  According to Acima's RPAs, to obtain ownership of

20

the product, the customer has two options, both of which require additional, nonnominal consideration. A customer can either exercise Acima's "Early Purchase Option," which "may be an amount greater than the retailer's sales price and not 'same as cash,'" or the customer can make all of the "regular Renewal Payments." *Id*. at 1, 2. Thus, upon completion of the initial rental term, a customer would not own the product "for no additional consideration or for nominal consideration." 12 C.F.R. § 1026.2(a)(16)(ii). Both of these payment options require consideration beyond the initial rental period's lease payment.

Because lease-to-own transactions like Acima's fail all three portions of Regulation Z's definition of "credit sale," courts, including in this District, have held consistently that they are not credit sales. *See, e.g.*, *Snap*, 2024 WL 3625007, at \*12–13 (a "lease-to-own agreement does not constitute a 'credit sale' under the plain language of Regulation Z's definition"); *Remco Enter., Inc. v. Houston*, 9 Kan. App. 2d 296, 300 (1984); *Homeway Rentals v. Martin* (*In re Martin*), 64 B.R. 1 (Bankr. S.D. Ga. 1984); *Hanley*, 135 B.R. at 313; *In re Johnson*, 203 B.R. at 501.

Attempting to shoehorn lease-to-own transactions like Acima's into the TILA's definition of "credit sale" would lead to absurd results because many of the mandatory disclosures in Regulation Z *do not exist in lease-to-own transactions*. *See* 12 C.F.R. § 1026.18 (prescribing disclosure of "annual percentage rate" and "security interest," among others). For example, the RPA has no interest rate because *it is not financing*, and Acima does not maintain a security interest in the goods because it *maintains ownership outright*. "It is a fundamental canon of statutory interpretation that courts should not 'construe a statute in a way that renders words or phrases meaningless, redundant, or superfluous.'" *Town of Dutch John v. Daggett Cnty.*, 367 F. Supp. 3d 1290, 1301 (D. Utah 2019) (quoting *Bridger Coal Co./Pac. Min., Inc. v. Dir., OWCP*, 927 F.2d 1150, 1153 (10th Cir. 1991)).

In short, the TILA does not apply to Acima's lease-to-own transactions. The Court should dismiss the TILA claim (Count X) and the derivative CFPA claim (Count XI) with prejudice.

### D.     Acima Is Not a "Financial Institution" Under The FCRA.

The CFPB's FCRA claim under 15 U.S.C. § 1681s-2(a)(7) (Count XVII) also must be dismissed with prejudice because that statute's requirements apply only to "financial institutions," and Acima is not one within the meaning of the FCRA. *See* 15 U.S.C. § 1681s-2(a)(7) ("If any *financial institution* that extends credit and regularly . . . furnishes negative information to such an agency regarding credit extended to a customer, the *financial institution* shall provide a notice of such furnishing of negative information, in writing, to the customer.") (emphasis added).

The FCRA's definition of "financial institution" is similar to, but not exactly the same as, the EFTA's. The FCRA defines this term to mean "any institution the business of which is engaging in financial activities as described in section [4(k) of the Bank Holding Company Act of 1956 or 12 U.S.C. § 1843(k)]." 15 U.S.C. § 1681s-2(a)(7)(G)(ii) (adopting definition in 15 U.S.C. § 6809). Those activities in turn include "[l]ending, exchanging, transferring, investing for others, or safeguarding money or securities," acting as an "insur[er]," "[p]roviding financial, investment, or economic advisory services," and "[u]nderwriting, dealing in, or making a market in securities." 12 U.S.C. § 1843(k)(4). As explained above, Acima's lease-to-own transactions do not create any security interest, and the CFPB has made no allegation—because it cannot—that Acima engages in any other statutorily defined activities of a "financial institution." *See, e.g.*, *In re Roberts*, 620 B.R. 336, 341 (Bankr. D. N.M. 2020) (as a matter of state law, lease-to-own transactions do not create a security interest where they are terminable at will by the lessee) (collecting cases); *In re Powers*, 983 F.2d 88, 90 (7th Cir. 1993) (same); *In re Yarbrough*, 211 B.R. 654, 657-58 (Bankr. W.D. Tenn. 1997) (same); *In re Johnson*, 203 B.R. 498 at 503 (same).

