Matthew A. Steward (#7637)
mas@clydesnow.com
Walter A. Romney, Jr. (#7975)
war@clydesnow.com
Nickolas C. Sessions (#18091)
ncs@clydesnow.com
CLYDE SNOW & SESSIONS
201 South Main Street, Suite 2200
Salt Lake City, Utah 84111-2216
Telephone (801) 322-2516

Tierney E. Smith (*pro hac vice* pending)
TierneySmith@GoodwinLaw.com
GOODWIN PROCTER LLP
1900 N Street NW
Washington, DC 20036
Telephone (202) 346-4019

***Attorneys for Defendant Aaron Allred***

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Plaintiff,<br><br>v.<br><br>ACIMA HOLDINGS, LLC; ACIMA DIGITAL, LLC (F/K/A ACIMA CREDIT, LLC, D/B/A ACIMA LEASING), and AARON ALLRED,<br><br>Defendants. | **DEFENDANT AARON ALLRED'S MOTION TO DISMISS AND MEMORANDUM IN SUPPORT**<br><br>Case No. 2:24-CV-00525-DBB<br><br>Judge David Barlow |

# TABLE OF CONTENTS

**Page**


RELIEF SOUGHT AND GROUNDS FOR MOTION ........ 1

INTRODUCTION ........ 1

LEGAL STANDARD ........ 4

ARGUMENT ........ 4

I. The CFPB is Unconstitutionally and Unlawfully Funded. ........ 4

II. CFPB Lacks Jurisdiction to Bring Enforcement Action Against Acima and Allred Under the CFPA. ........ 5

III. All Claims Against Allred Should Be Dismissed As Insufficient to State A Claim. ........ 6

A. CFPB Failed to Sufficiently Plead Claims for Corporate Liability, and Thus the Derivative Claims Against Allred Also Fail. ........ 7

B. CFPB's UDAAP Claims Against Allred (I-II, IV-VIII) Fail for Independent Reasons. ........ 7

C. CFPB's "Substantial Assistance" Claim Against Allred (Count IX) is Insufficiently Pled. ........ 21

D. CFPB's FCRA Claims Against Allred (Counts XVIII and XIX) Also Fail. ........ 23

CONCLUSION ........ 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................4

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................4, 8

*Bick v. Utah State Univ.*,
2021 WL 2379600 (D. Utah June 10, 2021) (Barlow, J.)....................8, 10

*CFPB v. CashCall, Inc.*,
2016 WL 4820635 (C.D. Cal. Aug. 31, 2016)....................19

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
601 U.S. 416 (2024)....................5

*CFPB v. Commonwealth Equity Grp., LLC*,
554 F. Supp. 3d 202 (D. Mass. 2021)....................12, 13, 15, 16, 18

*CFPB v. Consumer Advoc. Ctr. Inc.*,
2023 WL 5162392 (C.D. Cal. July 7, 2023)....................17

*CFPB v. Gordon*,
819 F.3d 1179 (9th Cir. 2016)....................8, 11, 12, 13, 14, 15, 16, 17, 19

*CFPB v. ITT Educ. Servs., Inc.*,
279 F. Supp. 3d 878 (S.D. Ind. 2015)....................11

*CFPB v. Manseth*,
2023 WL 5400235 (W.D.N.Y. Aug. 22, 2023)....................21

*CFPB v. NDG Fin. Corp.*,
2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016)....................11

*CFPB v. Nexus Servs., Inc.*,
2024 WL 1461382 (W.D. Va. Apr. 2, 2024)....................21

*CFPB v. Prime Mktg. Holdings, LLC*,
2016 WL 10516097 (C.D. Cal. Nov. 15, 2016)....................12, 17

*CFPB v. RD Legal Funding, LLC*,
332 F. Supp. 3d 729 (S.D.N.Y. 2018)....................22

*CFPB v. Snap Finance LLC*,
2024 WL 3625007 (D. Utah Aug. 1, 2024) (Parrish, J.)....................2, 5

*FTC v. Swish Mktg.*,
2010 WL 653486 (N.D. Cal. Feb. 22, 2010) ....................11

*Integrity Advance, LLC v. CFPB*,
48 F.4th 1161 (10th Cir. 2022), *cert denied*, 143 S. Ct. 2610 (2023)....................8

*McNack v. Smith*,
2015 WL 7302218 (C.D. Cal. Nov. 16, 2015)....................24, 25

*Richfield v. PolarityTE, Inc.*,
2023WL 3010208 (D. Utah Apr. 19, 2023)....................4, 12

*Watson v. Caruso*,
424 F. Supp. 3d 231 (D. Conn. 2019)....................23, 24

**Statutes**

12 U.S.C. §§ 5481, *et seq*....................5, 6

12 U.S.C. § 5531, *et seq*....................3, 5, 7

12 U.S.C. § 5536, *et seq*....................3, 5, 7

15 U.S.C. §§ 1681 *et seq*....................3

Utah Code § 16-10a-801....................10

Utah Code § 48-3a-112....................9

Utah Code § 48-3a-407, *et seq*....................9, 10

**Other Authorities**

CFPB, Taskforce on Fed. Consumer Fin. Law, Report Vol. I (Jan. 2021),
https://tinyurl.com/mr283dfs ....................20

Fed. R. Civ. P. 9(b) ....................4, 12, 13, 15, 16, 17, 18

Fed. R. Civ. P. 12(b)(6)....................1, 4

## RELIEF SOUGHT AND GROUNDS FOR MOTION

Aaron Allred ("Allred") moves to dismiss the Amended Complaint with prejudice because (i) the Consumer Financial Protection Bureau ("Bureau" or "CFPB") is unconstitutionally and unlawfully funded and therefore has no authority to bring this lawsuit; (ii) the Bureau lacks the statutory authority to bring an enforcement action concerning the lease-to-own agreements at issue here, and its claims violate Allred's due process rights; and (iii) the Counts against Allred fail to state a claim for relief under Fed. R. Civ. P. 12(b)(6) for still further reasons.

## INTRODUCTION

This case is about an unbridled federal government agency's policy-driven overreach and disregard for statutory restraints and basic fairness, all in a misguided effort at consumer protection. The CFPB is not only operating without a constitutional basis (as argued in Acima's brief), it is simultaneously endeavoring to expand its jurisdiction more than ever – not through regulation, but through enforcement action. That impermissible overreach extends not only to the Acima company Defendants, but also to Allred, a former company executive on whose behalf this brief is filed.

