SARAH E. TROMBLEY
JAMES D. RENNER
FRANCESCA L. BARTOLOMEY
ALEXANDER BROCHE
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
202-435-9735
sarah.trombley@cfpb.gov
james.renner@cfpb.gov
francesca.bartolomey@cfpb.gov
alexander.broche@cfpb.gov

*Attorneys for Plaintiff Consumer
Financial Protection Bureau*

## THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>        Plaintiff,<br><br>    v.<br><br>ACIMA HOLDINGS, LLC, ACIMA DIGITAL, LLC (F/K/A ACIMA CREDIT, LLC, D/B/A ACIMA LEASING), and AARON ALLRED,<br><br><br>        Defendants. | **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS ACIMA HOLDINGS AND ACIMA DIGITAL'S MOTION TO DISMISS**<br><br>Case No. 2:24-cv-00525-DBB-CMR<br><br>District Judge David B. Barlow<br><br>Magistrate Judge Cecilia M. Romero |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ..................................................................................................... 1

LEGAL STANDARD ................................................................................................. 3

ARGUMENT ............................................................................................................. 3

I.    The CFPB Sufficiently Alleges Facts Establishing Its Statutory Authority Over Acima Credit ............................................................................................. 5

   A.   The CFPB Sufficiently Alleges that Acima Credit "Provided Credit" Under the CFPA, TILA, and EFTA ................................................................. 5

     1.   The CFPB Alleges Sufficient Facts Showing that Acima Provides Credit Because Its Agreements Create a Debt Repaid Over Time ..................... 7

     2.   The CFPB Alleges Sufficient Facts Showing that Acima Provided Credit Because Its Agreements Functioned as Disguised Security Interests ....... 9

   B.   The CFPB Sufficiently Alleges Acima "Offered Credit" Under the CFPA ........ 12

   C.   The CFPB Sufficiently Alleges that Acima Provided the Functional Equivalent of Purchase Finance Arrangements ....................................................... 14

   D.   Acima Provided "Credit Sales" Under TILA (Counts X and XI) ...................... 16

     1.   Consumers Paid a Sum Substantially Equivalent To, or In Excess Of, the Total Value of the Property and Service ................................................... 17

     2.   Consumers Became, for No Additional Consideration or for Nominal Consideration, the Owner of the Property ................................................. 19

   E.   Acima is a "Financial Institution" Under FCRA (Count XVII) .......................... 19

i

**II.    The CFPB Sufficiently Alleges that Acima Credit Violated the CFPA by Engaging in Deceptive, Unfair, and Abusive Conduct (Counts I-VIII)** ...................................... 20

    **A.    The CFPB Sufficiently Alleges that Acima's "90 Days Same as Cash" and Similar Marketing is Deceptive Under the CFPA (Count I)** ................................ 20

    **B.    The CFPB Sufficiently Alleges Acima Unfairly and Deceptively Represented to Consumers an Obligation to Maintain "Autopay" (Counts II and III)** ............... 21

    **C.    The CFPB Sufficiently Alleges that Acima Deceived Consumers About and Created Unfair Barriers to Returns (Counts IV and V)** ...................................... 23

    **D.    The CFPB Sufficiently Alleges that Acima Acted Unfairly with respect to their Merchant Partners (Count VI)** .................................................................. 24

    **E.    The CFPB Sufficiently Alleges that Acima Credit Engaged in Abusive Acts and Practices with Respect to Its Mobile Application Process (Count VII)** ............... 26

    **F.    The CFPB Sufficiently Alleges that, if Acima Credit Did Not Extend Credit, It Misrepresented its Lease-to-Own Transactions as Credit (Count VIII)** ............. 27

**III.    The CFPB Sufficiently Alleges that Acima Credit Failed to Provide Consumers with the Disclosures Required by TILA and Regulation Z** .................................................. 27

**IV.    Acima Credit Had Fair Notice It Was Subject to CFPA, EFTA, TILA, and FCRA** 28

**V.    The CFPB's TILA (Count X) and EFTA (Count XII) Claims are Timely** ............... 29

**VI.    The CFPB's Funding is Valid and Provides No Grounds for Dismissal** ................. 31

**CONCLUSION** ........................................................................................ 35

## TABLE OF AUTHORITIES

**Cases**

*Am. Fin. Servs. Ass'n. v. FTC,*

    767 F.2d 957 (D.C. Cir. 1985) ................................................................. 24

*Andersen v. Mountain Heights Academy*,

    No. 2:24-CV-00168, 2024 WL 5136924 (D. Utah Dec. 17, 2024) ............................ 3

*Ashcroft v. Iqbal*,

    556 U.S. 662 (2009) ........................................................................... 3

*Bell Atl. Corp. v. Twombly*,

    550 U.S. 544 (2007) ........................................................................... 3

*Bistline v. Parker*,

    918 F.3d 849 (10th Cir. 2019) ............................................................... 31

*Bros. v. First Leasing*,

    724 F.2d 789 (9th Cir. 1984) ................................................................ 29

*CFPB v. 1st All. Lending, LLC,*

    No. 3:21-CV-55 (RNC), 2022 WL 993582 (D. Conn. Mar. 31, 2022) ...................... 20

*CFPB v. Active Network, LLC,*

    2024 WL 4437639 (E.D. Tex. Oct. 7, 2024) ............................................... 31

*CFPB v. Citizens Bank*, N.A.,

    504 F. Supp. 3d 39 (D.R.I. 2020) .......................................................... 30

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,

    601 U.S. 416 (2024) .......................................................................... 32

*CFPB v. Commonwealth Equity Grp., LLC*,

No. 1:20-CV-10991-IT, 2024 WL 4362126 (D. Mass. Sept. 30, 2024) .................................. 23

*CFPB v. D & D Mktg.*,

No. CV 15-9692 PSG (EX), 2016 WL 8849698 (C.D. Cal. Nov. 17, 2016) ........................... 25

*CFPB v. Frederick J. Hanna & Assocs. P.C.*,

114 F. Supp. 3d 1342 (N.D. Ga. 2015) ................................................................................ 20

*CFPB v. Gordon*,

819 F.3d 1179 (9th Cir. 2016)..................................................................... 13, 21, 25

*CFPB v. ITT Educ. Servs., Inc.*,

219 F. Supp. 3d 878 (S.D. Ind. 2015) .......................................................... 23, 24, 30

*CFPB v. Nexus Services, Inc.*,

No. 5:21-CV-00016, 2024 WL 1392568 (W.D. Va. Mar. 31, 2024),

*amended on other grounds by* 2024 WL 1461382 (W.D. Va. Apr. 2, 2024)........................... 13

*CFPB v. Ocwen Fin. Corp.*,

No. 17-80495-CIV, 2019 WL 13203853 (S.D. Fla. Sept 5, 2019) ........................ 20, 28, 29, 30

*CFPB v. Snap Finance LLC*,

No. 2:23-CV-00462-JNP-JCB, 2024 WL 3625007 (D. Utah Aug. 1, 2024) . 8, 9, 12, 14, 15, 17, 18

*CFPB v. SoLo Funds, Inc.*,

2024 WL 4553110 (C.D. Cal. Oct. 17, 2024) .................................................... 31, 35

*CFPB v. Think Fin., LLC*,

No. CV-17-127-GF-BMM, 2018 WL 3707911 (D. Mont. Aug. 3, 2018)................................ 23

iv

*Christopher v. SmithKline Beecham Corp.,*

    567 U.S. 142 (2012) ........................................................................................... 29

*Clark v. Rent-It Corp.,*

    685 F.2d 245 (8th Cir. 1982) ................................................................... 6, 18, 29

*Dorton v. Kmart Corp.,*

    229 F. Supp. 3d 612 (E.D. Mich. 2017) ............................................................ 7, 9

*Duncan v. Walker,*

    533 U.S. 167 (2001) ........................................................................................... 14

*Encino Motors, LLC v. Navarro,*

    579 U.S. 211, 221 (2016) ................................................................................... 29

*FCC v. Fox Television Stations, Inc.,*

    567 U.S. 239 (2012) ..................................................................................... 28, 29

*Fernandez v. Clean House, LLC,*

    883 F.3d 1296 (10th Cir. 2018) ......................................................................... 31

*Ford Motor Credit Co. v. Cenance,*

    452 U.S. 155 (1981) ............................................................................................. 7

*FTC v. Amazon.com, Inc.,*

    735 F. Supp. 3d 1297 (W.D. Wash. 2024) ........................................................ 27

*FTC v. DirecTV, Inc.,*

    No. 15-cv-01129-HSG, 2018 WL 3911196 (N.D. Cal. Aug. 16, 2018) .................. 22

*FTC v. IFC Credit Corp.,*

    543 F. Supp. 2d 925 (N.D. Ill. 2008) .................................................................. 6

*FTC v. Nudge, LLC,*

No. 2:19-cv-867-DBB-DAO, 2022 WL 2132695 (D. Utah June 14, 2022) ............................ 23

*FTC v. Wyndham Worldwide Corp.,*

799 F.3d 236 (3d Cir. 2015) ...................................................................... 28

*FTC. v. Freecom Commc'ns, Inc.,*

401 F.3d 1192 (10th Cir. 2005) .................................................................. 20

*Fuller v. Rent-A-Ctr., Inc.,*

No. CIV-20-00777-JD, 2020 WL 12772102 (W.D. Okla. Dec. 28, 2020) ................................ 9

*GFF Corp. v. Assoc. Wholesale Grocers, Inc.,*

130 F.3d 1381 (10th Cir. 1997) .................................................................. 4

*Helms v. Consumerinfo.com, Inc.,*

436 F. Supp. 2d 1220 (N.D. Ala. 2005) ......................................................... 14

*Huntington Tech. Fin., Inc. v. Neff,*

612 F. Supp. 3d 5 (D. Conn. 2020) ........................................................ 10, 11

*Ide v. Brit. Airways PLC,*

529 F. Supp. 3d 73 (S.D.N.Y. 2021) ............................................................ 8

*In re Bankers Tr. Co.,*

450 F.3d 121 (2d Cir. 2006) ...................................................................... 8

*In re Myriad Genetics, Inc.,*

No. 2:19-cv-00707-DBB-DBP, 2021 WL 977770 (D. Utah Mar. 16, 2021) ............................. 4

*In re Phoenix Equip. Co.,*

No. 2:08-bk-13108-SSC, 2009 WL 3188684 (Bankr. D. Ariz. Sept. 30, 2009) ...................... 10

*In re Roberts*,

    641 B.R. 613 (Bankr. E.D. Wis. 2022) ..................................................... 11

*In re Schultz*,

    No. 22-20090-DOB, 2022 WL 16752855 (Bankr. E.D. Mich. Nov. 7, 2022)......................... 11