The CFPB alleges only that Acima is "a 'financial institution' within the meaning of FCRA because [it] extended credit" to consumers."  FAC ¶ 173.  But, as explained above, Acima does not extend credit as a matter of law.  Count XVII should be dismissed with prejudice.

### III.   THE CFPB'S SUDDEN REINTERPREATION OF THE CFPA, THE TILA, THE EFTA, AND SECTION 1681S-2(A)(7) OF THE FCRA VIOLATED ACIMA'S DUE PROCESS RIGHT TO FAIR NOTICE.

Even if Acima's lease-to-own transactions could fall within the scope of the CFPA, the EFTA, the TILA, and the FCRA (and they cannot), the CFPB's sudden departure from its prior interpretation of these statutes and its attempt to stretch the meaning of "credit," "credit sale," and "financial institution" to cover Acima's lease-to-own transactions violates Acima's Fifth Amendment due process rights.  This is yet another reason to dismiss Counts I–VIII, X–XIII, XVII, and XIX.

"The fundamental principle that laws regulating persons or entities must give fair notice of what conduct is required or proscribed . . . is essential to the protections provided by the Fifth Amendment's Due Process Clause . . . which requires the invalidation of impermissibly vague laws."  *F.C.C. v. Fox TV Stations, Inc.*, 567 U.S. 239, 240 (2012) (internal quotation marks and citations omitted).  Due process therefore requires agencies to "provide regulated parties fair warning of the conduct [a regulation] prohibits or requires."  *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) (internal quotation marks and citation omitted) (alternation in original).  An "agency should not change an interpretation in an adjudicative proceeding where doing so would impose new liability on individuals for past actions which were taken in good-faith reliance on agency pronouncements."  *Id.* at 156-57 (internal quotation marks, alterations, and citation omitted).  An agency's retroactive application of a new statutory or regulatory interpretation to a party's conduct without fair notice violates that party's due process rights.  *See, e.g.*, *PHH Corp. v. CFPB*, 839 F.3d 1, 46 (D.C. Cir. 2016) (vacating an order following an

23

enforcement action where the Department of Housing and Urban Development sought retroactively to prohibit conduct it had previously permitted ), *reinstated in relevant part on reh'g en banc*, 881 F.3d 75 (D.C. Cir. 2018), *abrogated on other grounds*, *Seila L. LLC v. CFPB*, 591 U.S. 197 (2020).

The CFPB has failed to provide requisite notice to Acima that it would attempt suddenly to police Acima's lease-to-own transactions. In January 2021, the CFPB published guidance declaring that lease-to-own transactions do not constitute "credit." *See* CFPB Taskforce Report at 215–16.[15] That report contained a synopsis of lease-to-own transactions materially identical to Acima's and explicitly concluded that "[s]trictly speaking, rent-to-own transactions are not credit." *Id.* at 215. It expressly distinguished *lease-to-own transactions* (which do not transfer ownership to the consumer during the lease period) from *credit transactions* (which transfer ownership at point of sale). For example, the CFPB concluded that unlike installment loans, lease-to-own transactions involve "the provider bear[ing] the ownership risks and costs during the rental period" because "[t]he renter can return the product at the end of any rental period without early termination fee or further charge, except for damages." *Id.* Thus, the statutory definition of "credit" and the CFPB's own guidance gave Acima and other industry participants substantial reasons to believe that the CFPB would not attempt to police lease-to-own transactions.