The present suit seems to be motivated primarily by the CFPB's dislike of the rent-to-own industry, which is already heavily regulated by at least 46 states and the District of Columbia, and wildly popular among consumers. This is the second in what may become a series of suits in this Court against rent-to-own, preceded by a case against Snap Finance which is pending before Judge Parrish. *See* Complaint, *CFPB v. Snap Finance LLC, et al.*, No. 2:23-cv-00462-JNP-JCB (filed July 19, 2023 D. Utah). As there, CFPB takes the outlier position here that rent-to-own leases of consumer goods—like furniture and electronics—are "credit," and so within its authority to criticize, regulate, and sue. Am. Compl. ¶¶ 3, 148-151. The Amended Complaint

then proceeds to condemn many aspects of Acima's business as "unfair, deceptive, or abusive" and warranting the imposition of civil money penalties. *Id.* ¶¶ 177-233, 286.

Whatever the reason for the CFPB's prejudice, this case must be dismissed because the Bureau's attempted regulation of the central aspects of the rent-to-own industry is plainly outside of its statutory jurisdiction. Judge Parrish decided exactly that in dismissing the case before her. *See CFPB v. Snap Finance LLC*, 2024 WL 3625007, at *8-11 (D. Utah Aug. 1, 2024) (Parrish, J.) ("At bottom, the CFPB would have this court adopt an expansive interpretation of 'credit' that has been roundly rejected by the federal courts."). This Court also should reject the CFPB's invitation to expand its jurisdiction without Congressional approval.

Moreover, this Court should decline to permit the CFPB to go one step further by attaching personal liability to Allred, who is one of the Company's former executives—but who has no connection to Acima or the rent-to-own industry today. This is true for many reasons, but two are prominent. First, since Acima is outside the jurisdiction of the CFPB, Allred cannot be liable to the CFPB either. But here, the CFPB is trying to create retroactive liability for Allred. In the face of settled law and the Bureau's own published conclusion that rent-to-own is not a credit product, the CFPB now asserts that it *is* "credit" and that Allred should be held personally liable for violations of laws that, while CEO, *he never could have thought applied*. It is categorically unfair – and unconstitutional – for any government agency to bring a suit based on a novel interpretation of law and then, if it wins, ask the court to apply that law against an individual retroactively.

Second, whatever the reach of the CFPB's subject matter jurisdiction over the rent-to-own product, the Amended Complaint does not state a claim because, fundamentally, Allred is accused of doing nothing more than serving as the company's chief executive. The theory that any or every CEO can be held personally liable for acts of a business under the CFPB's

jurisdiction is untenable. The Consumer Financial Protection Act ("CFPA"), which is the source of much of the Amended Complaint's causes of action, does not just allow the CFPB to sue a company for certain policies and practices and therefore also sue the executive who ran the company—more is required.

To the extent the CFPA (and other relevant laws and cases) permit a claim against a target's CEO, they require a basis in fact that the Amended Complaint simply does not allege. The Amended Complaint tries to make up in volume what it lacks in substance, asserting a welter of claims against Allred.[1] But for all their bluster, the CFPB's allegations against Allred are too sparse, too vague, and too conclusory to support any of these claims under the established legal standards. This reality is staggering in light of the CFPB's multi-year investigation of Acima precipitating this suit. In contrast to typical litigation where the complaint is filed before any discovery has been conducted, here, the CFPB's complaint is based on its review of millions of pages of documents produced by the Company, and testimony from Allred, among other information. Put simply, the Amended Complaint's thin allegations against Allred are all that the CFPB will ever be able to muster, and they do not support any individual liability.

There are also strong reasons why the required dismissal is supported by sound policy. The CFPB can offer no justification for the significant departure here from the historical and sensible practice it and other consumer regulators have followed of pursuing individuals only when they are wrongdoers who actively engaged in *bona fide* law-breaking, using corporations or entities as vehicles for committing systemic violations. Nor does such a justification exist here. The

[1] The Bureau purports to assert claims against Allred for the Company's alleged violations of the CFPA's prohibition on unfair, deceptive, or abusive acts or practices ("UDAAP"), 12 U.S.C. §§ 5531 and 5536 (Counts I, II, IV-VIII) and the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 *et seq.* (Count XVIII). It also alleges that Allred provided "substantial assistance" to the Company in its purported violations of the CFPA (Count IX), 12 U.S.C. § 5536(a)(3), and that Allred is, by default, liable for violating the CFPA because he violated FCRA as alleged in Count XVIII (Count XIX).

CFPB's suit instead embraces a far-reaching theory of liability and seeks significant monetary penalties against Allred personally, all because he was, at one point, CEO of a business in an industry that the CFPB wants to start regulating.

For all of these reasons, and the other reasons explained below, the Court should dismiss this suit against Allred with prejudice.

## LEGAL STANDARD

Dismissal of a claim under Fed. R. Civ. P. 12(b)(6) is appropriate where the plaintiff fails to state a claim upon which relief can be granted. To survive dismissal, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[L]abels and conclusions," a "formulaic recitation of the elements of a cause of action," and "naked assertion[s]" devoid of "further factual enhancement" are not sufficient. *Twombly*, 550 U.S. at 555, 557. Rather, a plaintiff must present "enough factual matter (taken as true)" to "raise a right to relief above the speculative level." *Id.* at 555, 556. Additionally, for causes of action that sound in fraud or contain allegations of fraudulent conduct, the plaintiff's allegations must meet the heightened pleading standards of Rule 9(b). *See, e.g.*, *Richfield v. PolarityTE, Inc.*, 2023WL 3010208, at *3 (D. Utah Apr. 19, 2023) (citing Fed. R. Civ. P. 9(b)'s requirement to "state with particularity the circumstances constituting fraud").

## ARGUMENT

### I. The CFPB is Unconstitutionally and Unlawfully Funded.

Allred joins Acima's argument that the CFPB's case against Acima and Allred should be disposed of entirely because the CFPB's funding is unconstitutional and unlawful. *See* ECF No. 45 ("Motion" or "Mot.") at 8-11. As discussed in Acima's Motion, the Supreme Court recently held that the Appropriations Clause only authorizes the Federal Reserve System to fund the CFPB

so long as it "draw[s] funds from the combined *earnings* of the Federal Reserve System." *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 435 (2024) (emphasis added). However, the Federal Reserve has not made a profit – meaning, it has not had earnings – since 2022. Mot. at 9-10. When the Federal Reserve does not have earnings to fund the CFPB, the Bureau's general operations, including its investigative and enforcement activity, are not within the scope of the Appropriations Clause. Therefore, the agency's actions since 2022, including its initiation of this suit, are unconstitutional, invalid, and require dismissal of the Amended Complaint. *See* Mot. at 11.

## II. CFPB Lacks Jurisdiction to Bring Enforcement Action Against Acima and Allred Under the CFPA.

Allred also joins Acima's argument that each of the CFPB's claims brought under the CFPA, 12 U.S.C. §§ 5481, *et seq.*, must be dismissed because the CFPB does not have jurisdiction to enforce that statute against Acima or Allred. Mot. at 12-18.