*In re Smith*,

    262 B.R. 365 (Bankr. E.D. Va. 2000) ..................................................... 11

*In re Vistaprint Corp Marketing and Sales Practices Litigation*,

    2009 WL 2884727 (S.D. Tex. Aug 31, 2009)................................................ 21

*In re WorldCom, Inc.*,

    339 B.R. 56, 64 (Bankr. S.D.N.Y. 2006) ................................................. 10

*Landgraf v. USI Film Prods.*,

    511 U.S. 244 (1994) ..................................................................... 29

*Liberty Leasing Co. v. Machamer*,

    6 F. Supp. 2d 714 (S.D. Ohio 1998)........................................................ 9

*Maul v. Aaron's, Inc.*,

    No. CIV-12-924-M, 2013 WL 12090304 (W.D. Okla. Mar. 19, 2013).................................. 9

*McAuliffe v. Vail Corp.*,

    69 F.4th 1130 (10th Cir. 2023)........................................................... 16

*Melnick v. TAMKO Bldg. Prods., Inc.*,

    469 F. Supp. 3d 1082 (D. Kan. 2020) ..................................................... 13

*Minshall v. McGraw Hill Broad. Co.*,

    323 F.3d 1273 (10th Cir. 2003)........................................................... 13

*Renfroe v. Nationstar Mortg., LLC,*

    822 F.3d 1241 (11th Cir. 2016) ............................................................................. 7

*Rocky Mountain Wild v. Dallas,*

    98 F.4th 1263 (10th Cir. 2024) ............................................................................ 31

*SEC v. Binance,*

    2024 WL 3225974 (D.D.C. June 28, 2024) .......................................................... 5

*SEC v. Lauer,*

    52 F.3d 667 (7th Cir. 1995) ................................................................................. 13

*Stout v. FreeScore, LLC,*

    743 F.3d 680 (9th Cir. 2014) ............................................................................... 14

*Texas v. Colony Ridge, Inc.,*

    2024 WL 4553111 (S.D. Tex. Oct. 11, 2024) ..................................................... 31

*Texas v. Colony Ridge, Inc.,*

    2024 WL 4553111 (S.D. Tex. Oct. 11, 2024),

    *report and recommendation adopted* (S.D. Tex. Nov. 26, 2024) ........................ 31

*TKO Equip. Co. v. C & G Coal Co., Inc.,*

    863 F.2d 541 (7th Cir. 1988) ................................................................................. 6

*TRW Inc. v. Andrews,*

    534 U.S. 19 (2001) .............................................................................................. 14

*Zimmerman v. Cambridge Credit Counseling Corp.,*

    529 F. Supp. 2d 254 (D. Mass. 2008), *aff'd sub nom. Zimmerman v. Puccio*, 613 F.3d 60 (1st

    Cir. 2010). ........................................................................................................... 14

**Statutes**

12 U.S.C. § 15(a)(ii)(III) ........................................................................................ 16

12 U.S.C. § 1843(k) ......................................................................................... 19, 20

12 U.S.C. § 1843(k)(4)(A) .................................................................................... 19

12 U.S.C. § 1843(k)(4)(F) .................................................................................... 19

12 U.S.C. § 289(a) ............................................................................................... 34

12 U.S.C. § 289(a)(3)(B) ...................................................................................... 32

12 U.S.C. § 5390(n)(2) ......................................................................................... 32

12 U.S.C. § 5481(15)(A)(i) ..................................................................................... 6

12 U.S.C. § 5481(15)(A)(ii) ............................................................................. 15, 16

12 U.S.C. § 5481(15)(A)(ii)(III) ............................................................................ 16

12 U.S.C. § 5481(5) ............................................................................................... 6

12 U.S.C. § 5481(6) ............................................................................................... 6

12 U.S.C. § 5481(6)(A) ................................................................................... 12, 14

12 U.S.C. § 5481(7) ......................................................................................... 6, 12

12 U.S.C. § 5497 ................................................................................................. 32

12 U.S.C. § 5497(a)(1) .................................................................................... 31, 34

12 U.S.C. § 5497(e) ............................................................................................. 34

12 U.S.C. § 5497(e)(1)(B) .................................................................................... 34

12 U.S.C. § 5531(d)(1) ......................................................................................... 26

12 U.S.C. § 5564(a) ............................................................................................. 30

12 U.S.C. § 5564(g)(1) .................................................................................... 30, 31

12 U.S.C. § 5565(a) ............................................................................................. 30

15 U.S.C. § 1607 ................................................................................................. 30

15 U.S.C. § 1607(a)(1)(6) ................................................................................... 30

15 U.S.C. § 1607(b) ............................................................................................ 30

15 U.S.C. § 1640(a) ............................................................................................ 30

15 U.S.C. § 1679a(A)(3)(a) ................................................................................ 13

15 U.S.C. § 1681s-2(a)(7)(G)(ii) ....................................................................... 19

15 U.S.C. § 1693m(a) ......................................................................................... 30

15 U.S.C. § 1693o ............................................................................................... 30

15 U.S.C. § 1693o(a)(1)(5) ................................................................................. 30

15 U.S.C. § 1693o(b) .......................................................................................... 30

15 U.S.C. § 6809(3)(A) ....................................................................................... 19

15 U.S.C. § 6809) ................................................................................................ 19

15 U.S.C. § 78u-6(g)(5)(D) ................................................................................. 32

15 U.S.C. §1640(e) .............................................................................................. 29

15 U.S.C. §1693m(g) ........................................................................................... 29

**Rules**

Fed. R. Civ. P. 12(b)(6) ....................................................................................... 30

Fed. R. Civ. P. 8(a)(2) ........................................................................................... 3

Fed. R. Civ. P. 9(b) ............................................................................................. 20

**Regulations**

12 C.F.R. § 1016.3(l)(1) ..................................................................................... 20

12 C.F.R. § 1026.17 ............................................................................................. 28

12 C.F.R. § 1026.18 ............................................................................................. 27

12 C.F.R. § 1026.18(j) ......................................................................................... 27

12 C.F.R. § 1026.2(a)(16) ........................................................................................ 17, 19

12 C.F.R. § 225.28(b)(1) .............................................................................................. 19

**Other Authorities**

Anti-Deficiency Act, 31 U.S.C. § 1341 *et seq.* ............................................................ 35

Black's Law Dictionary (12th ed. 2024) ...................................................................... 31

Cong. Res. Serv., *Why Is the Federal Reserve Operating at a Loss?* (Jan. 23, 2023), available at

    https://crsreports.congress.gov/product/pdf/IN/IN12081 ........................................ 33

Federal Reserve Board, Press Release, Federal Reserve Board releases annual audited financial

    statements (Mar. 26, 2024) ("FRB 2023 Press Release"), available at

    https://www.federalreserve.gov/newsevents/pressreleases/other20240326a.htm .................... 33

Federal Reserve, Financial Accounting Manual for Federal Reserve Banks (Apr. 2024), available

    at  https://www.federalreserve.gov/aboutthefed/files/bstfinaccountingmanual.pdf ................ 33

Oxford English Dictionary (online ed. 2024) ............................................................... 31

S. Rep. No. 111-176 (2010) ........................................................................................ 34

## INTRODUCTION

Under any common-sense definition, Acima Credit's[1] product was "credit." Looking past the "rental-purchase" label Acima hopes this Court will find dispositive, the Court will find all the hallmarks of traditional credit in Acima's "virtual rent-to-own" offering: consumers purchased goods from a merchant and used those goods as their own; Acima funded the purchase; and consumers then paid Acima back, typically over a twelve-month term and totaling over twice the retail price. Acima never possessed the goods, though it claimed to become the "owner" just before the consumer took them home. Acima locked consumers in by requiring them to authorize recurring payments through their bank account. Consumers who wanted to return goods and terminate their agreements found that Acima imposed endless obstructions, resulting in a return rate under 1%. Internally and externally, Acima treated its product as "credit." Acima reported loan amounts and balances to credit reporting agencies. (FAC ¶ 139) Acima provided ads and training to its merchant partners referring to the product as "credit," "financing," or a "loan," (*id*. ¶¶ 117, 120); as giving "credit where it's due," (*id*. ¶ 50); as being able to turn "credit denials into approvals," (*id*. ¶ 50); and as providing an opportunity to make a "firm offer of credit" (*id*. ¶ 49). As aptly stated by Acima's founder, defendant Aaron Allred: "[t]he message…we want to send consumers and merchants should be based around the idea of our product being a loan without actually calling it a loan…." (*Id*. ¶ 40)

By labeling its product a virtual rental-purchase agreement rather than credit, Acima hopes to avoid a host of Federal consumer financial laws other creditors must comply with. Arguing that it does not offer "credit," Acima says it is not a "covered person" and therefore

---

[1] Defendants Acima Holdings, LLC and Acima Digital, LLC (f/k/a Acima Credit, LLC, d/b/a Acima Leasing) are referred to collectively as "Acima."

need not comply with the Consumer Financial Protection Act of 2010 (CFPA), which prohibits deceptive, unfair, or abusive acts and practices. Acima also argues it does not have to make the required disclosures under the Truth in Lending Act (TILA) and Regulation Z, which empower consumers to compare products and make informed decisions before entering the transaction. Acima argues that, even though the allegations show it reported inaccurate information to credit reporting agencies, it did not violate the Fair Credit Reporting Act (FCRA). And Acima says it was permitted to lock consumers into making future payments by conditioning the agreement on repayment by preauthorized electronic fund transfers, arguing that it need not comply with the Electronic Funds Transfer Act (EFTA). Acima would have this Court believe that its self-serving description of its awkwardly-engineered Frankenstein of a product—complete with its own set of alternative factual allegations—provides an escape hatch from the Consumer Financial Protection Bureau's (CFPB) authority and prevents this Court from considering the allegations about how the product actually worked. But the caselaw is clear that labeling something a "rental-purchase" agreement or a "lease" does not make it so. And the allegations in the CFPB's First Amended Complaint (FAC), the only factual allegations to be considered at this stage, show that Acima offered and provided credit and provided the functional equivalent of purchase-finance agreements. Acima lured consumers into its agreements through deceptive advertising and an abusive application process that confused consumers about the agreements' nature, terms, and costs. And it harmed consumers through, among other things, unfair practices that made it tremendously difficult to get out of the agreements or pay through means other than auto-debits. Far from "overstepping the bounds of its statutory authority," the CFPB is using that authority to protect consumers from those who seek to disguise their products to circumvent the law and exploit consumers and to ensure a level playing field for honest creditors that do comply with

2

Federal consumer financial law. Finally, Acima's argument that the CFPB's funding is unconstitutional is entirely without merit. Acima's motion should be denied.

## LEGAL STANDARD

The CFPB need only provide "a short and plain statement of the claim showing that [it] is entitled to relief." Fed. R. Civ. P. 8(a)(2). Acima Credit's motion must be denied if the CFPB has "plead[ed] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "does not impose a probability requirement…; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "In evaluating a motion to dismiss, the court must take as true all well-pleaded facts, as distinguished from conclusory allegations, view all reasonable inferences in favor of the nonmoving party, and liberally construe the pleadings." *Andersen v. Mountain Heights Academy*, No. 2:24-CV-00168, 2024 WL 5136924, at *3 (D. Utah Dec. 17, 2024) (slip copy).