Only when the CFPB sued Snap Finance LLC in 2023 did Acima (and the rest of the lease-to-own industry) learn of the CFPB's sudden departure from its own guidance and its attempt to police lease-to-own transactions as purported "credit" dealings. The CFPB's unforeseen about-

---

[15] This report now contains an undated disclaimer, added after the CFPB's initial publication of the report, which states: "This report was produced in violation of the Federal Advisory Committee Act ("FACA") . . . . Because the Taskforce did not comply with FACA's requirements, readers should not assume that the report provides sound advice." CFPB Taskforce Report at i (as amended). The CFPB, however, never provided a substantive explanation for its changed position. When an agency changes its existing policy, it must provide "a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (citations omitted).

4903-4104-3719.v1

face violated Acima's due process rights because, without any notice, Acima could not be expected to have "divine[d] the agency's interpretations in advance." *SmithKline*, 567 U.S at 158-59.

## IV. THE COURT SHOULD DISMISS COUNTS I–VIII BECAUSE THE COMPLAINT FAILS TO ALLEGE PLAUSIBLY ANY DECEPTIVE, UNFAIR, OR ABUSIVE PRACTICES.

Counts I–VIII allege that Acima violated the CFPA by purportedly engaging in deceptive, unfair, or abusive practices. But the FAC fails to supply plausible allegations[16] that Acima's conduct was deceptive, unfair, or abusive.

### A. The CFPB Fails To Allege Plausibly that Acima's "90 Day Same As Cash" Marketing Is Deceptive (Count I).

The CFPB alleges that Acima violated the CFPA by deceptively marketing its early purchase option "as though it was a 90-day loan" by using phrases such as "90 days same as cash . . . without providing any further explanation of Acima's 'rental-purchase' or 'lease-purchase' financing." FAC ¶ 178. The CFPB also alleges that Acima failed to disclose to its customers that the early purchase option included an initial markup and an exercise fee. *Id.* ¶ 83. But these allegations are devoid of any factual support. Moreover, they are contradicted on their face by Acima's RPA, which customers receive and sign prior to executing any lease transaction. Just as "[a] consumer cannot decline to read clear and easily understandable terms that are provided on the same [document] in close proximity to the location where the consumer indicates his agreement to those terms and then claim that the [document], which the consumer has failed to read, is deceptive," the CFPB cannot do so either. *In re Vistaprint Corp Mktg. & Sales Prac. Litig.*, 2009 WL 2884727, at *6 (S.D. Tex. Aug. 31, 2009) (citations omitted), *aff'd sub nom. Bott v.*

---

[16] Numerous courts have ruled that CFPA claims additionally must meet the heightened pleading standard under Fed. R. Civ P. 9(b). *See, e.g., CFPB v. Prime Marketing Hldgs., LLC*, 2016 WL 10516097, at *7 (C.D. Cal. Nov. 15, 2016); *CFPB v. Commonwealth Equity Grp.*, LLC, 554 F. Supp. 3d 202, 209 (D. Mass. 2021). Although the Tenth Circuit questioned whether the heightened pleading standard applies to a claim under section 5 of the Federal Trade Commission Act, *see FTC v. Freecom Comms., Inc.*, 401 F.3d 1192, 1203 n.7 (10th Cir. 2005), it should apply that standard here. Regardless, the CFPB's claims fail under either standard.

*Vistaprint USA Inc.*, 392 F. App'x 327 (5th Cir. 2010).  Accordingly, the CFPB's Count I fails to state a claim upon which relief may be granted.

The CFPB provides no facts supporting its conclusory allegation that Acima described its "90 day option" to consumers "as though it was a 90-day loan" or that it withheld the terms of the early purchase option from them before or during the time they signed the RPA.  FAC ¶¶ 81–87, 178–81.  That alone is reason to dismiss it.  *Twombly*, 550 U.S. at 556.