The Bureau has jurisdiction to bring CFPA claims, including for purported violations of the CFPA's UDAAP prohibition, 12 U.S.C. § 5531(a), only against a "covered person," a person who is a "service provider" to a "covered person," or a person who provides "substantial assistance" to a "covered person" or "service provider." 12 U.S.C. § 5536(a). The Bureau has alleged that Acima is a "covered person." Am. Compl. ⁋ 153. However, the CFPA defines a "covered person" as "any person that engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6)(A). And it enumerates eleven categories of "consumer financial product[s] or service[s]," none of which include rental-purchase agreements like Acima's leases. *Id*. §§ 5481(5), (15)(A). *Cf*. Am. Compl. ⁋⁋ 146-152. Indeed, in a parallel enforcement action, Judge Parrish analyzed this issue for exactly the same type of rental-purchase agreement, and ***concluded that the leases were not covered by the CFPA.*** *Snap Fin. LLC*, 2024 WL 3625007, at *8-11; *see*

Mot. at 13, 14, 18. Just as in that case, because Acima's lease-to-own transactions are not a "consumer financial product or service," Acima is not a "covered person," and the Bureau lacks statutory authority to bring a CFPA claim against Acima.

Similarly, the Bureau lacks statutory authority to bring a CFPA claim against Allred. The Bureau's claims against Allred are entirely derivative of the Company's alleged violations under the CFPA, brought solely because he was an officer and employee of Acima. Specifically, Allred's asserted CFPA liability is as a "related person" to Acima, which would make him a "covered person," 12 U.S.C. §§ 5481(25)(B), (C), and as a person who provided "substantial assistance" to Acima, to the extent Acima is a "covered person." Am. Compl. ¶¶ 154, 233. However, neither of the two relevant definitions apply: Allred is not a "related person" because Acima is not a "covered person" for which Allred was a "director, officer, or employee charged with managerial responsibility." 12 U.S.C. § 5481(25)(C)(i). And Allred did not provide "substantial assistance to a covered person" through his work for Acima because Acima is not a "covered person." 12 U.S.C. § 5481(6)(A). Accordingly, each of the Bureau's claims against Allred brought under the CFPA (I-II, IV-IX, XIX) must be dismissed.

Further, Allred joins Acima's argument that the Bureau's CFPA claims must be dismissed because, by seeking through this lawsuit to characterize short-term lease-to-own transactions as "credit" under the CFPA, the Bureau has violated Acima's and Allred's constitutional due process rights to fair notice. Mot. at 23-25.

## III. All Claims Against Allred Should Be Dismissed As Insufficient to State A Claim.

Even assuming *arguendo* that this lawsuit is constitutionally and jurisdictionally sound (it is not), the claims against Allred must still be dismissed because the Bureau has failed to plausibly allege their key elements.

**A. CFPB Failed to Sufficiently Plead Claims for Corporate Liability, and Thus the Derivative Claims Against Allred Also Fail.**

As discussed above (at 6), the Bureau's CFPA claims against Allred are entirely derivative. The Bureau seeks to hold him personally liable for the Company's alleged violations based on his purported involvement in, support for, or ability to control Acima as an officer and employee. *See* Am. Compl. ⁋⁋ 180, 188, 200, 208, 217, 221, 227 (asserting CFPA claims against Allred based on his "participat[ion] in or [] authority to control" corporate violations of UDAAP), ⁋⁋ 231-233 (asserting CFPA claim against Allred because he "provided substantial assistance to [Acima] in [its] deceptive, unfair, and abusive acts or practices"). However, for the reasons discussed in Acima's Motion, the Bureau has failed to state a claim against Acima for corporate violations of the CFPA in each of the CFPA claims the Bureau also asserts against Allred. Mot. at 25-33. Allred joins in Acima's arguments respecting the Bureau's failure to sufficiently plead the corporate violations in Counts I-II and IV-VIII. *Id*. Therefore, the derivative CFPA claims against Allred must be dismissed.

**B. CFPB's UDAAP Claims Against Allred (I-II, IV-VIII) Fail for Independent Reasons.**

Regardless of the Company's purported liability under the CFPA, the claims that seek to hold Allred personally liable for purported "unfair, deceptive, [and] abusive act[s] or practice[s]" committed by Acima in violation of the CFPA (Counts I-II and IV-VIII) fail for independent reasons. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B). To hold an individual liable for corporate violations of the CFPA's UDAAP prohibition, the Bureau must establish that the individual (i) "participated directly in the [unfair, abusive, or] deceptive acts *or* had the authority to control them," ***and*** (ii) "had knowledge of the misrepresentations [or unfair or abusive acts], was recklessly indifferent to [them], or was aware of a high probability of [the law violation] along with an intentional avoidance of the truth." *CFPB v. Gordon*, 819 F.3d 1179, 1193 (9th Cir. 2016) (emphasis in original)

(citation omitted); *see Integrity Advance, LLC v. CFPB*, 48 F.4th 1161, 1173 (10th Cir. 2022) (applying *Gordon* standard), *cert denied*, 143 S. Ct. 2610 (2023). Rather than allege specific facts against Allred, the Amended Complaint makes generalized and generic assertions of this legal standard, divorced from any meaningful factual allegations about Allred's supposed actions, state of mind, or ability to control aspects of the Company. *See, e.g.*, Am. Compl. ⁋ 180 ("Allred participated directly in or had the authority to control this conduct and was or should have been aware of it."); *see also id*. ⁋⁋ 188, 200, 208, 217, 221, 227, 280 (similar). Such naked legal conclusions are insufficient pleadings. *See e.g., Bick v. Utah State Univ.*, 2021 WL 2379600, at *1 (D. Utah June 10, 2021) ("'Factual allegations must be enough to raise a right to relief above the speculative level.' Mere labels, conclusions, and formulaic recitations of the elements 'will not do.'") (Barlow, J.) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 555 ).

Resting only on the sparse remaining allegations in the Amended Complaint relating to Allred, the Bureau fails to sufficiently state a claim against him based on any of the Company's purported UDAAP violations. Given the extraordinary nature of attempting to hold an individual liable for the alleged conduct of a business, the CFPB should be required to do far more than rely on naked recitals of a legal standard—particularly where, as here, the CFPB's suit is premised on a novel, far-reaching theory of liability.

1. The Amended Complaint Fails to Allege Allred's "Authority to Control" Acima's Conduct That Supposedly Violated UDAAP.

At the outset, the Bureau fails to plead allegations to establish Allred's "authority to control" Acima's conduct at any time relevant to the Amended Complaint. *Gordon, supra*.