## ARGUMENT

The CFPB plausibly alleges that Acima Credit is a "covered person" under the CFPA and subject to TILA and EFTA because it offered credit, extended credit, engaged in credit sales, and provided the functional equivalent of purchase finance arrangements. The CFPB also sufficiently alleges that Acima engaged in deceptive, unfair, and abusive practices in connection with its product, violated FCRA, and failed to make the disclosures required by TILA. Finally, the CFPB's claims do not violate due process, and their timeliness should not be resolved on a motion to dismiss.

As an initial matter, Acima ignores the rule that "the sufficiency of a complaint must rest on its contents alone." *In re Myriad Genetics, Inc.*, No. 2:19-cv-00707-DBB-DBP, 2021 WL 977770, at *5 (D. Utah Mar. 16, 2021) (unpublished) (internal quotations and citations omitted). Acima claims that it is entitled to dismissal based substantially on its own alternative factual allegations, including *four pages* of "factual background" (Def. Br. at 4-8) that it improperly relies on throughout its brief to contest the accuracy of the CFPB's allegations and advance its own preferred version of the facts. As part of this approach, Acima attaches a document as Exhibit A that it claims is "the" agreement Acima used (Def. Br. at 5) and invites the Court to make sweeping conclusions about the nature of Acima's agreements based on a few quotations. On a motion to dismiss, the Court has the discretion to consider a document not attached to or incorporated by reference into the complaint only when "the document is referred to in the complaint and is central to the plaintiff's claim," and then only if the defendant can submit "an indisputably authentic copy to the court." *GFF Corp. v. Assoc. Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997). Troublingly, Acima has failed to mention the many different versions of its agreement it has used in forty-six states across the decade covered by the FAC. As alleged in the FAC, these agreements have varied in material aspects depending on date and location, most notably in that many lacked the disclaimers concerning the nature of the product, such as a statement that "[t]his [agreement] is not a loan or credit transaction" (FAC ¶¶ 72-75).[2]

Exhibit A is also a version of the agreement which, to the best of the CFPB's knowledge, Acima never produced to the CFPB during its investigation and which the CFPB has never

---

[2] The FAC describes other important variations in the agreements over time, including whether the contract explicitly identified the term of the agreement as being 365 days (FAC ¶ 30); how or whether it disclosed a "cost of rental" (*id.* ¶¶ 73-74); and whether the contract assigned the risk of loss or damage to the goods to the consumer (*id.* ¶ 34).

seen—and which thus could not be "central to [the CFPB's] claim." It is undated, and the affidavit attaching it is devoid of allegations concerning even the approximate period during which it was used.[3] The Court should consider neither Exhibit A nor any of the other supposed "factual background" not drawn from the FAC or otherwise properly subject to judicial notice at this point in the litigation.[4]

## I.    The CFPB Sufficiently Alleges Facts Establishing Its Statutory Authority Over Acima Credit

### A.    The CFPB Sufficiently Alleges that Acima Credit "Provided Credit" Under the CFPA, TILA, and EFTA

After years of marketing its product as "credit" (including in its name), using enticing marketing taglines to emphasize its product as credit ("Give yourself some credit" and "We all need a little EXTRA CREDIT every now and then") (FAC ¶¶ 44, 47), Acima Credit now contends that it is not a "covered person" under the CFPA and not subject to TILA and EFTA because its virtual rent-to-own product is not "credit."[5] But the CFPB sufficiently alleges that Acima Credit "provided credit" under the CFPA and is therefore a "covered person" under the

---

[3] Indeed, Exhibit A could have been drafted any time between December 2021, when Acima Credit changed its name to Acima Digital (which was well after Acima became aware of the CFPB's investigation) and the day Acima filed its motion.

[4] Even if the Court were to consider Exhibit A, in a case in which it is specifically alleged that Acima sought to confuse consumers as to the true nature of its agreement (FAC ¶¶ 1-4) and repeatedly changed its agreements (*id.* ¶¶ 72-75), it should not give dispositive weight to cherry-picked provisions of one version without considering all versions in their full context.

[5] Acima seeks "clear congressional authorization" for the CFPB's authority over "virtual rent-to-own companies, but that exists in the CFPA definition of "credit" and the accompanying grant of regulatory and enforcement power. Courts have properly rejected this kind of argument by defendants in government enforcement actions where, as here, the government is simply asking the court to enforce the law as written. *See, e.g.*, *SEC v. Binance*, 2024 WL 3225974, at *42 (D.D.C. June 28, 2024) (unpublished). Acima also advances throughout its brief a peculiar theory of reverse preemption, whereby regulation by some states of some aspects of an economic activity would rob Congress of the power to regulate it. (Def. Br. at 17) This flies in the face of federalism and is so unsupported in the law that Acima does not even try to offer a case squarely in support.

CFPA. *See* 12 U.S.C. §§ 5481(5), (6), (15)(A)(i). The CFPA defines "credit" as "the right granted by a person to a consumer to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment for such purchase." 12 U.S.C. § 5481(7).[6] The CFPA does not define the term "debt," and there are few cases in which courts have grappled with the definition of "credit" under the statute. However, the FAC sufficiently alleges that the structure of Acima's twelve-month, functionally non-terminable contracts created a "debt" which consumers paid off over time. And that Acima considered its consumers to be in debt to it is made clear by its reporting to consumer reporting agencies, where it claimed that consumers had "loan amounts" and "balances" that did not correspond to any amounts even allegedly in arrears. (*See* FAC ¶ 139.) Additionally, in considering whether Acima consumers purchased property or services and deferred payments, there is some guidance from other contexts. Lenders are often motivated (e.g., by a desire to evade regulation) to cloak credit transactions in other guises, including leases. *See*, *e.g.*, *FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 944 (N.D. Ill. 2008) ("[C]alling something a lease does not necessarily make it a lease…substance is not to be subordinated to semantics and labels.") (collecting cases); *TKO Equip. Co. v. C & G Coal Co.*, *Inc.*, 863 F.2d 541, 544 (7th Cir. 1988). Therefore, the court should evaluate whether the CFPB's allegations plausibly allege that Acima's product constitutes "credit" based on the economic substance of the transactions. The formal parameters of the contract should not be determinative, consistent with the longstanding principles that in interpreting and applying remedial consumer protection laws, courts should examine "substance rather than the form" of transactions, *Clark v. Rent-It Corp.*, 685 F.2d 245, 248 (8th Cir. 1982)

---

[6] The definition of "credit" under EFTA corresponds to that of ECOA; the definition in TILA is similar but lacking the third branch.

(cleaned up), and construe such laws "liberally in order to best serve Congress's intent," *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1244 (11th Cir. 2016); *Ford Motor Credit Co. v. Cenance*, 452 U.S. 155, 158 (1981). And, critically, the Court should not engage in fact-finding to conclude that Acima's product is or is not "credit"; it need only determine at this stage that the CFPB has plausibly alleged that it is "credit."

1. The CFPB Alleges Sufficient Facts Showing that Acima Provides Credit Because Its Agreements Create a Debt Repaid Over Time

The CFPB's allegations indicate that Acima's consumers purchased property and deferred payment therefor or incurred a debt and paid it off over the course of the agreement. As a case Acima relies on states, "how the [product] actually operates is dispositive." *Dorton v. Kmart Corp.*, 229 F. Supp. 3d 612, 624 (E.D. Mich. 2017). When consumers entered into agreements with Acima, they took possession of their chosen goods. In return, Acima enrolled them in a payment schedule enforced by mandatory (and illegal, *see* p. 21-22) autopayments. (FAC ¶¶ 129-36) If a consumer took no other action, at the end of the year's term Acima considered that consumer the owner of the goods (Def. Br. at 15), even though many attributes of ownership (e.g., assumption of risk of loss or damage and responsibility for maintenance (FAC ¶ 34)) had already passed to the consumer. If consumers attempted to cancel their agreements, however, they quickly learned that Acima had made it absurdly difficult to do so. (*Id.* ¶ 6) Acima first required consumers to email photos of the goods, sometimes multiple rounds, before permitting the start of a return. (*Id.* ¶ 90) For years, it deceived consumers by telling them the goods would be picked up by Acima, even though it had no capacity to do so. (*Id.* ¶¶ 89, 91) Acima then tried to steer consumers into other expensive settlement options rather than simply accept a return of the goods. (*Id.* ¶ 92)

If consumers nonetheless persisted in trying to return the goods to terminate the contract, for the majority of goods, Acima required them to locate a nonprofit willing to accept the item and transport it there themselves, a task that (as Acima knew) consumers often found extremely challenging. (FAC ¶¶ 95-97) Additionally, Acima categorically did not permit the return of goods under certain conditions, e.g., goods damaged before delivery to the consumer or anything less than an entire group of items that happened to be purchased together (such as two different pieces of jewelry). (*Id.* ¶¶ 99-100) And, of course, one cannot return services of the kinds that Acima purported to "lease," such as automotive repair services and furniture delivery services. (*Id.* ¶¶ 35-36) These roadblocks had their desired effect: an astonishing less than 1% of goods (and, obviously, no services) were ever returned (*id.* ¶ 6). In other words, Acima's own policies and practices frustrated a consumer's supposed right to terminate an agreement at any time without penalty, a scenario courts have long recognized in analyzing whether a conditional right under a contract was actually available. *See Ide v. Brit. Airways PLC*, 529 F. Supp. 3d 73, 84-85 (S.D.N.Y. 2021) (when consumers were contractually required to take certain steps to receive refunds, airline nonetheless had to provide refunds when its own practices made it excessively onerous for consumers to take those steps); *In re Bankers Tr. Co.*, 450 F.3d 121, 127 (2d Cir. 2006).