In any event, the CFPB's allegations are contradicted on their face by Acima's RPA, which Acima's customers review and sign before renting goods from Acima (as the CFPB acknowledges, *see* FAC ¶¶ 62–75).  The RPA clearly states in bolded and underlined text:  "**This is not a loan**." Ex. A at 1 (emphasis in original).  Thus, Acima's customers could not have been misled into thinking the 90-day purchase option "was a 90-day loan."  FAC ¶ 178.  Similarly, the RPA provides in full the terms of the early purchase option, including all fees.  For example, the RPA states at the top of the first page in bolded, large size text:  "**The Agreement includes a {EARLY_PURCHASE_OPTION_TERM} Early Purchase Option. This Early Purchase Option may be an amount greater than the retailer's sale price and not 'same as cash.'**" Ex. A at 1 (emphasis in original).  The RPA also sets forth additional lease details, including potential purchase pricing and other terms, if the customer elects to purchase.  *Id.* at 2–3.  Thus, regardless of Acima's alleged occasional use of the phrases "90 day option" or "90 day same as cash" in portions of certain historical marketing materials, the agreement that each customer signed expressly forecloses any possibility of an overall "net impression" that would mislead customers. *CFPB v. Gordon*, 819 F.3d 1179, 1193 (9th Cir. 2016) (courts examine the overall "net

4903-4104-3719.v1

impression" on a reasonable consumer to determine whether a representation is deceptive).[17]  The

CFPB speculatively asserts that Acima's marketing materials "misled" customers, FAC ¶ 5,

notwithstanding the fact customers received the full terms of the early purchase option in the RPA.

### B.   The CFPB Fails To Allege Plausibly That Acima Deceptively Represented to Customers an Obligation To Maintain "Autopay" (Counts II and III).

The CFPB also fails to provide adequate factual support for its allegations that Acima

deceptively misrepresented to customers that they were obliged contractually to maintain auto-pay

in order to continue leasing, FAC ¶¶ 182–89, and unfairly obstructed customers' ability to revoke

ACH authorizations, *id.* ¶¶ 190–95.

"An act or practice is 'unfair' under the CFPA only if it 'causes or is likely to cause

substantial injury to consumers which is not reasonably avoidable by consumers, and . . . (2) such

substantial injury is not outweighed by countervailing benefits to consumers or to competition.'"

*CFPB v. Intercept Corp.*, 2017 WL 3774379, at *4 (D.N.D. Mar. 17, 2017) (quoting 12 U.S.C.

§ 5531(c)(1)).  The CFPB has not alleged plausibly these key statutory elements.  Out of Acima's

millions of customers and transactions, the CFPB supplies a few isolated conclusory allegations

of communications advising "some" customers that they should maintain a payment method on-

file.  *See* FAC ¶¶ 183, 185.  As a matter of law, these few isolated communications, even if true,

are insufficient to establish either a practice likely to deceive a customer acting reasonably or the

materiality of such communication to a customer who apparently never saw such communication.

*See FTC v. DIRECTV, Inc.*, 2018 WL 3911196, at *16 (N.D. Cal. Aug. 16, 2018) (requiring an

explanation for "why conclusions about a handful of advertisements can be applied to derive a

---

[17] Acima's clear disclosures to its customers of the existence of early purchase option fees and the option's complete terms stands in stark contrast to claims of deceptive conduct courts have sustained under the FTC Act.  *See, e.g.*, *FTC v. LendingClub Corp.*, 2018 WL 11436309 at *6-8. (N.D. Cal. Oct. 3, 2018) (finding a "no hidden fees" representation deceptive because an "origination fee" had not been disclosed during the application process).  "[T]he standard for a CFPA deception claim under [Section 5536] is the same as the standard under § 5(a) of [the] Federal Trade Commission Act[.]" *CFPB v. Frederick J. Hanna & Assocs., P.C.*, 114 F. Supp. 3d 1342, 1369-70 (N.D. Ga. 2015).

uniform net impression for an extremely large number of others" and ruling that the agency "simply cannot meet this burden by characterizing the advertisements at a high level of generality and asserting that conclusions regarding one advertisement apply uniformly to tens of thousands of others").