As a Utah limited liability company (Am. Compl. ⁋⁋ 13-15), the Utah Revised Limited Liability Company Act and the Company's operating agreement exclusively govern who can control the Company. *See* Utah Code § 48-3a-407(1)-(3) (providing that "[a] limited liability company

is [] member-managed" "unless [stated otherwise by] the operating agreement" and, depending on whether the company is member-managed or manager-managed, either "the management and conduct of the limited liability company are vested in the members" or "any matter relating to the activities and affairs of the limited liability company is decided exclusively by the manager, or, if there is more than one manager, by a majority of managers.").[2] However, the Amended Complaint is devoid of any allegation that those sources vested authority in Allred to control Acima's business. Indeed, while the Amended Complaint contains deliberately vague statements about Allred's alleged positions within Acima at various times (*see* pg. 10, *infra*), it alleges nothing at all about whether Acima was member-managed or manager-managed at any time relevant to the Amended Complaint, whether Allred was a "member" or "manager" within the Company at any time (including before and after the acquisition by RAC), or what the operating agreement otherwise said about Allred's ability to control the Company or any aspect of its affairs. This failure is fatal to every one of the Bureau's claims against Allred that rests upon his purported authority to control.

Further, the Amended Complaint's meager allegations purporting to describe Allred's role at Acima over a ten-year period, taken as true, are insufficiently pled as to his alleged authority to control Acima's conduct during that time, even if Utah limited liability law did not apply. Instead, all the Amended Complaint alleges is that (i) in Acima's early years, Allred performed tasks like "customer service" and "cleaning the bathroom" (Am. Compl. ⁋ 24); (ii) he was "closely involved" in aspects of Acima's business and policy-setting as the Company developed (*id.* ⁋ 25); and (iii) at some later, unspecified time when the Company had advanced, he was "still involved in corporate decisions." *Id.* ⁋ 26. Taken as true, these allegations at most describe a level of involvement

[2] *See also* Utah Code § 48-3a-112 ("[T]he operating agreement governs: (a) relations . . . between the members and the limited liability company; (b) the rights and duties . . . of a person in the capacity of manager; [and] (c) the activities and affairs of the limited liability company and the conduct of those activities and affairs," but "[t]o the extent the operating agreement does not provide for a matter described [here], this chapter governs the matter.").

at Acima shared by *dozens* of individuals who sat in leadership roles or otherwise had some influence within the Company during the past decade. But such involvement cannot reasonably imply controlling authority over the Company for that entire roster—or for Allred specifically—and, anyway, the allegations are too vague as to time to establish Allred's authority to control for the entire relevant period. Simply put, these allegations do not "raise a right to relief" based on Allred's personal authority to control the Company from the time it was incepted in 2013 (*id*. ⁋ 20) through the time his consulting contract expired in February 2024 (*id*. ⁋ 23) that exists "above the speculative level." *Bick*, 2021 WL 2379600, at *1 (Barlow, J.) (citation omitted).

Mere rote recitals of the various positions Allred held at the Company do not establish his authority to control either:

First, the Amended Complaint alleges that "[f]rom the creation of Acima Holdings through 2021, Allred sat on and controlled the Acima Holdings board of directors" (Am. Compl. ⁋ 22). But Acima Holdings is a Utah limited liability company (*id*. ⁋ 14), and it is well-established that Utah limited liability companies, unlike Utah corporations, do not have directors or boards of directors. *Compare* Utah Code § 48-3a-407 (identifying "members" and "managers" as the "management of [a] **limited liability company**") *with* Utah Code § 16-10a-801 (requiring that "each [Utah] **corporation** shall have a board of directors") (emphasis added). In any event, the Amended Complaint contains no factual allegations from which one could reasonably infer that Acima Holdings was anything more than a holding company or that it controlled the alleged conduct of Acima.

Next, while the Amended Complaint incorrectly alleges that Allred held the title of CEO "through 2020" (*id*. ⁋ 23)—even though the Bureau definitively knows from its investigation that Allred resigned from that position in August of 2020—it is devoid of any factual allegation about

Allred's role, powers, or responsibilities while CEO.[3] Such "conclusory assertions of authority—untethered to virtually any supportive facts—do not support an inference" of authority to control a company. *FTC v. Swish Mktg.*, 2010 WL 653486, at *5 (N.D. Cal. Feb. 22, 2010) (dismissing FTC's deception claim against individual and rejecting argument that his "status as CEO, standing alone, plausibly demonstrates his control over the company.").[4] The CFPB must be required to allege more for the *Gordon* standard to have any meaning; it cannot be enough to warrant tremendous monetary penalties from an individual personally that he was, at one point, CEO of a business in an industry that the CFPB wants to start regulating.

Finally, the Amended Complaint contains no factual allegations about what authority Allred had to control the Company while he held the title of Chief Revenue Officer—which the Amended Complaint vaguely asserts was from some time "before the acquisition by Rent-A-Center" until March 2022—or while he served in an "advisory role as a consultant [beginning] some time in spring 2023." Am. Compl. ⁋ 23.

[3] The CFPB is also aware from its investigation that, notwithstanding testimony from one witness that Allred was the "final decisionmaker" for Acima while he held the title of EVP (Am. Compl. ⁋ 23), Allred did not in fact have authority to control the Company during that time. Rather, following the departure of the former EVP when the RAC acquisition was completed in February 2021, Allred agreed to take the title temporarily while the Company sorted out its new leadership. However, his role was simply that of an advisor to the Company who offered suggestions while called upon; Allred at all times deferred to the decisions of other executives. Regardless, the Amended Complaint alleges that Allred was EVP only for the period of March 2022 through "spring 2023" (*id.*), and it contains no allegations whatsoever regarding Allred's status as a "manager" or "member" of Acima, as applicable, during the same period. *See* pgs. 8-9, *supra*.

[4] Given that the CFPA's UDAAP prohibition "closely mirrors" the Federal Trade Commission Act's ("FTCA") prohibition on unfair or deceptive acts or practices in or affecting commerce, courts routinely look to "longstanding interpretations of [liability under] the FTCA [as] inform[ing] interpretation of [liability under] the CFPA." *CFPB v. ITT Educ. Servs., Inc.*, 279 F. Supp. 3d 878, 903 (S.D. Ind. 2015); *see also CFPB v. NDG Fin. Corp.*, 2016 WL 7188792, at *15 (S.D.N.Y. Dec. 2, 2016) ("[C]ourts have adopted the established meaning of [] words in [the CFPA's UDAAP prohibition] from the FTCA, in acknowledgment of the two provisions' similarity") (citing cases); *Gordon*, 819 F.3d at 1193 n.8 (adopting the test for holding an individual liable for a corporation's actions used under the FTCA).