The cases Acima cites are not to the contrary. Although Acima alleges that the product at issue in *CFPB v. Snap Finance LLC* was substantially similar to its own, the product in that case was not alleged to have a twelve-month term; the court did not treat returns as impracticable (although they were rare and the company discouraged them); and there was no allegation that the company categorically forbade the return of goods under certain circumstances. No. 2:23-CV-00462-JNP-JCB, 2024 WL 3625007, at *2, *5 (D. Utah Aug. 1, 2024) (unpublished). In

*Dorton*, the court interpreted the definition of "credit" in the Equal Credit Opportunity Act (in the context of a program that explicitly denied being "rent-to-own"), focusing on "whether the incremental payments constitute a contemporaneous exchange of consideration for the possession of the leased goods." 229 F. Supp. 3d at 623-24; *see also Snap*, 2024 WL 3625007, at *7. In this circumstance, as *Liberty Leasing Co. v. Machamer*, 6 F. Supp. 2d 714, 717 (S.D. Ohio 1998), explains, there is no debt because "lessees' financial obligation … would have been extinguished upon the surrender of possession of the equipment." Since Acima's consumers lacked an effective ability to terminate the lease through surrender, however, any talk of "contemporaneous exchange of consideration for possession" becomes meaningless—the consumer had little choice but to possess, and thus pay for, the goods over the length of the contract (or to enter an expensive settlement with Acima, *see* below at p. 18).The lack of contemporaneity is even more evident in the context of services, where the consumer received the value of the services (such as labor for an auto repair or delivery of furniture) all at once at the time the service was performed, yet the consumer had to pay for it over time. (FAC ¶¶ 35-36) The same distinction can be drawn with the other cases Acima cites.[7]

2.    The CFPB Alleges Sufficient Facts Showing that Acima Provided Credit Because Its Agreements Functioned as Disguised Security Interests

Further, in distinguishing between true leases and security interests (as here, loans secured by the goods being purchased—i.e., a kind of purchase of property or services with

---

[7] *See Fuller v. Rent-A-Ctr., Inc.*, No. CIV-20-00777-JD, 2020 WL 12772102, at *3 (W.D. Okla. Dec. 28, 2020) (unpublished) (relying solely on a citation to *Dorton*); *Maul v. Aaron's, Inc.*, No. CIV-12-924-M, 2013 WL 12090304, at *3 (W.D. Okla. Mar. 19, 2013) (unpublished) ("plaintiff had the right to return the leased property without further obligation at any time after the initial lease term").

deferral of payment for such purchase), courts have applied the Uniform Commercial Code (UCC), which has provided useful guidance given the lack of case law interpreting the CFPA's definition of "credit." "As the leading treatise on the UCC [explains:]… A lease involves payment for the temporary possession, use, and enjoyment of goods, with the expectation that the goods will be returned to the owner with some expected residual interest of value remaining at the end of the lease term." *In re WorldCom, Inc.*, 339 B.R. 64 (Bankr. S.D.N.Y. 2006) (applying NY law) (internal quotation marks omitted). "[W]hether a transaction creates a lease or security interest is determined by the facts of each case." *Huntington Tech. Fin., Inc. v. Neff*, 612 F. Supp. 3d 5, 19 (D. Conn. 2020) (applying NY law). Both tests used in the UCC analysis indicate that Acima's product is a security interest—a form of credit.

      In evaluating the sufficiency of the CFPB's allegations that Acima's product is "credit," this Court should consider two sequential tests that courts apply in determining whether a transaction creates a lease or a security interest. *In re WorldCom, Inc.*, 339 B.R. at 64-65. The first "Bright Line" test under the UCC establishes four independent conditions for when contracts "not subject to termination" create security interests. *See In re Phoenix Equip. Co.*, No. 2:08-bk-13108-SSC, 2009 WL 3188684, at *7 (Bankr. D. Ariz. Sept. 30, 2009) ("If the lease is not terminable by the lessee and one or more of the enumerated conditions [in § 1-203(b)] is present, then the contract is a per se security agreement, and the court's analysis may conclude.").

      The CFPB alleges that Acima's contracts are, as a practical matter, not terminable because Acima has created so many barriers to returns that it has rendered any termination right illusory. Among the four independent conditions in the Bright Line Test that these nonterminable agreements could satisfy to qualify as security interests, Acima's agreements satisfies at least the

following one: "the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement." *Huntington Tech.*, 612 F. Supp. 3d at 19; *In re Schultz*, No. 22-20090-DOB, 2022 WL 16752855, at *4 (Bankr. E.D. Mich. Nov. 7, 2022) (unpublished). Acima's consumers have this option, as making all payments anticipated by the agreement automatically results even on the face of the agreement in their ownership of the goods. (FAC ¶ 33) Thus, no additional consideration is required. *In re Smith*, 262 B.R. 365, 370 (Bankr. E.D. Va. 2000) (interpreting similar provision in Virginia law).

The Court should evaluate the sufficiency of the allegations that Acima's product is "credit" by recognizing that, even if this Court finds the Bright Line Test does not apply, Acima would also qualify under the second, more fact-specific test:

> The key fact determining whether a lease is a true lease or a security interest, assuming the Bright Line Test is not satisfied, is…whether the lessor retained a reversionary interest [in the property]. If there is a meaningful reversionary interest-either an up-side right or a down-side risk-the parties have signed a lease, not a security agreement…[I]f the . . . lessor cannot reasonably expect to receive back anything of value at the end of the lease, then the lease creates a security interest.

*Huntington Tech.*, 612 F. Supp. 3d at 20 (applying the second-step "Economic Realities Test") (internal quotations and citations omitted).[8] As the CFPB alleges, Acima did not hold a meaningful residual interest in the items that were the subject of its agreements. Acima purported to take nominal "ownership" of the goods only at the moment that the agreement was signed, although the goods were actually in the possession of its merchant partner, not Acima. (FAC ¶

---

[8] Not all states will consider the Economic Realities Test if the agreement is deemed to be terminable without penalty. "[I]f a lease can be terminated … courts are split on the significance of that fact." *In re Roberts*, 641 B.R. 613, 617 (Bankr. E.D. Wis. 2022).

29) Acima barely even knew what the goods were, requiring only the most minimal information about their nature and condition from the merchant. (*Id.* ¶ 78) It treated even returned items as having no residual value and never attempted to repossess goods. *(Id.* ¶¶ 103-06) In most states, it also passed on the risk of loss or damage to the consumer. (*Id.* ¶ 34) Its agreements also covered one-time services, which inherently lack a residual value. (*Id.* ¶ 35) Unlike a true lessor, Acima had no interest in the goods it purportedly purchased and leased. It never even saw them. Rather, Acima was interested in fixing the consumer's repayment obligation. Hence, considering the Economic Realities Test, Acima's agreements also qualify as disguised security agreements—i.e., credit.[9]

### B. The CFPB Sufficiently Alleges Acima "Offered Credit" Under the CFPA

Even if Acima Credit did not "provide" credit, the CFPB separately alleges that it still "offered" credit and thus is a covered person under the CFPA. 12 U.S.C. § 5481(6)(A). Acima included "Credit" in its name; promised consumers "Buy what you need, when you need it. We'll give you the time to pay"[10]; and invited them to "give yourself some credit." (FAC ¶¶ 4, 38, 40-44, 46-48, 51-53, 151) Acima's brief does not address this distinct alternative basis for the CFPB's authority. (*See* Def. Br. 11-22.) Instead, it offers only a one-sentence conclusory denial in its introduction that confounds "providing" and "offering" credit. (Def. Br. at 3) Acima has thus waived any argument that the CFPB fails to allege it is a "covered person" under the CFPA

---

[9] The *Snap* court declined to consider the UCC analysis on the ground that the laws in question "do not invite courts to consider the economic realities … [of the agreements]. Instead, credit is defined by consumers' right to defer payment or incur debt and defer its payment." 2024 WL 3625007, at *8 n.13. But, as the cases discussed above at p. 6-7 have shown, the economic substance of an agreement can *determine* its actual significance for consumers' rights. It is entirely appropriate for the Court to consider that substance, especially in the remedial consumer protection context.

[10] Notably, this language mirrors one branch of the CFPA's definition of credit: "the right to…purchase property or services and defer payment for such purchase." 12 U.S.C. § 5481(7).

because it did not "offer" credit. "[I]ssues not raised in the opening brief are deemed abandoned or waived." *Minshall v. McGraw Hill Broad. Co.*, 323 F.3d 1273, 1288 (10th Cir. 2003) (internal citations omitted); *Melnick v. TAMKO Bldg. Prods., Inc.*, 469 F. Supp. 3d 1082, 1119 (D. Kan. 2020) (applying standard to motion to dismiss).

There is little case law exploring what the CFPA's use of "offering," as distinct from "providing," credit means. However, it is most reasonable to understand a company to be "offering" credit when it acts so that a consumer acting reasonably under the circumstances would likely believe that the company's product is credit. This approach is consistent with the standard under the CFPA, and consumer protection law generally, for evaluating a company's representations to consumers for deceptiveness.[11] *See, e.g.*, *CFPB v. Gordon*, 819 F.3d 1179, 1192-93 (9th Cir. 2016) (representations that are "likely to mislead consumers acting reasonably under the circumstances" are deceptive) (internal quotation marks omitted). This approach has also been followed in securities law. *See SEC v. Lauer*, 52 F.3d 667, 670 (7th Cir. 1995).

This approach also parallels that taken by courts in interpreting another consumer protection statute, the Credit Repair Organizations Act (CROA). CROA defines credit repair organizations as "any person who uses any instrumentality … to sell, provide, or perform (or represent that such person can or will sell, provide, or perform)" credit repair services. 15 U.S.C. § 1679a(A)(3)(a). In other words, it too hinges statutory coverage on whether an individual provides or offers to provide certain services. In determining whether a person has "represented" that it will provide credit repair services, regardless of whether it actually provided them, courts

---

[11] A court used this standard, in dicta, to address this very question in *CFPB v. Nexus Servs., Inc.*, No. 5:21-CV-00016, 2024 WL 1392568, at *5 (W.D. Va. Mar. 31, 2024), *amended on other grounds by* 2024 WL 1461382, at *4 (W.D. Va. Apr. 2, 2024) (unpublished). The court found that defendants were "covered persons" because they "create[d] the reasonable impression in consumer[s'] minds that [they were] offering or providing extensions of credit …'." *Id.*

have looked to "the 'overall net impression' of the subject [communications to consumers] to determine what message a viewer may reasonably ascribe to [them]." *Stout v. FreeScore, LLC*, 743 F.3d 680, 685 (9th Cir. 2014); *Helms v. Consumerinfo.com, Inc.*, 436 F. Supp. 2d 1220, 1230-31 (N.D. Ala. 2005); *Zimmerman v. Cambridge Credit Counseling Corp.*, 529 F. Supp. 2d 254, 272-74 (D. Mass. 2008), *aff'd sub nom. Zimmerman v. Puccio*, 613 F.3d 60 (1st Cir. 2010).