The CFPB likewise fails to allege plausibly that Acima unfairly obstructed customers' ability to withdraw ACH transactions. *See* FAC ¶¶ 190–95. It merely alleges that in the event "some" of Acima's millions of customers attempted to change their authorized bank account for ACH withdrawals, Acima purportedly made statements to the effect that the customer was obligated to maintain autopay and could not "fully revoke ACH authorization." FAC ¶ 134. But the FAC contains no factual allegations supporting key elements of its claims—that these actions comprised substantial consumer injury or that any substantial injury was not outweighed by countervailing benefits. *See Intercept Corp.*, 2017 WL 3774379, at *4 ("Although the complaint contains several allegations that Intercept engaged in or assisted in unfair acts or practices, it never pleads facts sufficient to support the legal conclusion that consumers were injured or likely to be injured. Nothing in the complaint allows the defendants or the court to ascertain whether any potential injury was or was not counterbalanced by benefits to the consumers at issue."). All that the CFPB alleges is that Acima told some customers that "'[i]n the event *that payments are returned from the new ACH*, [Acima] will keep the prior checking account on file per your lease agreement as a back up [sic] form of payment." *See* FAC ¶ 134 (emphasis added).

The CFPB never explains how asking customers to comply with their contractual lease payment obligations by keeping a valid account on file—as a backup form of payment, no less—constitutes substantial injury to consumers. The CFPB's own enforcement practice establishes that a claim for unfair acts or practices requires more. *Cf.* Consent Order, *CFPB v. Main S. Pers.*

28

4903-4104-3719.v1

*Fin., Inc.* ¶¶ 43–50 (June 2, 2020), https://tinyurl.com/mrxmv277 (finding a violation under the CFPA's prohibition on unfair acts or practices where defendant collected, retained, and failed to refund overpayments *for amounts customers did not owe*). The lack of any allegations in the FAC that Acima misused ACH authorizations or charged customers improperly is telling given that the CFPB has already amended its complaint once but failed to cure this pleading infirmity.

> **C.     The CFPB Fails To Allege Plausibly that Acima Deceptively Misrepresented Consumers' Ability To Return Goods or Created Unfair Barriers to Returns (Counts IV and V).**

Here again, the CFPB fails to allege plausibly that Acima deceptively misrepresented its return policy or unfairly created barriers to customers' ability to return goods. FAC ¶¶ 196–209.

The CFPB acknowledges that Acima "represented that consumers may terminate their agreements at any time (or, until 2017, after a 60-day period) by returning the goods or services," but then alleges that Acima "created barriers to returns." FAC ¶¶ 197–98. But the CFPB does not allege sufficient facts (because it cannot) from which the Court could draw a reasonable inference that Acima's statements either were likely to mislead a customer or were important to customers. The only allegations the CFPB can muster is to list examples of Acima offering customers a variety of options to dispose of, donate, return, or take ownership of products. *See* FAC ¶¶ 88–107. None of these are "barriers to returns." *Id.* ¶ 198. Instead, these are basic good business practices.

For example, asking customers to provide pictures of goods to be returned to help verify their condition or asking for donation receipts are all legitimate means to mitigate fraud or ensure that a customer does not improperly retain possession of leased goods after terminating the RPA. And offering customers an early settlement or promotional purchase price they can accept or decline in their sole discretion, asking them in certain cases to donate larger goods, or not repossessing goods from defaulted customers are simply business decisions made to account for circumstances when the costs of collecting such returned goods would exceed their value.

29

Importantly, the CFPB does not (and cannot) allege that Acima prevented returns or failed to terminate a lease if any of these alternative options were exercised. *See* FAC ¶¶ 88–107. Finally, the CFPB's allegations that Acima *permitted returns* of smaller items by mail, auctioned off, pawned, or discarded certain goods *after they were returned*, and refused to deal with certain customers who *previously returned* goods plainly did not create any barriers to returns.