2. <u>The Amended Complaint Fails to Allege the Other Requisite Elements for Personal Liability Under the CFPA.</u>

Under *Gordon*, to the extent that the CFPB cannot show that Allred had the "authority to control" Acima's purportedly unfair, abusive, or deceptive acts – and for the reasons discussed above, it cannot – then, to state a claim, it must show that Allred "participated directly in" those acts. *Gordon*, 819 F.3d at 1193. Moreover, because the Bureau's claims in Counts I, II, IV, VI, and VIII sound in fraud or otherwise contain allegations of fraudulent conduct, the Bureau must "state with particularity" the circumstances of Allred's purported participation, i.e., the what, where, and when of the misrepresentations alleged in those claims. *Richfield.*, 2023 WL 3010208, at *3. *See, e.g.*, *CFPB v. Commonwealth Equity Grp., LLC*, 554 F. Supp. 3d 202, 209 (D. Mass. 2021) (holding that CFPB's claims that defendants engaged in "deceptive actions by making materially false statements about the efficacy of Key Credit's services and the qualifications of its employees," triggered Rule 9(b)'s requirement to allege "specific examples of false statements" made in particular places and on "specific dates"); *CFPB v. Prime Mktg. Holdings, LLC*, 2016 WL 10516097, at *5-6 (C.D. Cal. Nov. 15, 2016) (requiring the CFPB to satisfy the heightened pleading standards of Rule 9(b) where "[t]he crux of Plaintiff's [CFPA] claims . . . is that [the defendant] purposefully misrepresented the efficacy of its services, its money back guarantee, and the costs of its services and that these statements were likely to mislead consumers.").

*Gordon* also requires the Bureau to allege, for each CFPA claim for which it seeks to hold Allred individually liable, that Allred "had knowledge of the misrepresentations [or unfair or abusive acts], was recklessly indifferent to [them], or was aware of a high probability of [the law violation] along with an intentional avoidance of the truth." *Gordon*, 819 F.3d at 1193 (citation omitted).

For the reasons stated below, the Bureau has failed to allege facts to satisfy both the direct

participation and the scienter elements of the *Gordon* standard for each of its UDAAP claims asserted against Allred. Without more, there is no justification for the CFPB's departure here from its historical practice of only pursuing liability against individuals who are actively engaged in *bona fide* law-breaking, using companies as vehicles for committing systemic violations.

a. *Deceptive to use phrases like "90 days same as cash" (Count I)*

The Bureau alleges in Count I that Allred should be held individually liable for Acima's "deceptive" use of "phrases like '90 day option,' '90 days same as cash,' '90 day cash option,' or 'for only [$fee]'" in its marketing "without providing any further explanation of Acima's 'rental-purchase' or 'lease-purchase' financing." Am. Compl. ⁋⁋ 178-181. However, the Amended Complaint does not contain any factual allegation that Allred "participated directly" in the creation or approval of marketing materials that used these phrases without "further explanation"—never mind with the particularity required under Rule 9(b). Am. Compl. ⁋ 178; *Gordon*, 819 F.3d at 1193; *see Commonwealth Equity Grp., LLC*, 554 F. Supp. 3d at 209 (CFPB's "deception" claims subject to Rule 9(b)). Since the Amended Complaint fails to establish that Allred had the "authority to control" Acima's marketing (s*ee* pgs. 8-11, *supra*), this omission is fatal to Count I as to Allred.

Moreover, the Amended Complaint's only factual allegation about Allred's purported knowledge of the "deceptive" marketing falls short of satisfying the scienter element of the *Gordon* standard, too. The Bureau contends only that Allred "knew that [the lease's 90-day payment] option was sometimes advertised . . . as '90 day same as cash' or '90 day cash option' or '$10 [or similar] fee'." Am. Compl. ⁋ 86. However, the Bureau does *not* allege that Allred knew that such descriptors were being used in consumer-facing marketing "without . . . any further explanation" of Acima's leases (or that Allred was "recklessly indifferent to" or "intentional[ly] avoided[ed]" that fact (*Gordon*)), which is the aspect of the Bureau's claim in Count I that purportedly makes use of the quoted phrases "deceptive." *Id.* ⁋ 178. Indeed, the Bureau does not assert that it is

inherently misleading to describe an option to purchase merchandise during the first 90 days of the lease as, for example, a "90 day option" (*id.*) even when the actual cost to the consumer of exercising the option is disclosed – nor could the Bureau credibly do so.

b. *Deceptive to represent to consumers that their contracts required maintenance of autopay (Count II)*

In Count II, the Bureau alleges that Acima "engaged in deceptive acts" by "represent[ing] to some consumers attempting to discontinue autopay that their contracts required maintaining it," when in fact the leases required only that autopay (or ACH) be set up for the first payment. Am. Compl. ⁋⁋ 129, 136, 183-189. But as explained below, the only factual allegations in the Amended Complaint purporting to connect Allred to Count II are insufficient to establish his individual liability.

First, the Bureau alleges that email templates containing the following language were "sent to Allred for his review": "Payment by ACH is required for all regular payments, as agreed to in your lease." *Id.* ⁋⁋ 130-131. However, this allegation falls short of stating that Allred approved the quoted language, or even that he ever saw it – an easy threshold pleading for the Bureau if their investigation had uncovered any such facts. And it is not plausible to infer from this allegation that Allred implicitly approved or otherwise "participated directly" in use of the quoted language, or that he was "recklessly indifferent to" or "intentional[ly] avoided[ed]" seeing the quoted language (*Gordon*), just by way of its inclusion in templates that were allegedly sent to him. Put simply, it would not be reasonable to assume that Allred, as CEO of a large company, was responsible for or knowledgeable about the content of every attachment to every email that reached his inbox.

Second, the Bureau alleges that Allred "reviewed and provided extensive comments on the set of templates that included the emails containing [the following] language": "As part of your lease, you agreed to provide us with a valid checking account. . . . Failure to provide a valid

checking account represents an immediate default under your lease agreement." Am. Compl. ⁋⁋ 132-133. However, this quoted language was literally true; the Bureau admits that consumers were contractually required "to authorize payment through preauthorized electronic fund transfers (EFTs) via recurring debits from their bank account." *Id*. ⁋ 129; *see also id*. ⁋⁋ 136, 184. And the Bureau does not allege that Allred approved of the quoted language being used, or that he was aware that such language was used, in any misleading contexts, such as when a consumer was appropriately attempting to revoke their authorization for autopay following their first payment. Therefore the Bureau has failed to allege that Allred participated directly in or knew about (or was recklessly indifferent to or intentionally avoided) any material misrepresentations for purposes of Count II (*cf. id*. ⁋ 187), let alone with the specificity required under Rule 9(b). *See Commonwealth Equity Grp., LLC*, 554 F. Supp. at 209 (CFPB's "decept[ion]" claims subject to Rule 9(b)).

c. *Deceptive to misrepresent, and unfair to create barriers to, ability to return goods (Counts IV-V)*

Counts IV and V allege that Acima's descriptions to consumers of its return policies were "deceptive" in light of the realities of how returns could be effectuated in practice, and that such realities were "unfair," respectively. Am. Compl. ⁋⁋ 196-209. While the Bureau purports to hold Allred individually liable for these so-called violations, the Amended Complaint's sole allegation of his involvement as to Acima's returns policies and practices is insufficient under *Gordon*. Specifically, the Amended Complaint states only that Allred "has authorized ***or*** been aware of Acima Credit's return policies since its founding." *Id.* ⁋ 107 (emphasis added). In other words, the Bureau alleges that Allred *either* authorized *or* had knowledge of Acima's return policies at any time, whereas *both* (i) scienter and (ii) direct participation or authority to control are required for individual liability under *Gordon* – not one or the other.