The CFPB is aware of only one court that has rejected a proposed standard similar to this one. In *Snap*, the court expressed concerns that a "subjective theory" might give statutory authority to the CFPB based on a consumer's "misunderstanding" of a company's product. 2024 WL 3625007, at *8-*9. Thus, the court interpreted the CFPA to require that the entity offering credit "fraudulently induc[e] payment from consumers" while providing *no* actual product to be a "covered person." *Id.* at *9. But the CFPB does not argue for an unmoored "subjective" standard in which any consumer's mistake might turn an entity into a covered person; rather, as discussed above, it relies on a familiar standard applied constantly by courts to determine what reasonable consumers likely understood Acima's representations to mean. It cannot be the law that a company may evade the regulatory authority of the agency charged by Congress with the oversight of the providing and offering of credit to consumers by describing its product as "credit" to consumers but instead signing them up for something else.[12]

### C.  The CFPB Sufficiently Alleges that Acima Provided the Functional Equivalent of Purchase Finance Arrangements

The CFPB has also sufficiently alleged that Acima is a covered person under the CFPA because its agreements, even if not found to be credit, are the "functional equivalent of purchase

---

[12] To the extent Acima contends it could not have "offered" credit because it did not "provide" it, Acima urges the Court to read the word "offering" out of 12 U.S.C. § 5481(6)(A). This contravenes the "cardinal principle of statutory construction" that "a statute ought … to be so construed that … no clause, sentence, or word shall be superfluous, void, or insignificant." *Duncan v. Walker,* 533 U.S. 167, 174 (2001); *TRW Inc. v. Andrews,* 534 U.S. 19, 31 (2001).

finance arrangements." 12 U.S.C. § 5481(15)(A)(ii); FAC ¶ 152. Few courts have considered

what this phrase in the CFPA means. The *Snap* court held that, with respect to that defendant's

transactions, which Acima characterizes as "substantially similar" to its own (Def. Br. at 13),

"the salient characteristics of such functional equivalents to be that (i) payment is, in fact,

deferred (regardless of the formal terms of the agreement), with (ii) the deferred payment being

for the purchase price of personal or real property (even if the lessee does not come to own the

property at purchase)." *Snap*, 2024 WL 3625007, at *11. It then concluded that, except for the

fact that the defendant claimed its initial minimum lease term was 60 days, the defendant's

contracts, though not credit, "may well have been the functional equivalent of a purchase finance

arrangement." *Id.* Because, as Acima itself proclaimed, its agreements allowed consumers to

"spread out payments" for household goods (FAC ¶ 46) or "buy what you need, when you need

it…we'll give you the time to pay" (*id.* ¶ 42), it allowed consumers to defer payments for the

purchase price of personal property. Thus, it offered the functional equivalent of purchase

finance arrangements.

       Importantly, Acima does not dispute the *Snap* court's analysis of "the salient

characteristics of" the functional equivalent of purchase finance arrangements or deny that

Acima's agreements have those characteristics, but rather claims that its agreements cannot be

such arrangements for two other reasons. (Def. Br. at 18.) First, it claims its agreements fail to

satisfy an additional requirement that any initial term of the agreement be at least 90 days

because "the initial term of the lease is not 'at least 90 days.'" (Def. Br. at 18)[13] But the CFPB

has plausibly alleged the contrary, noting that some Acima agreements explicitly identify their

"term" as "365 days" (and generally do not "clearly identify themselves as having two-week (as

---

[13] *See also id*. at 5 n.4 (declaring that the "reference to a '12-month' term is also false").

opposed to twelve-month) terms"), that Acima often described its agreements to consumers (as well as internally, to potential investors, and to consumer reporting agencies) as twelve-month contracts, and that the agreement did not distinguish between an "initial" and a full term. (FAC ¶ 30) In short, Acima may disagree with the CFPB's characterization of its contract, but, at best, the temporal scope of the agreements is ambiguous. Such a question is not appropriate to resolve on a motion to dismiss. *McAuliffe v. Vail Corp.*, 69 F.4th 1130, 1146 (10th Cir. 2023) (error for district court to determine meaning of ambiguous term in contract on motion to dismiss).

Second, Acima misquotes the statutory definition of the relevant term, claiming that it provides: "financial products or services are 'the functional equivalent of purchase finance arrangements, if . . . the initial term of the lease is at least 90 days; and . . . at the inception of the initial lease, the transaction is intended to result in ownership of the leased property to be transferred to the lessee.' 12 U.S.C. § 5481(15)(A)(ii)." (Def. Br. at 18 (ellipses in original)) But Acima has omitted a key phrase from the statutory language, which actually states, "*in the case of a lease involving real property*, at the inception of the initial lease, the transaction is intended to result in ownership of the leased property to be transferred to the lessee." 12 U.S.C. § 5481(15)(A)(ii)(III) (emphasis added). This case concerns personal, not real, property (as well as services), so 15(a)(ii)(III) does not apply.

### D.    Acima Provided "Credit Sales" Under TILA (Counts X and XI)

Acima's claim that its virtual rent-to-own product is not a "credit sale" under TILA is likewise meritless. (*See* FAC ¶ 38-54.) Recognizing that some purported leases effectively function as credit sales, Regulation Z (which implements TILA) defines "credit sale" to include "lease[s] (unless terminable without penalty at any time by the consumer) under which the consumer: (i) Agrees to pay as compensation for use a sum substantially equivalent to, or in

16

excess of, the total value of the property and service involved; and (ii) Will become (or has the option to become), for no additional consideration or for nominal consideration, the owner of the property upon compliance with the agreement." 12 C.F.R. § 1026.2(a)(16). The FAC sufficiently alleges all these elements (*see* FAC ¶¶ 30-33, 88-102).

      1.   <u>Consumers Paid a Sum Substantially Equivalent To, or In Excess Of, the Total Value of the Property and Service</u>

The CFPB sufficiently alleges that Acima consumers paid a sum substantially equivalent to, or in excess of, the total value of the property and service involved. The CFPB alleges that Acima's product consisted of single (usually) 12-month term contracts. (FAC ¶¶ 30-31) In other words, consumers contracted with Acima to purchase goods over a period of 12 months and paid Acima in biweekly installments. At the conclusion of that term, the CFPB alleges, many consumers paid over 200% of the cost of the goods to own them. (FAC ¶¶ 31-33) Acima also offered early purchase options, wherein consumers could own the goods by paying (depending on timing) either the retail price plus a fixed markup or a substantial percentage of the sum that would be paid over the contract term, as well as an additional fee for using this option. (FAC ¶¶ 31, 81-84, 86-87) Thus, Acima consumers paid "a sum substantially equivalent to, or in excess of, the total value of the property and service involved" to use the product over the term of contract, and to ultimately own the product. *See* 12 C.F.R. § 1026.2(a)(16).

Acima's reliance on *Snap* with respect to this element is misplaced. In *Snap*, the court determined that the contract term was only 60 days; as a result, the court held that "compensation for use" for that term was not substantially equivalent to or greater than the total value of the property. *Snap*, 2024 WL 3625007, at *13 (citation omitted). Even if *Snap* consumers' recurring biweekly payments might ultimately exceed the purchase price of the property, they were, according to the *Snap* court, able to terminate the agreement at the conclusion of the initial 60-

day term or at the end of any other two-week lease term. *Id.* Unlike the defendant in *Snap*, Acima's agreements were for a 12-month term and did not provide many consumers with a practicable method of termination. (*See* FAC ¶¶ 30, 88-106.)

Furthermore, the *Snap* court erred in focusing solely on the formal terms of the agreement and refusing to consider the practical conditions placed on termination. *Snap,* 2024 WL 3625007, at *13. Consumers who are incapable of exercising their ability to terminate, like those alleged in this case, *cannot* "conditionally decline to renew the [agreement] for subsequent terms before paying a sum substantially equivalent to the total value (i.e., purchase price) of the property." *Id.*; *see* p. 8-9 above. The *Snap* court's interpretation of the regulatory language is inconsistent with TILA's remedial nature wherein the "substance rather than the form of credit transactions should be examined." *Clark*, 685 F.2d at 248 (cleaned up). Here, while the form of Acima's contracts might purport to allow termination, in substance, marketing, and practice they are typically 12-month non-renewable contracts with no practicable way to terminate.

Because there was no practicable way to terminate for many Acima consumers, they found they could only exit the agreement by effectively incurring a penalty. For those who did not want the goods anymore, but were unable to fulfill Acima's impracticable conditions for returns, or whose goods or services were deemed categorically ineligible for returns, the only way out of the agreement was to pay an extra-contractual penalty. While this option was not provided for in the agreements themselves, Acima pushed consumers who sought returns to accept an "early settlement option" instead, which required payment of "a substantial percentage of the remaining" payments on the contract, a stiff penalty that would in most cases result in the consumer paying more than the retail price of the goods. (FAC ¶¶ 32, 92) These consumers were also left with an inaccurate negative code on their credit reports. (FAC ¶¶ 93, 263)

  2.  <u>Consumers Became, for No Additional Consideration or for Nominal Consideration, the Owner of the Property</u>

As for the second prong of the "credit sales" definition, consumers became (or had the option to become), for no *additional* consideration or for nominal consideration, the owner of the property upon completion of the contract term. 12 C.F.R. § 1026.2(a)(16). As alleged in the FAC, consumers could make all payments under the contract, and at its conclusion, Acima treated the consumer as owning the goods for no *additional* consideration than what was contemplated at the outset. (FAC ¶ 33) Alternatively, consumers could also end the contracts early by paying a percentage of the same marked up price contemplated in the agreement plus a *nominal* $10 fee for electing this option. (FAC ¶ 83) In both instances, the consumer became the owner of the goods for no additional consideration than what was initially contemplated, or for nominal consideration. Therefore, Acima's motion to dismiss Counts X and XI should be denied.

  **E.**  **Acima is a "Financial Institution" Under FCRA (Count XVII)**

Contrary to Acima's claims (Def. Br. at 22-23), Acima is a "financial institution" under FCRA.[14] Under FCRA, a "financial institution" is defined as any institution the business of which is engaged in lending or extending credit. *See* 15 U.S.C. § 1681s-2(a)(7)(G)(ii) (defining financial institution by cross reference to 15 U.S.C. § 6809); 15 U.S.C. § 6809(3)(A) (defining financial institution as one which engages in financial activities defined in the Bank Holding Company Act, or 12 U.S.C. § 1843(k)); 12 U.S.C. §§ 1843(k)(4)(A), (F) (defining activities that are "financial in nature" to include lending or those defined by the Federal Reserve Board to be "so closely related to banking...as to be a proper incident thereto"); 12 C.F.R. § 225.28(b)(1) (Federal Reserve Board regulation defining activities "so closely to related to banking" to

---

[14] Acima does not challenge the adequacy of the CFPB's allegations, in Count XVII, that Acima failed to provide consumers the notice in question. *Id*. It challenges only whether the CFPB plausibly alleged that Acima was a "financial institution" under FCRA. *Id*.

include extending credit).[15] As discussed above, the CFPB sufficiently alleges that Acima extended credit. Accordingly, the CFPB sufficiently alleges that Acima was a "financial institution" for the purposes of FCRA, and Acima's motion as to Count XVII should be denied.

## II.    The CFPB Sufficiently Alleges that Acima Credit Violated the CFPA by Engaging in Deceptive, Unfair, and Abusive Conduct (Counts I-VIII)

The Court should reject Acima Credit's various challenges to the sufficiency of the CFPB's claims in Count I through VIII that Acima violated the CFPA's prohibition against deceptive, unfair, and abusive acts and practices.[16] (*See* Def. Br. at 25-34.)