The CFPB asks the Court to draw an inference that Acima's offers of alternative return mechanisms were "barriers" to returning goods, but the Court should not draw inferences that are unsupported by sufficient factual allegations. *Twombly*, 550 U.S. 544, 555–56. Here, where the CFPB has failed to demonstrate a "reasonable likelihood of mustering factual support for [its] claims," *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (citing *Twombly*, 550 U.S. at 570), the Court should dismiss Counts IV and V.

> **D.    The CFPB Fails To Allege Plausibly that Acima Made Unfairly Deceptive Statements to or Failed To Train and Monitor Its Third Party Retailers (Count VI).**

Count VI alleges that Acima engaged in unfair acts or practices by purportedly making deceptive statements to third party merchants and failing to train and monitor them properly. FAC ¶¶ 210–18. The CFPB, however, fails plausibly to allege substantial injury to consumers or that any such injury is not outweighed by countervailing benefits, which are key elements of a CFPA claim that "[a]n act or practice is 'unfair.'" *See Intercept Corp.*, 2017 WL 3774379, at *4.

As with other claims above, out of thousands of third party merchants where customers can lease eligible goods, the CFPB merely speculates that Acima may have made statements to certain merchants that purportedly would "creat[e] the likelihood that merchants would market the product inaccurately." FAC ¶ 115. For example, the CFPB alleges that Acima's agreements with merchant partners "never explicitly stated that Acima [] was purchasing the goods from the merchant partner." *Id.* ¶ 112. The CFPB also alleges that Acima's training materials were

inadequate because they "*sometimes* described consumers as purchasing goods and services from merchants using Acima financing" and "used the term 'credit.'" *Id.* ¶¶ 117, 120 (emphasis added). But the CFPB fails to allege that any of these purportedly misleading statements made to certain merchants and certain communications, even if true, resulted in substantial injury to a customer. *See CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 914 (S.D. Ind. 2015) (finding, with respect to a CFPA unfair practices claim, that "without coercion it is impossible to show that ITT's actions were the proximate cause of any subsequent financial harm[]").

In any event, under the CFPA, an act cannot be unfair unless a customer "cannot reasonably avoid" it. *Ill. v. Alta Colls., Inc.*, 2014 WL 4377579, at *2 (N.D. Ill. Sept. 4, 2014) (citing 12 U.S.C. § 5531(c)(1)). Here, *even if* any of the allegedly misleading statements Acima made to third party merchants reached customers, and *even if* those statements impacted a customer's decision to execute a lease-to-own agreement, Acima's RPAs stated in bold, prominent text that Acima's leases were not loans and Acima was not extending credit. It strains credibility that purportedly "inaccurate" internal company training materials governing Acima's relationship with merchants deceived customers when Acima provided customers the full terms of the lease agreement prior to executing the RPA.

### E. The CFPB Fails To Allege Any Abusive Acts or Practices with Respect to Acima's "Text To Apply" Process (Count VII).

The CFPB vaguely alleges that Acima's "Text To Apply" process "materially interfered . . . with consumers' ability to understand . . . the terms and conditions" of their agreements with Acima. FAC ¶ 220. But this is nothing more than a "threadbare recita[l] of the elements of a cause of action." *Iqbal*, 556 U.S. at 678. The CFPB fails to plead sufficient factual allegations supporting its claim that Acima's application process meets the statutory requirements for abusive acts or practices. *See* FAC ¶¶ 55–80, 219–22. Under the CFPA, a practice is "abusive" if

31

it "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or . . . takes unreasonable advantage of—(A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service; (B) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or (C) the reasonable reliance by the consumer on a covered person to act in the interests of the consumer."