Moreover, "authoriz[ing] . . . return policies" (*id*.) is not at all the same as participating

directly in alleged misstatements to customers about those policies—and the Amended Complaint has not alleged that Allred made or approved such statements whatsoever, let alone with the particularity required by Rule 9(b) (*see Commonwealth Equity Grp.*, *supra*). Nor has the Bureau alleged that Allred "had knowledge of the misrepresentations" to consumers about returns, or that he "was recklessly indifferent to [them], or was aware of a high probability of [them] along with an intentional avoidance of the truth." *Gordon*, 819 F.3d at 1193 (citation omitted). So, the Bureau has failed to allege facts to support the claim against Allred in Count IV.

Similarly, authorizing return policies is not the same as fostering, approving, or otherwise participating directly in whatever circumstances made returns "not practically possible for many types of items." *Id.* ¶ 204. And the Bureau has not alleged that Allred had any knowledge of such circumstances, or other facts from which it could be inferred that he was recklessly indifferent to them or intentionally avoided them. Therefore, the Bureau has failed to allege facts to support the claim against Allred in Count V, as well.

d. *Unfair to inadequately train and monitor merchants (Count VI)*

The Bureau alleges in Count VI that Allred should be held individually liable for Acima's "unfair" provision of "deceptive and inadequate advertisements and training to merchants" and its failure to "sufficiently monitor how merchants independently advertised the [lease] product," because such advertisements described the lease product as being or having the characteristics of credit. Am. Compl. ¶¶ 113, 117-118, 120, 211-218. But Count VI does not make sense. The Bureau contends that it has jurisdiction to bring Count VI against Acima and Allred precisely because Acima's lease product *was* "credit" (*id.* ¶¶ 145-150, 218), so both things cannot be true. Either the lease product was credit and therefore the purported advertisements and training characterizing it as credit were not deceptive, or the lease product was not credit, in which case the Bureau does not have jurisdictional authority to bring the claim—either way, Count VI should be dismissed.

Moreover, Count VI should be dismissed as to Allred for the following reasons:

First, the Amended Complaint does not contain sufficient factual allegations to show that Allred "participated directly" in the provision of deceptive and inadequate advertisements and training to merchants, or in the monitoring of merchants. *Gordon*, 819 F.3d at 1193 (citation omitted). Indeed, the Amended Complaint contains no allegations about Allred's participation in the monitoring of merchants whatsoever. And its only allegation as to Allred's participation in the provision of advertisements and training to merchants is that he "personally reviewed or approved *many of* Acima Credit's merchant marketing and training materials," Am. Compl. ⁋ 121 (emphasis added), though the Amended Complaint is silent as to whether he reviewed or approved the purportedly "deceptive" ones. *Gordon* requires allegations that the individual facing personal liability for corporate acts "participated directly *in the deceptive acts*" (or had authority to control them); it is insufficient to allege only that Allred participated in *some* marketing activity generally, but not the purportedly deceptive marketing activity specifically. *Gordon*, 819 F.3d at 1193 (emphasis added). *Compare with CFPB v. Consumer Advoc. Ctr. Inc.*, 2023 WL 5162392, at *1, *4 (C.D. Cal. July 7, 2023) (finding that individual defendant "participated in the deceptive acts" of "charg[ing] illegal advance fees" by "help[ing] establish the Company's fee structure," "approv[ing] the Company's contracts" that deceptively promised no advance fees, and "acknowledg[ing] the Company's illegal fee collection practices in emails with close associates and counsel, while simultaneously perpetuating them through approving and overseeing these practices."). Further, since the portion of Count VI that surrounds "deceptive" marketing materials rests on "allegations of fraudulent conduct," those allegations are subject to Rule 9(b). *Prime Mktg. Holdings, LLC*, 2016 WL 10516097, at *5-6 ("Rule 9(b)'s heightened pleading standard is implicated . . . [as] to any allegations of fraudulent conduct, even when none of the claims in the

complaint 'sound in fraud.'") (internal citation and quotations omitted); *see also Commonwealth Equity Grp., LLC*, 554 F. Supp. 3d at 209 (CFPB's claims about "unfair" conduct triggered Rule 9(b) where they relied on allegations about defendants "making materially false statements"). But the Bureau has not alleged "specific examples of false statements" that Allred "reviewed or approved" (Am. Compl. ⁋ 121), or when he did so. *Commonwealth Equity Grp., LLC*, 554 F. Supp. 3d at 209 (finding that the CFPB "complied with the requirements of Rule 9(b) by indicating the who (defendants), what (specific examples of false statements), where (on their website), and when (specific dates when the statements were accessible online)."). Accordingly, the Bureau has failed to adequately plead that Allred participated directly in the conduct alleged in Count VI.

Likewise, the Amended Complaint lacks any factual allegation that Allred knew or should have known that "deceptive and inadequate" advertisements and training were being provided to merchants, or that merchants were not being "sufficiently monitor[ed]." Am. Compl. ⁋⁋ 211-212. Count VI must be dismissed as to Allred on this basis, as well.

e. *Abusive to interfere with consumers' ability to understand their lease agreements through the mobile application (Count VII)*

In Count VII, the Bureau alleges that Acima "designed and implemented a mobile application and contracting process that materially interfered . . . with consumers' ability to understand" the Acima lease by "(1) direct[ing] the consumer to the application through statements that misrepresented the nature of the product; (2) depriv[ing] consumers of the opportunity to even see the terms and conditions until the check-out process; (3) ma[king] it difficult for the consumer to read the agreement; and (4) obscur[ing] the cost of the product." Am. Compl. ⁋ 220. However, the Amended Complaint contains no allegations about Allred's direct participation in designing or implementing the mobile application process—which is not surprising given that the Bureau learned through its investigation that Allred was not at all involved. In fact, all the Amended