### A.    The CFPB Sufficiently Alleges that Acima's "90 Days Same as Cash" and Similar Marketing is Deceptive Under the CFPA (Count I)

In Count I, the FAC sufficiently alleges how Acima's "90 days same as cash" and similar marketing statements were likely to mislead reasonable consumers about the nature of Acima's financing arrangement. (FAC ¶¶ 4, 83) It was reasonable for consumers to interpret these statements to mean they could purchase goods at the same cash price as they would have in store, except spread those payments to Acima over a 90-day period, as though it were a 90-day no-interest loan. (FAC ¶ 4) In fact, however, "the price of that option included both the initial markup from the retail price applied to all purchases, generally from $40-$75, and a fee for exercising this option, initially $10." (FAC ¶ 83)

---

[15] *See also* 12 C.F.R. § 1016.3(l)(1) (similarly defining "financial institution" by reference to the Bank Holding Company Act, 12 U.S.C. 1843(k)).

[16] Contrary to Acima's argument (Def. Br. at 20 n.16), the heightened pleading standard in Fed. R. Civ. P. 9(b) does not apply because the CFPB has not alleged "fraud or mistake." *CFPB v. 1st All. Lending, LLC*, No. 3:21-CV-55 (RNC), 2022 WL 993582, at *6 (D. Conn. Mar. 31, 2022) (unpublished) ("[T]he overwhelming weight of precedent militates against applying Rule 9(b) to CFPA claims."). As the Tenth Circuit found, "[a] § 5 claim [i.e., a deception claim under the FTC Act] simply is not a claim of fraud as that term is commonly understood or contemplated by Rule 9(b)." *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1203 n.7 (10th Cir. 2005). Another court has applied *Freecom* to CFPA claims. *CFPB v. Frederick J. Hanna & Assocs. P.C.*, 114 F. Supp. 3d 1342, 1371 (N.D. Ga. 2015); *see also, e.g.*, *CFPB v. Ocwen Fin. Corp.*, No. 17-80495-CIV, 2019 WL 13203853, at *14-16 (S.D. Fla. Sept 5, 2019).

Citing *In re Vistaprint Corp Marketing and Sales Practices Litigation*, 2009 WL 2884727 (S.D. Tex. Aug 31, 2009), Acima claims that the agreement contains the full terms of the agreement and is readily available for viewing upon signing, so it cannot be held liable for a consumer's failure to read its terms. (Def. Br. at 25) But *VistaPrint* is inapposite because it did not concern whether a misleading statement could be cured by a subsequent disclosure.[17] *Id.* at *5-6. The CFPB alleges that consumers were presented with the agreement *after* Acima advertised its product as "90 Days Same as Cash." (FAC ¶ 4). Based on this well-pled allegation, Acima's agreements would provide no defense regardless of their contents because "[a] later corrective written agreement does not eliminate a defendant's liability for making deceptive claims in the first instance." *Gordon*, 819 F.3d at 1194. There is no basis to dismiss Count I.

**B.     The CFPB Sufficiently Alleges Acima Unfairly and Deceptively Represented to Consumers an Obligation to Maintain "Autopay" (Counts II and III)**

In Count II, the CFPB sufficiently alleges Acima made various misrepresentations to consumers attempting to discontinue autopay that their contracts required maintaining it. (FAC ¶¶ 18, 19-26, 129-136, and 145-157) Acima argues that these allegations, even if true, "are insufficient to establish either a practice likely to deceive a customer acting reasonably or the materiality of such communication to a customer who apparently never saw [it]." (Def. Br. at 27) Acima first mischaracterizes these allegations as customers being told they "should maintain a payment method on-file." (Def. Br. at 27) The CFPB actually alleges that when consumers' autopayments failed, Acima told them that "they were *contractually obligated* to maintain autopay" despite their agreements requiring no such thing. (FAC ¶ 135-36 (emphasis added))

---

[17] In *Vistaprint*, the plaintiffs did not even point to any misleading statements. They merely argued that the purchasing "process" was deceptive.

Next, Acima relies on *FTC v. DirecTV, Inc.*, No. 15-cv-01129-HSG, 2018 WL 3911196 (N.D. Cal. Aug. 16, 2018) (unpublished) to support its claim that the CFPB has failed to show that communications sent to "some" consumers are enough to establish a deceptive practice. (*See* Def. Br. at 27-28.) *DirecTV* is inapposite for at least two reasons. First, in *DirecTV*, the court heard evidence adduced at *trial* and concluded that the FTC failed to show by a preponderance of the evidence that a handful of DirecTV's ads created a misleading "uniform net impression for an extremely large number of [other ads] that vary significantly in format, content and emphasis." *DirecTV, Inc.*, 2018 WL 3911196 at *16. That standard should not be applied to a motion to dismiss. Second, Acima wrongly construes the CFPB's reference to "some" consumers to mean merely a "few isolated communications." (Def. Br. at 27) In fact, "some" means "being an unknown, undetermined, or unspecified number." Merriam-Webster's Dictionary (2025). The CFPB alleges that the misrepresentations at issue in Count II reflected "template" language, were statements that representatives were required to make, or otherwise constituted a "practice." (FAC ¶¶ 130-35) Thus, there were likely many consumers who received them. Moreover, even if the number of such communications were not sufficient to establish a "practice," each would constitute a deceptive "act."

In Count III, the CFPB sufficiently alleges that Acima unfairly obstructed consumers' ability to revoke ACH authorizations by representing to some consumers who sought to update the account from which their autopay was withdrawn that they were required to maintain their prior account as a "backup." (FAC ¶¶ 190-195) Acima, however, argues that the CFPB "never explains" the substantial injury. (Def. Br. at 28) In fact, the FAC clearly describes the substantial injury: Acima "causing [consumers] to have to maintain money in accounts they no longer wanted to use or experience nonsufficient-funds fees" (FAC ¶ 192). Consumers could not

reasonably avoid this injury because they could not prevent Acima from making withdrawals from their accounts if it refused to honor their revocations of consent. (*Id.* ¶ 193) Finally, the CFPB alleges that the injury to consumers was not outweighed by any countervailing benefits to those same consumers. (*Id.* ¶ 194) Given the harm alleged, this is more than sufficient at this stage of the litigation. *See CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 917-18 (S.D. Ind. 2015) (harm alleged sufficient to allow inference that any benefits do not outweigh it); *CFPB v. Think Fin., LLC*, No. CV-17-127-GF-BMM, 2018 WL 3707911, at *8 (D. Mont. Aug. 3, 2018) (unpublished). There is no basis to dismiss Counts II and III.

### C.    The CFPB Sufficiently Alleges that Acima Deceived Consumers About and Created Unfair Barriers to Returns (Counts IV and V)

In Count IV, the CFPB sufficiently alleges that Acima misrepresented that "consumers who wanted to end their contracts could easily do so at any time (or, until 2017, after 60 days) by returning the goods" and that Acima "would pick up goods consumers wished to return." (FAC ¶¶ 88, 89) Acima's contention (Def. Br. at 29) that the CFPB does not allege sufficient facts from which the Court can reasonably infer that these statements were likely to mislead consumers ignores the extensive and detailed allegations underlying Count IV. (*See* Section I(A)(1) above; FAC ¶¶ 32, 89, 91-93, 96 197-98, 204.[18])

In Count V, the CFPB sufficiently alleges that Acima's obstructionist return policies constitute an unfair practice in violation of the CFPA. Acima makes no argument that the FAC fails to plausibly allege any element of the unfairness claim in relation to Acima's return

---

[18] Acima asserts that the CFPB did not sufficiently allege that the representations underlying Count IV "were important to customers" (Def. Br. at 29), but the representations were express and "[m]ateriality is presumed with express claims." *CFPB v. Commonwealth Equity Grp., LLC*, No. 1:20-CV-10991-IT, 2024 WL 4362126, at *14 (D. Mass. Sept. 30, 2024) (unpublished). Moreover, returnability of goods is material as it is "likely to affect a consumer's decision to buy a product or service." *FTC v. Nudge, LLC*, No. 2:19-cv-867-DBB-DAO, 2022 WL 2132695, at *12 (D. Utah June 14, 2022) (unpublished).

practices. Instead, Acima argues that Count V should be dismissed because the CFPB's allegations merely show that Acima provided consumers a "variety of options" to return products (Def. Br. at 29). But what the CFPB actually alleges is that Acima systematically "obstructed" consumer returns by building a returns system "designed to make it absurdly difficult" to terminate the contract, causing consumers to pay for additional, unwanted "lease" periods or fees. (FAC ¶¶ 6, 32, 92, 88-106)[19]

As to both Counts IV and V, Acima asserts that its return policies were "good business practices." (Def. Br. at 29) But Acima's motivations have no bearing on any element of a deception or unfairness claim. There is no basis to dismiss Count IV and V.

### D. The CFPB Sufficiently Alleges that Acima Acted Unfairly with respect to their Merchant Partners (Count VI)

Acima seeks dismissal of Count VI on the basis that the CFPB "merely speculates" that Acima "may have made statements to certain merchants" leading them to market the product inaccurately and fails to allege that any of these statements "resulted in substantial injury to a customer." (Def. Br. at 30-31)[20] These arguments are meritless.

First, the CFPB is not required to allege actual injury. Rather, it must plausibly allege that Acima's conduct "cause[d] or [was] *likely to cause* substantial injury to consumers." (emphasis

---

[19] Contrary to Acima's assertion (Def. Br. at 30), the FAC does allege, in these respects, that Acima's acts prevented returns. Additionally, and again contrary to Acima's assertion (*id.*), the implication that a small percentage of Acima consumers (under 1%, FAC ¶ 102) were ultimately able to return goods does not undercut the CFPB's argument that Acima's systemic obstruction of returns constituted an unfair practice.

[20] Acima argues that "'without coercion it is impossible to show that [defendant's] actions were the proximate cause of any … financial harm.'" (Def. Br. at 31 (quoting *ITT*, 219 F. Supp. 3d at 914)). This quotation was not the *ITT* court's finding; rather, it was the court's characterization of the defendant's argument. The *ITT* court held that coercion was a *sufficient* basis for an unfairness claim. 219 F. Supp. 3d at 915-16. The law is clear that "coercion" is not *necessary* to state an unfairness claim. *Am. Fin. Servs. Ass'n. v. FTC*, 767 F.2d 957, 981-82 (D.C. Cir. 1985).

added)[21] The CFPB clearly alleges that Acima's conduct both "cause[d]" and "[was] likely to cause" substantial injury. For example, the CFPB alleges that Acima failed to prescreen merchants for integrity (FAC ¶ 110); that Acima "provided deceptive and inadequate ads and training to merchants" (*id.* ¶ 211), including ads and training that referred to Acima's product as having a "90-day CASH option" (*id.* ¶ 118) and as "credit" (*id.* ¶ 120), "financing" for "purchas[es]" (*id.* ¶ 117), and a "loan" (*id.* ¶ 117); that this conduct "created the likelihood merchants would misrepresent the terms of the agreements, mislead consumers about the ease of returns, and create confusion about whether the product was a lease or credit" (*id.* ¶ 211);[22] that Acima "did not sufficiently monitor how the merchants advertised the product, enabling the dissemination of deceptive materials" (*id.* ¶ 212); that Acima "was aware that merchants often misrepresented Acima Credit's financing product" (*id.* ¶ 125); and that Acima "caused substantial injury to consumers by misleading them about the price and other terms of the product and their ability to terminate the contract, resulting in consumers' making significantly greater payments than anticipated" (*id.* ¶ 214).