*Intercept Corp.*, 2017 WL 3774379, at *4 (quoting 12 U.S.C. § 5531(d)). The CFPB's allegations meet none of these requirements. Importantly, the CFPB never alleges (and cannot allege) that a consumer could not obtain a copy of Acima's RPA and read it prior to executing it. The CFPB acknowledges that a consumer could obtain the RPA from the merchant, FAC ¶ 63, or on their mobile phones, *id.* ¶¶ 65–70. These acknowledgements defeat the CFPB's abusive-practice claim because Acima's consumers fully were able to read the RPAs prior to signing them.

All the CFPB can allege is that Acima "did not explain the terms of the agreement (or provide a copy) [] at the time of being approved" and that it provided the agreement "in small font on a mobile phone." FAC ¶¶ 61, 68–70. But Acima's approval of consumers occurs **before** they receive and execute an RPA, and thus says nothing about consumers' ability to understand the RPA's terms on mobile devices, on which Acima presented the full terms of the RPA, and which are widely used as an ordinary course means of conducting consumer transactions.

The CFPB's other allegations fare no better. For example, the CFPB alleges that Acima "did not disclose to consumers the amount financed, the finance charge, or the annual percentage rate." FAC ¶ 77; *see id.* ¶ 72 (faulting Acima for "not disclos[ing] the actual cost of financing"). Of course, Acima did not make these disclosures—because it *could not* make these disclosures: its lease-to-own transactions are *not credit* and thus *do not have* a cost of financing, a financed amount, a finance charge, or an annual percentage rate. Acima could not have materially interfered with consumers' ability to understand terms that do not exist.

32

In short, because a consumer can read the full terms of Acima's RPA prior to executing it, the CFPB has failed to allege that Acima "materially interfere[d] with the ability of a consumer to understand" the RPA or that Acima "t[ook] unreasonable advantage" of a consumer, Count VII should be dismissed.

F.     **The CFPB Fails To Allege that Acima Misrepresented Its Lease-To-Own Transactions as Credit (Count VIII).**

The CFPB's last CFPA-based claim (Count VIII) also is pleaded inadequately because it lacks even a single particularized allegation that Acima ever told a customer that its lease-to-own transaction was an offer of "credit."  All the CFPB can allege is that Acima referred to itself as "a lender" and its product as "a loan" in certain "*internal* documents" and communications" and that its websites included generic "tagline[s]" such as "[g]ive yourself some credit."  FAC ¶¶ 39–40, 44, 47, 50.  None of these allegations sufficiently pleads that Acima purportedly told customers "it was making a 'firm offer of credit,'" or that its marketing materials "invited consumers to 'spread out payments'" or "give [them] the time to pay," FAC ¶¶ 43, 46, 49, and none of these taglines even uses the word "credit" in a financial sense.  Further, as the FAC acknowledges, customers received the RPA prior to executing a lease agreement, which contains express language that the "transaction is a rental-purchase agreement" and "is not a loan or credit transaction."  Ex. A at 1 (emphasis omitted).  Accordingly, Count VIII also should be dismissed for failure to state a claim.

V.     **EVEN IF THE TILA APPLIED TO ACIMA'S LEASE-TO-OWN TRANSACTIONS, ACIMA MADE ALL POSSIBLE DISCLOSURES REQUIRED BY THE TILA (COUNTS X AND XI).**

Even assuming that the TILA applies to Acima's lease-to-own transactions—and it does not, because those transactions are not "credit sales" under the TILA and its implementing Regulation Z, *see* Section II.C, *supra*—the CFPB still fails to state a claim under the statute

because it fails to allege that Acima omitted any disclosures required by the TILA that exist in lease-to-own transactions.