Complaint states about Allred's relationship to the Acima mobile application is that he "was familiar with the Acima Credit mobile application process." *Id.* ⁋ 80. Taken as true, that vague allegation of general "familiar[ity]" with the "process" is insufficient to establish that Allred directly participated in or had actual knowledge of the issues the Bureau identifies in Count VII as "materially interfer[ing] . . . with consumers' ability to understand" the Acima lease (*id.* ⁋ 220), or that he was recklessly indifferent to or intentionally avoided knowing about those issues. *See Gordon*, *supra*. More is required to establish direct participation, and more is required to establish the requisite scienter. *See, e.g.*, *CFPB v. CashCall, Inc.*, 2016 WL 4820635, at *4, *12 (C.D. Cal. Aug. 31, 2016) (finding that individual defendant "had the requisite factual knowledge to subject him to individual liability" under the CFPA for the company's "servicing [of,] and collecting full payment on[,] loans that state-licensing and usury laws had rendered wholly or partially void or uncollectible" where, among other things, "he knew of and approved of the tribal lending model to avoid state usury limits and licensing laws. . . and he knew that borrowers would believe that they were obligated to pay such loans in accordance with their loan agreements."). Count VII fails.

f. *Deceptive to misrepresent the lease product as credit (Count VIII)*

Finally, Count VIII rests on the novel and confounding position that even if the Acima leases were not in fact credit, the Bureau still has jurisdiction to bring an enforcement action against the Company and Allred under the CFPA because Acima "offered" "credit" through its deceptive marketing of the leases, thereby misleading consumers, and that makes Acima a "covered person." Am. Compl. ⁋⁋ 151, 224-228; *see* pgs. 5-6, *supra*. But there is no authority for the proposition that marketing can convert leases into something fundamentally different than what they are (i.e., credit). Acima cannot "offer[]" a credit product if what is offered is a lease.

Moreover, the Bureau's allegations about the aspects of Acima's marketing that Allred supposedly participated in or was aware of are insufficient to support a claim against him for

marketing that was "likely to mislead consumers" about Acima's leases. Am. Compl. ¶ 226. Instead, the Bureau alleges only that: (i) "Allred and his team designed Acima Credit's product to function and be marketed as credit"[5] and "repeatedly referred to Acima Credit ***in internal documents*** as a 'lender' and Acima Credit's product as 'credit'" (*id*. ¶¶ 38-39) (emphasis added), which say nothing about the content of consumer-facing marketing; (ii) Allred once "email[ed] individual store owners to offer them the chance to participate in what he described as a 'firm offer of credit,'" which also does not describe consumer-facing marketing (*id*. ¶ 49); and (iii) Allred was to some degree involved in or knew about the use of the following slogans on Acima's website or in the marketing materials that merchants displayed to consumers: "We'll give you the time to pay," "[g]ive yourself some credit," "[g]ive credit where it's due," and "[t]urn credit denials into approvals" (*id*. ¶¶ 42-43, 45, 50)—none of which actually say anything untrue or misleading about the "nature, terms, [or] price of Acima's" leases. *Id*. ¶ 226. Since the Bureau recognizes that "rent-to-own transactions . . . serve as credit substitutes in some cases," it is disingenuous at best and a significant overreach to suggest that any reference to "credit" in the context of rent-to-own products is inherently misleading. CFPB, Taskforce on Fed. Consumer Fin. Law, Report Vol. I, at 215 (Jan. 2021), https://tinyurl.com/mr283dfs. Indeed, the Bureau offers no facts to explain why a reasonable consumer would not interpret the slogans mentioning "credit" exactly as they were intended: a play-on-words referring to the worth that could be restored to a consumer who did not qualify for credit financing by successfully obtaining merchandise with an Acima lease.

---

[5] This vague and conclusory allegation confuses the reality that Acima's product was designed to *compete* with credit products, not be them. Indeed, the word "acima" roughly translates to "being above" in Portuguese, and so the company name "Acima Credit" was meant to convey that Acima's leases could allow consumers to transcend their lack of credit history, and obtain merchandise in circumstances where they could not use financing to do so.

### C. CFPB's "Substantial Assistance" Claim Against Allred (Count IX) is Insufficiently Pled.

Apart from the Bureau's attempts to hold Allred personally liable as a "related person" for alleged corporate violations of the CFPA's UDAAP prohibition in Counts I-II and IV-VIII, the Bureau also separately purports to assert a claim against Allred for his "substantial assistance" to Acima in those violations. Am. Compl. ¶¶ 230-233. In doing so, the Bureau attempts to take a second bite at the apple, seeking a secondary pathway for holding Allred individually liable for Acima's purported law violations. To establish a "substantial assistance" claim, courts have required the CFPB to show "(1) a primary violation of the CFPA; (2) the defendant's knowledge or reckless disregard of the primary violation; and (3) the defendant's substantial assistance in the primary violation." *CFPB v. Nexus Servs., Inc.*, 2024 WL 1461382, at *6 (W.D. Va. Apr. 2, 2024) (citation omitted). As explained directly below, the CFPB has not sufficiently pled any of these elements.

First, the CFPB has not pled facts to support "a primary violation of the CFPA" by Acima for any of Counts I-II or IV-VIII. *See* pg. 7, *supra*.

Second, for the reasons discussed above, the CFPB has not pled facts to show that Allred had "knowledge or reckless disregard of" any of the alleged violations by Acima. *See* pgs. 13-20, *supra*.

Third, the Bureau has failed to plead facts to show Allred's "substantial assistance [to Acima] *in the primary violation*" for any of the relevant claims. *Nexus Servs., Inc.*, 2024 WL 1461382, at *6 (emphasis added) (citation omitted). Courts have found that an individual provided "substantial assistance" in furtherance of a CFPA violation when "the [individual] in some sort associated [himself] with the venture, . . . participated in it as something [he] wished to bring about, and . . . sought by [his] action to make it succeed." *CFPB v. Manseth*, 2023 WL 5400235, at *18