Acima's argument that its agreements corrected for any misleading statements that reached consumers, rendering any substantial injury "reasonably avoidable" (Def. Br. at 31), is also unavailing. As noted above, Acima cannot avoid liability by relying on a "later corrective written agreement." *Gordon*, 819 F.3d at 1194.[23] There is no basis to dismiss Count VI.

---

[21] *See also CFPB v. D & D Mktg.*, No. CV 15-9692 PSG (EX), 2016 WL 8849698, at *11 (C.D. Cal. Nov. 17, 2016) (unpublished) ("Courts have found that there is a 'likelihood of substantial injury' to consumers where plaintiff can show that 'injury is a predictable consequence' of the Defendant's actions.") (citation omitted).

[22] Acima "received many complaints" indicating such confusion. (FAC ¶ 126)

[23] Acima also asserts that the CFPB fails to plausibly allege that any substantial injury was "not outweighed by countervailing benefits." (Def. Br. at 30.) But the numerous allegations regarding the nature of Acima's misconduct and the nature of the injuries it caused or likely caused (relating to Count VI), coupled with the allegation that "[t]his substantial injury is not

E.    **The CFPB Sufficiently Alleges that Acima Credit Engaged in Abusive Acts and Practices with Respect to Its Mobile Application Process (Count VII)**

The CFPB sufficiently alleges that Acima engaged in abusive acts and practices with respect to its mobile application process, which "materially interfere[d] with the ability of a consumer to understand a term or condition of" Acima's product. 12 U.S.C. § 5531(d)(1). Acima claims that "[a]ll the CFPB can allege is that Acima 'did not explain the terms of the agreement (or provide a copy) [] at the time of being approved' and that it provided the agreement 'in small font on a mobile phone.'" (Def. Br. at 32) The CFPB's allegations go far beyond this in both scope and detail.[24]

For example, the FAC describes an application process that began with Acima-provided advertising materials used by merchants that sometimes implied that the product was credit and often did not describe it as a lease, or did so only in tiny footnotes, even though credit and leases differ in many important respects, then continued as a series of text exchanges that also hid the nature of the product. (FAC ¶ 57) In other words, from many consumers' first encounter with Acima, the company obscured the fundamental nature of what it later argued it was actually offering them. Until 2020, the application that a consumer who clicked on the offered link was taken to offered no further explanation. (*Id.* ¶ 59) Acima would then approve consumers for a certain amount of money without any disclosure of the terms on which it was offering it. (*Id.* ¶ 61) Consumers chose their goods, and only when they were ready to check out did they see the agreement. (*Id.* ¶ 63) Acima's presentation of the agreement varied over time but frequently

---

outweighed by countervailing benefits to consumers or to competition," FAC ¶ 216, plausibly alleges the third element of the unfairness test. *See above* p. 23 (citing *ITT* case holding that allegations about alleged harm sufficient to allow inference that any benefits do not outweigh it).

[24] Acima asks this Court to dismiss Count VII in its entirety but fails to address the allegations concerning the category of consumer contracts signed via the merchant's computer (FAC ¶ 63). The CFPB considers any motion to dismiss as to this category waived; these claims of abusiveness should survive regardless.

involved blocking the actual agreement with a pop-up screen (which did not always have to be dismissed before signing the agreement) and providing no evident means for consumers to obtain their own copies to review independently. (*Id.* ¶¶ 65-67)[25] And, indeed, Acima presented its complex agreement via the small screen of a phone in tiny font. (*Id.* ¶ 68) *See FTC v. Amazon.com, Inc.*, 735 F. Supp. 3d 1297, 1319 (W.D. Wash. 2024) (small print of online disclosure relevant to consumer understanding). There is no basis to dismiss Count VI.

      **F.**      **The CFPB Sufficiently Alleges that, if Acima Credit Did Not Extend Credit, It Misrepresented its Lease-to-Own Transactions as Credit (Count VIII)**

In Count VIII, the CFPB sufficiently alleges that, if this Court finds that Acima Credit did not extend credit, then Acima engaged in deceptive practices by misrepresenting the product in their marketing and advertising to consumers as credit. Acima, however, asserts that the CFPB does not allege an instance in which Acima told a consumer that its product was an offer of "credit." (Def. Br. at 33) In fact, the FAC sets forth detailed allegations about how Acima "repeatedly portrayed its financing as credit in various marketing materials aimed at consumers." (FAC ¶¶ 41, 42, 44, 47, 51-52) For example, on its customer-facing marketing materials, Acima used the taglines "Give yourself some credit" and "We all need a little EXTRA CREDIT every now and then." (FAC ¶¶ 44, 47) Therefore, there is no basis to dismiss Count VIII.

**III.**      **The CFPB Sufficiently Alleges that Acima Credit Failed to Provide Consumers with the Disclosures Required by TILA and Regulation Z**

Under TILA and Regulation Z, if a transaction is credit or a credit sale, the creditor must disclose, in addition to the general disclosures outlined in 12 C.F.R. § 1026.18, the special disclosures of 12 C.F.R. § 1026.18(j) (e.g., "total sale price," "cash price") *before* the

---

[25] Acima's claim that "a consumer can read the full terms of Acima's RPA prior to executing it" (Def. Br. at 33) is thus yet another unsupported factual claim contradicting the CFPB's well-pled allegations and inappropriate at the motion to dismiss stage.

consummation of the agreement. *See* 12 C.F.R. § 1026.17. The CFPB sufficiently alleges that Acima failed to provide these required disclosures to consumers. (FAC ¶¶ 63, 67, 72-74, 77) The FAC further alleges that even when some relevant disclosures were made to consumers (albeit after the fact), Acima violated Regulation Z's form requirements. (*Id.* ¶¶ 69-71, 74, 76)

Acima simply claims that the information "does not exist." (Def. Br. at 34) For example, Acima argues it would be *impossible* for it to disclose the amount financed, the finance charge, or the annual percentage rate. *Id.* But if the product is credit or a credit sale such that TILA and Regulation Z apply to Acima's transactions, as the CFPB alleges, then TILA's definitions can be used to analyze its agreements to produce the required information.

## IV.    Acima Credit Had Fair Notice It Was Subject to CFPA, EFTA, TILA, and FCRA

Contrary to Acima's assertion (Def. Br. at 23-25), it was not "deprived of fair notice" that its product could violate the CFPA, TILA, EFTA, and FCRA. Acima cites no caselaw to support its statement that the CFPB "failed to provide the requisite notice to Acima Credit that it would attempt to suddenly police Acima Credit's lease-to-own transactions." (Def. Br. at 24) And for good reason: courts have consistently rejected this type of "fair notice" argument in opposition to CFPB enforcement actions. *Ocwen*, 2019 WL 13203853, at *19 (collecting cases). The relevant inquiry is whether Acima had "fair notice that its conduct could fall within the meaning of the statute," and Acima is "only entitled to notice of the meaning of the statute and not to the [CFPB's] interpretation of the statute." *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 255-56 (3d Cir. 2015); *see also Ocwen*, 2019 WL 13203853, at *19. Acima had fair notice that its product, which was repeatedly marketed both internally and to the public as credit, fell within the scope of the CFPA, EFTA, TILA, and FCRA.

Instead, Acima attempts to rely on *FCC v. Fox Television Stations, Inc.*—a case addressing the "void for vagueness" doctrine—for its fair notice argument. 567 U.S. 239 (2012);

*see* Def. Br. at 23. *Fox* involved a criminal statute, a restriction on speech, and an attempt by the agency to enforce retroactively a revised agency interpretation. None of those factors exists here. Acima also cites to *Christopher v. SmithKline Beecham Corp.*, arguing it could not "divine the agency's interpretations in advance." 567 U.S. 142 (2012); Def. Br. at 25. Again, *Christopher* involved a party's attempt to rely on an agency's new interpretation of an ambiguous statute; here, the CFPB is asking a court to determine under long-standing case law whether Acima's product grants the right to defer payment using a definition of "credit" tracking the one found in the CFPA, TILA, EFTA, and FCRA. *See Bros. v. First Leasing*, 724 F.2d 789, 796 (9th Cir. 1984); *Clark*, 685 F.2d at 248 (8th Cir. 1982); *Ocwen*, 2019 WL 13203853, at *17. Acima's attempt to evade the law by inventing a new product does not constitute a lack of notice.

Acima also argues that a January 2021 CFPB Taskforce Report provided "substantial reasons to believe that the CFPB would not attempt to police lease-to-own transactions." (Def. Br. at 24.)[26] The language Acima points to ("Strictly speaking, rent-to-own transactions are not credit…"), however, is a general statement that does not purport to opine on Acima's product, or the terms, form, or substance of that product.[27]

## V. The CFPB's TILA (Count X) and EFTA (Count XII) Claims are Timely

The CFPB's TILA and EFTA claims are not barred by any applicable statute of limitations. Acima contends that TILA and EFTA claims (Counts X and XII) are governed by a one-year limitations period under 15 U.S.C. § 1640(e) and 15 U.S.C. § 1693m(g) respectively.

---

[26] Additionally, a company that began operations in 2013 could not have relied on a 2021 report.
[27] The report is from an advisory committee created to advise the CFPB, not the CFPB itself. As the report never represented even an informal CFPB policy, Acima's citation to *Encino Motors, LLC v. Navarro*, concerning amending existing policy, is inapposite. 579 U.S. 211, 221 (2016). Further, Acima's argument does not provide a ground to dismiss this action, as the imposition of prospective relief is unaffected by fair notice issues. *See, e.g.*, *Landgraf v. USI Film Prods.*, 511 U.S. 244, 273 (1994).

(Def. Br. at 34-35) However, this limitations period applies to actions initiated by individual private plaintiffs, not to actions initiated by the CFPB. *See generally* 15 U.S.C. § 1640(a) (outlining TILA requirements for damages to an "individual"); 15 U.S.C. § 1693m(a) (same for EFTA). The CFPB, by contrast, enforces TILA and EFTA under 15 U.S.C. § 1607 and 15 U.S.C. § 1693o, respectively, through "subtitle E of the [CFPA]." *See* 15 U.S.C. § 1607(a)(1)(6); 15 U.S.C. § 1607(b) ("For the purpose of the exercise by [the CFPB] of its powers under [the CFPA], a violation of any requirement imposed under this subchapter shall be deemed to be a violation of a requirement imposed under [the CFPA].
"); 15 U.S.C. §§ 1693o(a)(1)(5), (b).