The TILA's required disclosures, which include items that exist only in credit transactions and are irrelevant to lease-to-own transactions, such as the annual percentage rate ("APR"), any variable interest rate, or terms relating to security interest, among others. *See* 12 C.F.R. § 1026.18; *see also* Section II.C, *supra*. The RPA discloses Regulation Z's requirements actually applicable to lease-to-own transactions—for example, the total amount of payments, the total cost to own, the total rental cost, the amount of each lease renewal payment, the cash price, and the number of payments. *See* Ex. A. The only required disclosures that the CFPB alleges the RPA does not make are those that are not possible with a lease-to-own transaction that does not offer "credit": "the amount financed, the finance charge, or the annual percentage rate." FAC ¶ 77. That is why the TILA is inapplicable to these transactions in the first place. But even if it were, Acima could hardly be faulted by not disclosing information that does not exist.[18] Indeed, attempting to provide such disclosures would surely cause customer confusion regarding the nature of Acima's leases. Accordingly, the CFPB fails to state a claim under the TILA, and the Court should dismiss Count X and Count XI (the CFPB's derivative CFPA claim).

## VI.    THE CFPB'S CLAIMS ARE TIME BARRED IN PART.

The CFPB's TILA and EFTA claims (Counts X and XII) are time-barred in part. Under both the TILA and the EFTA, an action must be brought "within one year from the date of the occurrence of the violation[.]" 15 U.S.C. § 1640(e); *accord* 15 U.S.C. § 1693m(g); *see ITT Educ. Servs.*, 219 F. Supp. 3d at 922–23 (applying one-year limitations period to TILA action brought

---

[18] The CFPB's own interpretation of Regulation Z supports the notion that entities need not disclose inapplicable information. *See* CFPB Official Staff Commentary on Regulation Z, 12 C.F.R. § 1026.18-1(i) (May 14, 2024) https://tinyurl.com/4azu8uef (Regulation Z disclosures "need be made only as applicable. Any disclosure not relevant to a particular transaction may be eliminated entirely.").

by CFPB) (citing *Gabelli v. SEC*, 568 U.S. 442, 454 (2013)).  On June 8, 2023, Acima and the CFPB agreed to a tolling agreement to suspend the statute of limitations as of July 15, 2022 for claims under the EFTA and TILA, among other statutes.  Thus, any EFTA or TILA claim involving conduct prior to July 15, 2021 (i.e., one year before the tolling date) is time-barred.

The FAC itself concedes that certain alleged misconduct occurred before July 15, 2021.  *See, e.g.*, FAC ¶¶ 130, 132, 134–35.  To the extent that Counts X and XII are based on allegedly deficient disclosures Acima made prior to July 15, 2021, each should be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, the Court should dismiss all of the CFPB's claims against Acima (i.e., all Counts other than Count IX, which is brought only against Mr. Allred).

Respectfully submitted,

Dated: December 16, 2024

By:  */s/  Matthew P. Previn*
    Matthew P. Previn *
    PAUL HASTINGS LLP
    200 Park Avenue
    New York, NY 10166
    Telephone: (212) 318-6049
    Facsimile: (212) 303-7049
    *admitted pro hac vice*

By:  */s/  Bradley J. Bondi*
    Bradley J. Bondi *
    PAUL HASTINGS LLP
    2050 M Street NW
    Washington, D.C. 20036
    Telephone: (202) 551-1701
    Facsimile: (202) 551-0201
    *admitted pro hac vice*

By:  */s/  Benson L. Hathaway, Jr.*
    Benson L. Hathaway, Jr.
    Alyssa K. Nielsen
    KIRTON MCCONKIE PC
    50 E. South Temple, Ste. 400
    Salt Lake City, UT 84111
    Telephone: (801) 328-3600
    Facsimile: (801) 321-4893

*Counsel for Defendants Acima Digital, LLC and Acima Holdings, LLC*

35

4903-4104-3719.v1

***Exhibit Index to Motion to Dismiss***

Exhibit 1 – Declaration of Matthew Previn

- Exhibit A to Declaration – Acima's standard Rental Purchase Agreement

36

4903-4104-3719.v1