(W.D.N.Y. Aug. 22, 2023) (finding that "defendants substantially assisted the underlying violations" where they received notice of affiliated debt collectors' violations and continued to do business with them, took steps to help the debt collectors avoid repercussions, and continued to benefit financially by accepting payments from the debt collectors) (quoting *CFPB v. RD Legal Funding, LLC*, 332 F. Supp. 3d 729, 772 (S.D.N.Y. 2018)). Here, the Bureau has not alleged facts that Allred participated in any of the purported CFPA violations "as something [he] wished to bring about" and that he "sought by [his] action to make [] succeed." *Id*. *See* pgs. 13-20, *supra*. Instead, the CFPB's theory of liability against Allred is premised only on the fact that he was, at one point, CEO. For example, the Bureau's sole allegation purporting to relate Allred to its claim that Acima's mobile application was "abusive" (Count VII) is that "Allred was familiar with the Acima Credit mobile application process." Am. Compl. ¶ 80. It is not plausible to infer from this allegation that Allred participated in developing the mobile application process (or the aspects of it that the Bureau calls "abusive") as something he wished to bring about and make succeed; the allegation is just that Allred generally knew of the process, just like everyone else in the Company. Similarly, the Bureau's only allegations attempting to connect Allred to its claim that Acima deceived consumers about whether they were required to maintain "autopay" (Count II) are that (i) Allred passively received some email templates containing language the Bureau calls deceptive (*id*. ¶¶ 130-131), but not that he approved or used the language; and (ii) Allred commented on a "set of templates that included [] emails containing" other language that the Bureau calls deceptive when used in an inappropriate context (*id*. ¶¶ 132-133), but not that Allred approved or used the purportedly deceptive language for any inappropriate reason. Such allegations are insufficient to show that Allred substantially assisted the alleged violations—and the same is true for each of the Bureau's claims against Allred for Counts I-II or IV-VIII. Moreover, these allegations are a far cry

from warranting individual liability against Allred based on the CFPB's own reasonable practice of seeking personal liability only from wrongdoers who actively engaged in *bona fide* law-breaking, and who used their businesses as vehicles for committing systemic law violations. Retroactive liability against Allred under a statute he could have never known applied to him while he was at Acima is simply not justified here.

**D. CFPB's FCRA Claims Against Allred (Counts XVIII and XIX) Also Fail.**

Finally, the Bureau's claims against Allred for purported FCRA violations in Counts XVIII and XIX also must be dismissed.

Count XVIII is another claim pled in the alternative to the Bureau's overarching theory that Acima's lease products were credit. In it, the Bureau conclusorily asserts that Acima "used or obtained consumer reports" in the form of prescreened lists "without a permissible purpose, in violation of FCRA," and Allred should be held personally liable. Am. Compl. ⁋⁋ 279, 281. Specifically, the Bureau alleges that there is a legal "permissible purpose" for obtaining or using a consumer report if, "among other things, the consumer authorizes the [provision of] such report . . ., or [the company obtaining the report] provides the consumers it contacts using the report with 'a firm offer of credit or insurance'." *Id.* ⁋ 277. Further, the Bureau alleges that Acima obtained consumer reports from consumers who did not authorize the reports, and that, if Acima did not extend credit, then it also obtained consumer reports without offering those consumers a "firm offer of credit." *Id.* ⁋⁋ 278-279. The Bureau does not allege facts to show that Acima did not have any other "permissible purpose" for using or obtaining consumer reports.

Count XVIII must be dismissed against Allred because the Bureau has failed to allege facts to establish his "personal[] involve[ment] in any alleged wrongdoing." *Watson v. Caruso*, 424 F. Supp. 3d 231, 251 (D. Conn. 2019). Indeed, while the Bureau recites the standard for individual liability under the CFPA as a naked conclusion in Count XVIII (Am. Compl. ⁋ 280), the standard

for personal liability for a violation of FCRA is actually different, and requires "evidence that [the individual] was personally involved in any alleged wrongdoing." *See Watson*, 424 F. Supp. at 251. "[C]ases which have found personal liability on the part of corporate officers have typically involved instances where the defendant was the 'guiding spirit' behind the wrongful conduct . . . or the 'central figure' in the challenged corporate activity." *McNack v. Smith*, 2015 WL 7302218, at *5 (C.D. Cal. Nov. 16, 2015) (citations omitted). Here, the Bureau's thin allegations as to Allred fall sufficiently short of satisfying the legal standard.

In the Amended Complaint, the Bureau raises only two allegations regarding Allred's purported involvement with Acima's prescreened lists – neither of which reflect his personal involvement in the alleged "wrongdoing" of using prescreened lists without a permissible purpose. First, the Bureau alleges that Allred "'authorized' Acima Credit's policies and procedures governing prescreened lists and signed the CRA contract(s) enabling the activity." *Id.* ⁋ 144. However, this says nothing about the purported "wrongdoing" of using prescreened lists without a permissible purpose. For example, the Bureau does not allege that the policies and procedures Allred authorized instructed that prescreened lists need not be obtained without a permissible purpose. Nor does the Bureau allege that, by signing the CRA contract(s) to enable the use of prescreened lists, Allred authorized them to be used in a manner not supported by a permissible purpose. Instead, the Bureau acknowledges that there are several different permissible purposes for using and obtaining consumer reports (*id.* ⁋ 277), so there is nothing inherently wrong with Acima using and obtaining them.

Second, the Bureau alleges that Allred "directed and supervised Acima Credit's retrieval and use of particular prescreened lists" (*id.* ⁋ 144), but it does not allege that Acima lacked a permissible purpose for using those lists. For example, there is no allegation that use of the

"particular prescreened lists" that Allred allegedly supervised was not authorized by the consumers on the reports, or supported by another permissible purpose. Accordingly, the Bureau has alleged only that Allred had some degree of involvement in the use of some of Acima's prescreened lists, but not that he played a role in any "wrongful conduct"—or was the "guiding spirit" behind it (*McNack*, *supra*). Therefore, the Bureau's allegations are insufficient to sustain Count XVIII against Allred.

Likewise, the Bureau's claim in Count XIX is fundamentally flawed. Count XIX alleges that, to the extent Allred can be held personally liable for a violation of FCRA in Count XVIII, he should therefore also be held liable as a "covered person" for having violated the CFPA's prohibition on violations of other Federal consumer financial laws, which include FCRA. *Id.* ¶¶ 283-285. But if Acima did not extend credit, then Allred cannot be a "covered person." *See* pgs. 5-6, *supra*. Therefore, if the Court eventually finds that Allred violated FCRA as alleged in Count XVIII because Acima did not extend credit and thus did not have a permissible purpose for using or obtaining consumer reports (and it should not), then there is no basis for Allred's liability as a "covered person" under Count XIX. On the other hand, if the Court denies the Bureau's claim in Count XVIII as to Allred, then the underlying premise of the claim against Allred in Count XIX is also moot. Either way, Count XIX cannot succeed against Allred.

## CONCLUSION

For these reasons, the Court should dismiss the Amended Complaint against Allred with prejudice.

Dated: December 16, 2024

Respectfully submitted,

CLYDE, SNOW & SESSIONS

*/s/ Walter A. Romney, Jr.*
Matthew A. Steward
Walter A. Romney, Jr.
Thomas A. Brady

GOODWIN PROCTER LLP

/s/ *Tierney E. Smith*
Tierney E. Smith

*Attorneys for Defendant Aaron Allred*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 16, 2024, I caused a true and correct copy of the foregoing to be served upon counsel of record as of this date by electronic filing.

/s/ *Walter A. Romney, Jr.*
Walter A. Romney, Jr.

4926-2255-0535, v. 1