Subtitle E of the CFPA, in turn, authorizes the CFPB to bring suit "to impose a civil penalty or to seek all appropriate legal or equitable relief," 12 U.S.C. §§ 5564(a), 5565(a), and instructs that an action may not be brought "more than 3 years after the date of discovery of the violation," 12 U.S.C. § 5564(g)(1). Read together, these statutory provisions give the CFPB three years to bring suit from the date it discovers a violation of TILA/Regulation Z and EFTA. *See CFPB v. Citizens Bank, N.A.*, 504 F. Supp. 3d 39, 49 (D.R.I. 2020) (holding that 15 U.S.C. § 1607 governs CFPB actions under TILA, and, as § 1607 lacks its own statute of limitations, the statute of limitations in 12 U.S.C. § 5564(g)(1) applies); *Ocwen*, 2019 WL 13203853, at *28 (holding that 12 U.S.C. § 5564(g)(1) applies to CFPA and TILA claims).

Acima relies on only one case—*ITT*, 219 F. Supp. 3d at 878—to support its assertion that TILA and EFTA claims are subject to a one-year limitations period, but that case has been consistently rejected since its issuance. *See, e.g., Citizens*, 504 F. Supp. 3d at 48 ("[T]his Court does not find...the *ITT* Court [analysis]…to be persuasive."). Finally, dismissal under Rule 12(b)(6) is only appropriate "when the complaint itself admits all the elements of the affirmative defense by alleging the factual basis for those elements." *Fernandez v. Clean House, LLC*, 883

F.3d 1296, 1299 (10th Cir. 2018). The FAC does not state when the CPFB "discovered" Acima's alleged violations. Nor was the CFPB under any obligation to plead such facts. *See Bistline v. Parker*, 918 F.3d 849, 876 (10th Cir. 2019). There is not yet a "factual basis" for the elements of a statute of limitations defense under 12 U.S.C. § 5564(g)(1), and the dismissal of any CFPB claim here, in full or in part, is thus unwarranted.

**VI.    The CFPB's Funding is Valid and Provides No Grounds for Dismissal**

Congress authorized the CFPB to draw funds from "the combined earnings of the Federal Reserve System." 12 U.S.C. § 5497(a)(1). The Federal Reserve's "earnings" plainly means the system's income, or money earned. Acima disagrees. It says that "earnings" means the surplus that is left after the payment of (non-CFPB) obligations and that, by statute, must be remitted to the Treasury. (*See* Def. Br. at 8-11.) The Court should reject this atextual argument, which has been easily discarded by every court to consider it. *See CFPB v. SoLo Funds, Inc.*, 2024 WL 4553110, at *2 (C.D. Cal. Oct. 17, 2024) (unpublished); *Texas v. Colony Ridge, Inc.*, 2024 WL 4553111, at *4 (S.D. Tex. Oct. 11, 2024), *report and recommendation adopted* (S.D. Tex. Nov. 26, 2024) (unpublished); *CFPB v. Active Network, LLC*, 2024 WL 4437639, at *2 (E.D. Tex. Oct. 7, 2024).

Because "earnings" is not statutorily defined, the Court must apply its ordinary meaning. *Rocky Mountain Wild v. Dallas*, 98 F.4th 1263, 1291 (10th Cir. 2024). The ordinary meaning of "earnings" is "revenue" or "income" generated from labor, services, or investments. *See Earnings*, Black's Law Dictionary (12th ed. 2024) ("Revenue gained from labor or services, from the investment of capital, or from assets."); *Earnings*, Oxford English Dictionary (online ed. 2024) ("[T]he money made through working, trade or business activity, etc."). Thus, the "combined earnings" of the Federal Reserve System is simply the total revenue its components generated. That definition is consistent with other parts of the Dodd-Frank Act, which also use

31

"earnings" to refer to money gained on investments or other income. *E.g.*, 12 U.S.C. § 5390(n)(2) (directing FDIC's handling of "interest and other *earnings* from investments"); 15 U.S.C. § 78u-6(g)(5)(D) (requiring SEC to report "amount of *earnings* on [fund's] investments").

To support its argument, Acima first insists that the Supreme Court already determined that the "combined earnings" of the Federal Reserve System "are 'surplus funds in the Federal Reserve System [that] would otherwise be deposited into the general fund of the Treasury.'" (Def. Br. at 8 (quoting *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425 (2024) (*CFSA*)). But Acima misreads *CFSA*, which did not interpret the phrase "combined earnings." The Court discussed the source of the CFPB's funds only to address the "threshold" question of whether the money transferred by the Federal Reserve Board is even "subject to the requirements of the Appropriations Clause[,]" given that the Clause covers money "'drawn from the Treasury.'" *CFSA*, 601 U.S. at 425 (quoting Art. I, § 9, cl. 7). The Court explained that the Clause covers the CFPB's funding source because "[t]he Bureau draws money from the Federal Reserve System" and, by statute, 12 U.S.C. § 289(a)(3)(B), any "surplus funds" in the System would otherwise go to the Treasury. *See CFSA*, 601 U.S. at 425. In so holding, the Court did not suggest that the phrase "combined earnings" in § 5497 referred to the surplus funds the System sends to Treasury. Indeed, if the Court believed that "combined earnings" meant "surplus funds," it presumably would have said so—as that would have simplified the constitutional analysis. Indeed, even Justice Alito's dissent recognized that the Federal Reserve's "earnings" means the "interest on and gains" the Reserve Banks "derived from the purchase and sale of securities, as well as from the fees they charge for providing services to depository institutions." *CFSA*, 601 U.S. at 450.

32

Acima next claims that dictionary definitions and "generally accepted accounting principles" support its view that "earnings" means "net income or profit" in the circumstances here. (*See* Def. Br. at 8-9.) For two reasons, that claim fails. *First*, Acima improperly ports the specialized meaning of "earnings" that can sometimes apply to private-sector companies to the very different context of the money generated by the country's central bank. That move makes little sense, as the Federal Reserve is not like a company in the private sector—including because it "is not profit-maximizing" and "[l]osses do not affect the Fed's ability to honor its liabilities," Cong. Res. Serv., *Why Is the Federal Reserve Operating at a Loss?* (Jan. 23, 2023).[28] Further confirming that Acima's specialized definition does not apply, the Federal Reserve's own accounting manual equates "earnings" with "income" and describes the money sent to the Treasury as "*excess* earnings." *See* Federal Reserve, Financial Accounting Manual for Federal Reserve Banks (Apr. 2024)[29] at 47-48, 53 (emphasis added). Under that accounting method, the Federal Reserve System has continued to generate well over $100 billion in earnings each year. *See* Federal Reserve Board, Press Release, Federal Reserve Board releases annual audited financial statements (Mar. 26, 2024) ("FRB 2023 Press Release").[30] Second, Acima's position is not actually that the statute's reference to "earnings" means "after-tax net income" or "profits." It urges a far narrower understanding of "earnings"—the Federal Reserve's remittances to the Treasury, which are sent after statutorily required payment of dividends to stockholders of the

---

[28] https://crsreports.congress.gov/product/pdf/IN/IN12081

[29] https://www.federalreserve.gov/aboutthefed/files/bstfinaccountingmanual.pdf.

[30] https://www.federalreserve.gov/newsevents/pressreleases/other20240326a.htm. Acima takes this and similar press releases as evidence that "there are no profits" from which the CFPB can draw funds. *See* Def. Br. at 9. But those sources support the CFPB, not Acima. They describe the System's balance sheet in terms of the "sum total of expenses [that] exceeded earnings" and refer to any money sent to the Treasury as "excess earnings." *See, e.g.*, FRB 2023 Press Release.

Reserve Banks. *See* 12 U.S.C. § 289(a). Even in the private-company setting, "earnings" are used to pay dividends—not what is left *after* paying them. *See*, *e.g.*, *Earnings*, Investopedia.

At base, Acima's argument rests on a fundamental misunderstanding of how the Federal Reserve's finances work. In Acima's view, when the System's expenses exceed its earnings, funds for the CFPB come from the System's "deficit account." (Def Br. at 9) But there is no such "deficit account," nor is that where the CFPB funds would come from. By statute, Reserve Banks send net earnings to Treasury's general fund after (1) paying for "all necessary expenses," (2) issuing required dividends to stockholders, and (3) putting funds up to a set cap into its surplus fund. *See* 12 U.S.C. § 289(a). Those "necessary expenses" include semiannual assessments from the Federal Reserve Board to pay its expenses, *id.* § 243, which in turn include required transfers from the Federal Reserve System to meet the CFPB's funding needs, *id.* § 5497(a)(1).

Acima's definition of "earnings" would also be unworkable. When Congress created the CFPB after the 2008 financial crisis, it deemed "the assurance of adequate funding" "absolutely essential." S. Rep. No. 111-176, at 163 (2010). In Acima's telling, Congress instead funded the agency so it would be intermittently unable to oversee the financial markets, often at times of economic disruption when its work would be most needed. Acima's answer is that the CFPB can request supplemental appropriations. (*See* Def. Br. at 10-11 (citing 12 U.S.C. § 5497(e)).) But that authorization to request additional funding was meant for situations where the CFPB's funding needs "exceed" the cap for transfers from the Federal Reserve. *See id.* § 5497(e)(1)(B). And, despite Acima's suggestion (*see* Def. Br. at 11 n.11), supplemental appropriations would not provide consistent or predictable funding. By Acima's own telling, the Federal Reserve System lacks "combined earnings" anytime it suspends weekly remittances to the Treasury, which can happen unexpectedly in the middle of an appropriations year. (*See* Def. Br. at 9 (citing

Federal Reserve Press release indicating that the Reserve Banks suspended weekly remittances "in the fall of 2022," even as the System had already sent tens of billions to the Treasury by that point).)

Finally, even if Acima were correct on the merits, dismissal would not be warranted. *See SoLo Funds*, 2024 WL 4553110, at *2 (court was "not persuaded" that "the Bureau's source of funding—even if illegitimate—is grounds for dismissal"). Congress—which has the power of the purse—has not provided that actions taken without proper funding must be undone. *See generally* Anti-Deficiency Act, 31 U.S.C. § 1341 *et seq.*

## CONCLUSION

For the reasons given above, the Court should deny Acima Credit's motion to dismiss in its entirety.


Dated: January 24, 2025                    Respectfully submitted,

                                           _/s/Sarah E. Trombley_____
                                           SARAH E. TROMBLEY
                                           JAMES D. RENNER
                                           FRANCESCA L. BARTOLOMEY
                                           ALEXANDER BROCHE
                                           Consumer Financial Protection Bureau
                                           1700 G Street, NW
                                           Washington, DC 20552
                                           202-435-9735
                                           sarah.trombley@cfpb.gov
                                           james.renner@cfpb.gov
                                           francesca.bartolomey@cfpb.gov
                                           alexander.broche@cfpb.gov
                                           *Attorneys for the Consumer Financial Protection Bureau*

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7-1(g), the CFPB requests oral argument on this case due to the many complex issues involved.