SARAH E. TROMBLEY
JAMES D. RENNER
FRANCESCA L. BARTOLOMEY
ALEXANDER BROCHE
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
202-435-9735
sarah.trombley@cfpb.gov
james.renner@cfpb.gov
francesca.bartolomey@cfpb.gov
alexander.broche@cfpb.gov

*Attorneys for Plaintiff Consumer
Financial Protection Bureau*

## THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>　　　Plaintiff,<br><br>　　v.<br><br>ACIMA HOLDINGS, LLC, ACIMA DIGITAL, LLC (F/K/A ACIMA CREDIT, LLC, D/B/A ACIMA LEASING), and AARON ALLRED,<br><br>　　　Defendants. | **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT ALLRED'S MOTION TO DISMISS**<br><br>Case No. 2:24:cv-00525-DBB-CMR<br><br>District Judge David B. Barlow<br><br>Magistrate Judge Cecilia M. Romero |

## INTRODUCTION

Aaron Allred (along with a friend) founded Acima Credit in 2013.[1] He ran it, under various titles, for most of the eight years of its existence before it was purchased by a larger company, and he continued to work for the company for about two years afterward. He provided most of its early funding, and he held a significant percentage of its equity. As he testified, he was heavily involved in every aspect of the company in its earlier years, doing "everything from sales to customer service to cleaning the bathroom," and, even as it grew larger, he was "still involved in [corporate] decisions, whether they be key or critical or important decisions." Unsurprisingly given Allred's own words, the First Amended Complaint (FAC) offers a number of other examples of Allred's ongoing involvement with, decision-making concerning, and awareness of Acima's policies, product, interactions with merchants, and marketing. Now, however, he would prefer to be known as a mere "former company executive." But the FAC goes far beyond this, making allegations that easily meet the standard for individual liability under the Consumer Financial Protection Act (CFPA) and the Fair Credit Reporting Act (FCRA).

Allred disputes the CFPB's claims about the company's conduct under his leadership. These arguments, also advanced by Acima, are largely addressed in the CFPB's opposition to the company's motion to dismiss. Allred also claims in his Introduction that the CFPB's suit is "trying to create retroactive liability for Allred" which is "unconstitutional and unfair" because "while CEO, he never could have thought [the law] applied." He does not, however, attempt to support this claim with arguments in his brief—perhaps because he knows that this is not the law. Whatever a sophisticated businessman like Allred may have believed at the time, it does not

---

[1] Defendants Acima Holdings, LLC and Acima Digital, LLC (f/k/a Acima Credit, LLC, d/b/a Acima Leasing) are referred to collectively as "Acima."

and could not exculpate him for violations of the existing laws and cannot be a basis for dismissing the FAC. His other arguments fail as well, including those attempting to equate this case with another involving a different product offered by a different company. This Court should deny his motion to dismiss in its entirety.

## LEGAL STANDARD

The Federal Rules of Civil Procedure require that the Bureau provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Allred's motion to dismiss must be denied if the Bureau has "plead[ed] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "does not impose a probability requirement … ; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "In evaluating a motion to dismiss, the court must take as true all well-pleaded facts, as distinguished from conclusory allegations, view all reasonable inferences in favor of the nonmoving party, and liberally construe the pleadings." *Andersen v. Mountain Heights Academy*, No. 2:24-CV-00168, 2024 WL 5136924, at *3 (D. Utah Dec. 17, 2024) (slip copy), (citing *McNellis v. Douglas Cnty. Sch. Dist.*, 116 F.4th 1122, 1130–31 (10th Cir. 2024)).

## ARGUMENT

As Acima's co-founder and chief executive officer (CEO), Allred had his hands in everything, from reviewing contract language (FAC ¶ 37), to designing the Acima website (FAC ¶ 45), to approving consumer-facing marketing (FAC ¶ 54) and merchant training materials (FAC ¶ 121). The FAC plausibly alleges jurisdiction as to Allred, his individual liability for Acima's violations of the CFPA and FCRA, and his substantial assistance. He provides no basis

to dismiss the FAC on constitutional grounds. For the reasons that follow, Allred's motion to dismiss should be denied.

## I.    The CFPB Sufficiently Alleges the Facts Establishing its Statutory Authority Over Acima and Allred

Allred adopts Acima's arguments concerning the CFPB's statutory authority to enforce its CFPA claims against Acima and, by extension, Allred, and Acima's argument as to "fair notice." (Def. Br. at 6) The CFPB has responded to these arguments in its brief in opposition to Acima's motion to dismiss (CFPB Acima Br. at 5-20, 28-29) and incorporates those responses herein.

## II.    The CFPB Sufficiently Alleges That Allred is Directly Liable in his Individual Capacity for Acima's Unfair, Deceptive, and Abusive Acts and Practices.

There is nothing "extraordinary" (Def. Br. at 8) in holding the founder CEO accountable for the misconduct of his company. As Allred acknowledges, under the CFPA, individuals may be directly liable for a corporation's unfair, deceptive, or abusive acts and practices (UDAAP) when they "participated directly in the practices or acts or had authority to control them" and "had or should have had knowledge or awareness" of the misconduct. *Integrity Advance, LLC v. CFPB*, 48 F.4th 1161, 1174 (10th Cir. 2022); *FTC v. Moses*, 913 F.3d 297, 307 (2d Cir. 2019); *see also CFPB v. Gordon*, 819 F.3d 1179, 1193 (9th Cir. 2016) (discussing applicability of FTC standards to CFPA UDAAP claims). An individual has sufficient knowledge or awareness where he had "actual knowledge" of the misconduct, was "recklessly indifferent" to the misconduct, or "had an awareness of a high probability" of misconduct "and intentionally avoided learning the truth." *Integrity*, 48 F.4th at 1174 (citing *Gordon*, 819 F.3d at 1193).

The FAC plausibly alleges that Allred (1) had the authority to control Acima's unfair, deceptive, and abusive acts, (2) also participated directly in some (if not all) of these acts, and (3) knew or should have known of these unfair, deceptive, and abusive acts. Accordingly, the FAC plausibly alleges that Allred should be individually liable for the CFPA violations.

3

A.    **The CFPB Sufficiently Alleges That Allred Had Authority to Control Acima and Participated Directly in At Least Some of the Conduct Giving Rise to Liability**

Contrary to Allred's claims (Def. Br. at 7-10), the FAC sufficiently alleges that Allred had the authority to control Acima. "Authority to control a company 'can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer.'" *CFPB v. NDG Fin. Corp.*, No. 15-cv-5211(CM), 2016 WL 7188792, at *17 (S.D.N.Y. Dec. 2, 2016) (unpublished) (quoting *FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 320 (S.D.N.Y. 2008)). Despite Allred's claims, the CFPB alleges a variety of significant facts collectively establishing that Allred had authority to control Acima. He founded the company and named it. (FAC ¶ 20) He funded it with his own money and continued to hold a significant amount of its debt up to 2021. (FAC ¶ 21) He sat on and controlled the company's board of directors.[2] (FAC ¶ 22) He led the company for years under a number of titles, including as its first CEO, and was "closely involved … with setting Acima policy." (FAC ¶¶ 23-25)

Indeed, the CFPB alleges even more specifically that Allred was not simply a hands-off CEO. Unsurprisingly given that the company was largely his creation, the FAC depicts Allred as a top-level manager who was intimately and actively involved in the day-to-day decision making at Acima in its early days and remained closely engaged with the business even as it grew larger. Allred steered much, if not most, of the misconduct in question in this matter. (*See* FAC ¶ 49 (Allred was personally involved in developing Acima's "firm offer of credit" marketing

---

[2] Allred argues Acima Holdings has no board of directors. (Def. Br. at 10) However, this contention goes towards the substance of the allegation and is inappropriate to raise in a motion to dismiss. *See CFPB v. SoLo Funds, Inc.*, No. 2:24-CV-04108-RGK-AJR, 2024 WL 4553110, at *3 (C.D. Cal. Oct. 17, 2024).

campaign, and individually emailed store owners to garner involvement); *id*. ¶ 50 (Allred personally requested Acima use specific terminology in marketing materials); *id*. ¶ 121 (Allred personally reviewed Acima's merchant marketing and training materials); *id*. ¶ 128 (Allred had final authority over whether a merchant partner continued to work with Acima); *id*. ¶ 133 (Allred received, reviewed, and provided extensive comments on relevant email templates the company used to require ACH payments); *id*. ¶ 129 (Allred ordered in writing that "[Acima] will force [consumers] to sign the [ACH] acceptance [included in the agreement] or we will not do the lease"); *id*. ¶ 144 (Allred was directly involved in Acima's prescreened list practices, authorized these policies, and directed and supervised Acima's retrieval and use of particular prescreened lists).) These allegations show in detail that Allred was actively involved in the business affairs and the making of corporate policy, and thus had the requisite authority to control Acima, including, necessarily, its unfair, deceptive, and abusive acts and practices.

Grasping at straws, Allred raises an esoteric argument under Utah's Revised Limited Liability Company Act, claiming that the CFPB was required to allege whether Acima was a "member-managed" company or a "manager-managed" company. (Def. Br. at 8-10) However, such hyper-particularized allegations are not necessary at the pleading stage. *See SoLo Funds, Inc.*, 2024 WL 4553110, at *2 (stating that a claim is plausible "if the plaintiff alleges enough facts to draw a reasonable inference that the defendant is liable for the alleged misconduct") (internal citations omitted). More importantly, the CFPA—not Utah law on limited liability companies—controls the question of individual liability under the CFPA. Pursuant to the proper standard for individual liability, the CFPB alleges in detail how Allred had the authority to control Acima, through his roles and active involvement in the company.

Equally unavailingly, Allred attempts to minimize his involvement in the company and dismisses the allegations in the FAC by stating that he, like "dozens of individuals in leadership roles" performed "tasks like 'customer service' and 'cleaning the bathroom'." (Def. Br. at 9-10) However, Allred misrepresents the allegations in the FAC. It alleges, as evidence of Allred's micro-managerial involvement in the day-to-day business of Acima, that he testified he "*[did] everything* from sales to customer service to cleaning the bathroom." (FAC ¶ 24) (emphasis added). He testified *he* was "involved in decisions, *whether they be key or critical or important decisions*, or whether they be … playing referee on an issue that was escalated." (FAC ¶ 26) (emphasis added). This Court need only heed Allred's own words in finding the FAC sufficiently alleges he had authority to control Acima. (FAC ¶¶ 24, 26.)

In fact, for certain claims, this prong is independently satisfied on the grounds that Allred "participated directly" in Acima's misconduct with respect to the specific UDAAP violations. Allred argues that the CFPB has failed to allege that Allred "participated directly" in each of the substantive UDAAP violations. (Def. Br. at 12-13) But Allred's argument apparently rests on the mistaken belief that, to establish his direct participation, it must be alleged that Allred reviewed every advertisement, read every company email, and spoke with every customer. On the contrary, "[a]n individual has directly participated in a deceptive act or practice when he or she 'developed or created, reviewed, altered and disseminated the deceptive marketing materials' or '[a]ctive[ly] supervis[ed]' the employees and sales related to the deceptive acts." *FTC v. Nudge, LLC*, No. 2:19-cv-867-DBB-DAO, 2022 WL 2132695, at *49 (D. Utah June 14, 2022) (unpublished) (internal citations omitted). Based on the correct legal standard, the FAC alleges

that Allred also directly participated in at least some of the alleged UDAAP violations, if not most of them.[3]

### B.    The CFPB Sufficiently Alleges That Allred, Through His Direct Participation or Otherwise, Had the Requisite Awareness to Establish His Liability for Acima's Deceptive, Unfair, and Abusive Practices

For the reasons described below, the CFPB sufficiently alleges that Allred had or should have had knowledge or awareness of Acima's deceptive, unfair, and abusive conduct alleged in the FAC—whether through his direct participation in such conduct or otherwise.[4]

### 1.    The CFPB Sufficiently Alleges that Allred Had the Requisite Awareness of Acima's Deceptive Use of Phrases Like "90 Days Same as Cash" (Count I)

The CFPB alleges that Acima advertised its 90-day option as a "cash option" or "same as cash," when, "in fact, the price of that option included both the initial markup from the retail price applied to all purchases, generally from $40-$75, and a fee for exercising this option, initially $10." (FAC ¶ 83.) Allred argues, in essence, that the FAC fails to allege that he "'participated directly' in the creation or approval of marketing materials that used [the '90 Days Same as Cash' and similar] phrases without 'further explanation[.]'" (Def. Br. at 13) But, as the FAC makes clear, Allred made the "major decisions" at Acima, including marketing decisions. (FAC ¶¶ 23, 25, 40.) Importantly, the CFPB alleges that he "provided feedback on, reviewed,

---

[3] In Section II.B below, the CFPB discusses specific allegations reflecting Allred's awareness of the particular conduct underlying each of the CFPB's claims that Acima and Allred engaged in deceptive, unfair, and abusive conduct. Many of these allegations also show his authority to control and direct participation in that conduct, because he obtained awareness, at least in part, by exercising that authority and directly participating in that conduct.

[4] Allred argues that "because the Bureau's claims in Counts I, II, IV, VI, and VIII sound in fraud or otherwise contain allegations of fraudulent conduct," the CFPB is subject to the heightened pleading standard of Fed. R. Civ. P. 9(b) when making allegations concerning Acima's misrepresentations. (Def. Br. at 12) This argument contradicts extensive precedent, including in this Circuit. The CFPB incorporates here its response on this point in its opposition to Acima's motion (CFPB Acima Br. at 20 n.16).

and approved consumer-facing marketing materials." (FAC ¶ 54) Allred knew, or at least should have known, that the marketing misrepresentations alleged in Count I were likely to mislead consumers about the nature of the product because he directly participated in Acima's marketing decisions, and he designed the product. The Court should reject Allred's peculiar argument that, because the CFPB did not specifically plead that Allred knew that these phrases were used "without providing any further explanation" (FAC ¶ 178), its allegations are inadequate. Allred approved marketing materials that employed these phrases and was thus well aware that these specific deceptive phrases were used in Acima's marketing, and in what context.[5] (FAC ¶¶ 54, 86) The CFPB sufficiently alleges Allred's authority and knowledge, as well as his direct participation in this particular conduct, and thus the Court should deny his motion to dismiss Count I.

    2.   <u>The CFPB Sufficiently Alleges that Allred Had the Requisite Awareness of Acima's Deceptive Misrepresentations that its Contracts Required Autopay (Count II)</u>

Allred next argues that the FAC fails to allege that he participated directly in or had any knowledge about the deceptive misrepresentations concerning autopay. (Def. Br. at 14) As discussed in the CFPB's opposition to Acima's motion to dismiss (CFPB Acima Br. at 21-23), Acima misrepresented to consumers that they were contractually obligated to maintain autopay on their accounts. The CFPB adequately alleges that Allred is individually liable for this conduct.

Allred was, of course, familiar with the written agreements, as they memorialized the terms of the credit product he designed. (FAC ¶ 3) He demonstrated his belief that the ACH provision of the contract was essential when he stated, "We will force [customers] to sign the

---

[5] Further, the CFPB has not argued that the mere absence of "further explanation" is what makes the phrases in question deceptive.

[ACH] acceptance [included in the agreement] or we will not do the lease." (FAC ¶ 129) Furthermore, "email templates containing [language about ACH being required for all regular payments] were sent to Allred for his review." (FAC ¶ 131) Allred argues that "it would not be reasonable to assume that [he], as CEO of a large company, was responsible for or knowledgeable about the content of every attachment to every email that reached his inbox." (Def. Br. at 14) But, at this stage of the litigation, the CFPB need only make a plausible allegation concerning Allred's knowledge. The FAC refers to emails containing form language sent to Allred *for his review* before being sent out to consumers en masse. (FAC ¶¶ 130-33) Viewing the allegations in the light most favorable to the CFPB, Allred had the requisite level of knowledge regarding the representations made to consumers by email. Thus, the Court should deny Allred's motion to dismiss Count II.

> 3. The CFPB Sufficiently Alleges that Allred Had the Requisite Awareness of Acima's Deceptive and Unfair Practices Regarding Consumers' Ability to Return Goods (Counts IV & V)

Acima made deceptive misrepresentations to consumers about their ability to return goods, by "represent[ing] both orally and in writing that consumers who wanted to end their contracts could *easily* do so at any time (or, until 2017, after 60 days) by returning the goods" and that, through approximately 2021, Acima would pick those goods up. (FAC ¶ 88-89) (emphasis added) Acima also created unfair barriers to returns. (FAC ¶¶ 88-107) Allred claims that the FAC does not sufficiently allege his personal liability for this conduct as alleged in Counts IV and V. (Def. Br. at 15-16) But Allred's chief argument, that the CFPB has not sufficiently alleged his individual liability for this conduct because the FAC describes Allred as having "authorized or been aware of" (FAC ¶ 107) Acima's return policies (Def. Br. at 15), makes no sense. Despite Allred's rewriting of the FAC to imply otherwise ("*either…or…*") (*id.*),

the CFPB did not allege these as two incompatible possibilities. Clearly, an individual *authorizing* a policy would also have been *aware* of it. Allred also complains that the CFPB does not allege that Allred "participat[ed] directly" in the circumstances that obstructed returns. (Def. Br. at 16) But, as discussed above (p. 3), direct participation is only one way to meet the standard for individual liability.

Allred further denies that he "had knowledge of the misrepresentations" alleged. (Def. Br. at 16) However, the CFPB alleges that Allred was "closely involved" in the marketing of Acima's product (FAC ¶ 25) and that "Allred provided feedback on, reviewed, and approved consumer-facing marketing materials" (FAC ¶ 54), which would include representations about returns. Finally, Allred complains that the CFPB has "not alleged that Allred had any knowledge of such circumstances," i.e., "whatever circumstances made returns 'not practically possible for many types of items.'" (Def. Br. at 16) But again, the FAC explicitly alleges that "Allred has authorized or been aware of Acima Credit's return policies since its founding." (FAC ¶ 107) The policies *themselves* contradict the representations about returns (e.g., they directed representatives to communicate to consumers that goods would be picked up by Acima (FAC ¶ 89) and to find nonprofits for donation of the goods (FAC ¶ 95)). And, given the pervasively obstructionist nature of Acima's return policy and practices, and his extensive and direct participation in every aspect of Acima's business, it is reasonable to infer from the FAC's allegations that Allred had the requisite *awareness* of the unfair barriers to return erected at Acima.

Thus, the Court should deny Allred's motion to dismiss Counts IV and V.

4. <u>The CFPB Sufficiently Alleges That Allred Had the Requisite Awareness of Acima's Unfair Merchant Partner Practices (Count VI)</u>

In Count VI, the CFPB alleges that Acima engaged in unfair acts and practices by providing deceptive and inadequate marketing and training to, and failing to monitor, its merchant partners (FAC ¶¶ 110, 111-120, 122, 125-127), thus "creat[ing] the likelihood merchants would misrepresent the terms of the agreements, mislead consumers about the ease of returns, and create confusion about whether the product was a lease or credit." (FAC ¶ 211) Contrary to Allred's claims (Def. Br. at 16-18), the CFPB has sufficiently alleged his individual liability for this conduct.

Allred initially argues that Count VI "does not make sense" because (as a CFPA claim) it is premised on Acima's product being "credit," yet alleges that Allred acted unfairly by, among other things, causing the product to be advertised as "credit." (Def. Br. at 16) Allred both misapprehends and understates the CFPB's allegations. First, if Acima "extended" or "offered" credit, Acima and Allred nonetheless acted unfairly by creating the likelihood that merchants would misrepresent to consumers the agreement's actual terms "by misleading them about *the price* and *other terms of the product* and *their ability to terminate the contract*, resulting in consumers making significantly greater payments than anticipated." (FAC ¶ 214) (emphases added) In other words, the CFPB's allegations go well beyond the characterization of the product as credit. Second, if it is ultimately determined that Acima did not "extend" credit but only "offered" it (or provided the functional equivalent of a purchase-finance arrangement), then

11

Acima and Allred's characterizations of the product as "credit" to merchants (and thereby consumers) supports Count VI for that separate reason.[6]

Allred also argues that the FAC "lacks any factual allegation that Allred knew or should have known that 'deceptive and inadequate' advertisements and training were being provided to merchants, or that merchants were not being 'sufficiently monitor[ed].'" (Def. Br. at 18) This ignores the multiple allegations in the FAC to this effect. (FAC ¶ 121 (Allred "personally reviewed or approved many of Acima Credit's merchant marketing and training materials"); *id.* ¶ 50 (Allred was "aware of" and "requested the use of" deceptive language in merchant marketing and training materials); *id.* ¶ 49 (Allred personally emailed merchants to participate in campaign he described as "firm offer of credit"); *id.* ¶ 86 ("Allred knew that the [early purchase] option was sometimes…described to merchants as "90 days same as cash" or "90 day cash option" or "$10 [or similar] fee."); and *id.* ¶ 40 (quoting an email from Allred stating, with regard to an Acima brand redesign, that "[t]he message…we want to send consumers and merchants should be based around the idea of our product being a loan without actually calling it a loan…."")). Finally, the FAC explicitly alleges that Allred was the "final authority" on whether Acima "terminated" its business relationship with any given merchant partner. (FAC ¶¶ 127-28) This is more than sufficient.[7]

---

[6] If this Court should ultimately hold that Acima's product is, in fact, credit, then that single aspect of this unfairness claim would no longer be applicable. Given the peculiar and contradictory engineering of the product, which was characterized and operated in whatever way was convenient for Acima, some of the CFPB's claims are pleaded in the alternative.

[7] Allred further argues that the FAC contains insufficient allegations about Allred's direct participation in the conduct. However, as has been discussed repeatedly (*see*, *e.g.*, p. 3, 4-7, 10), and as Allred himself acknowledges, having "the authority to control [the conduct]" of Acima (Def. Br. at 17) is sufficient to establish this prong of the individual liability standard. The Bureau has already shown this. *See* p. 4-6 above.

5.    The CFPB Sufficiently Alleges That Allred Had the Requisite Awareness of Acima's Abusive Mobile Application Process (Count VII)

The CFPB alleges that Acima engaged in abusive conduct through "design[ing] and implement[ing] a mobile application and contracting process that materially interfered…with consumers' ability to understand" the Acima agreement by "(1) direct[ing] the consumer to the application through statements that misrepresented the nature of the product; (2) depriv[ing] consumers of the opportunity to even see the terms and conditions until the check-out process; (3) ma[king] it difficult for the consumer to read the agreement; and (4) obscur[ing] the cost of the product." (*See* CFPB Acima Br. at 26-27; FAC ¶¶ 55-76, 220)

Allred contends that the CFPB alleges only Allred's general familiarity with Acima's mobile application process and therefore the FAC does not allege that he had the requisite knowledge of the conduct underlying Count VII. (Def. Br. at 19) But the CFPB alleges that Allred "provided feedback on, reviewed, and approved consumer-facing marketing materials" (FAC ¶ 54), which would include problematic materials used to prompt the consumer to begin the application process (FAC ¶ 57); that he "reviewed at least some language in the agreements" used in the process, which contributed to consumer confusion (FAC ¶¶ 37, 71-77); and that he "was familiar with the Acima Credit mobile application process and with the disclosures on the Acima Credit contracts." (FAC ¶ 80) This is more than adequate to plead that Allred had knowledge of the abusive conduct at issue. Allred seems to imply (Def. Br. at 19) that individual liability requires a unique knowledge that the conduct in question violated the law, but this is not the case. In the only decision he cites, *CFPB v. CashCall, Inc.*, No. CV 15-7522-JFW(RAOx), 2016 WL 4820635, at *12 (C.D. Cal. Aug. 31, 2016) (unpublished), the court considered only whether the defendant "had the requisite factual knowledge" of the conduct, not the defendant's legal conclusions. There, as here, "at the very least … the facts demonstrate that [Allred] was

recklessly indifferent to the wrongdoing." *Id.*[8] Thus, the Court should deny Allred's motion to dismiss Count VII.

> 6.  If Acima's Product is Not Credit, the CFPB Sufficiently Alleges that Allred Had the Requisite Awareness That Acima Was Deceptively Misrepresenting it as Such (Count VIII)

In the event this Court finds that Acima did not extend credit, then Acima misrepresented the product to consumers by describing it as credit, and Allred is personally liable for this deceptive act or practice in violation of the CFPA. Allred's contention that this claim attempts to "convert leases into something fundamentally different than what they are" (Def. Br. at 19), misunderstands the allegation. The CFPB alleges several grounds on which Acima and Allred are covered persons under the CFPA, only one of which hinges on the product actually being credit. (*See* CFPB Acima Br. at 5-16). If Acima is found not to have extended credit, but one of the other grounds applies—Acima offered credit or provided the functional equivalent of purchase finance arrangements—its characterization of the product as credit would be deceptive.

The FAC sufficiently alleges that Allred is liable for those deceptions as he directly participated in their dissemination and thus knew about them. In 2015 while discussing a brand redesign, Allred wrote: "[M]any consumers (and merchants) do not understand what a lease is. The message that we want to send to consumers and merchants should be based around the idea of our product being a loan without actually calling it a loan." (FAC ¶ 40 (internal quotation marks omitted)) Acima launched an aggressive marketing campaign using the term "credit" so pervasively, "consumers reasonably understood [the] statements to indicate that Acima Credit

---

[8] Allred also complains that the CFPB does not allege his "direct participation in designing or implementing the mobile application process." (Def. Br. at 18) However, as discussed above (p. 3), it is not only direct participation, but rather also authority to control and knowledge that give rise to individual liability, and the CFPB has already sufficiently alleged authority.

was offering credit." (FAC ¶ 41) Allred "was involved in the design of and reviewed copy for Acima Credit's website" which used the tagline "Give yourself some credit." (FAC ¶¶ 44-45) He also "provided feedback on, reviewed, and approved consumer-facing marketing materials." (FAC ¶ 54) Acima obtained prescreened lists of consumers to whom it stated it was "making a 'firm offer of credit.'" (FAC ¶ 48) "Allred was personally involved in developing this marketing campaign, even emailing individual store owners" who acted as the face of Acima to consumers "to offer them the chance to participate in what [Allred] described as a 'firm offer of credit.'" (FAC ¶¶ 49, 51)

If Acima's product is not in fact credit, Acima and Allred certainly went out of their way to make the consumer believe it was. The CFPB sufficiently alleges Allred's direct participation in and knowledge of these deceptive misrepresentations (as well as his authority to control them). The Court should therefore deny Allred's motion to dismiss as to Count VIII.

## III.  The CFPB Sufficiently Alleges That Allred Provided Substantial Assistance to Acima in Violating the CFPA

The FAC's allegations establish that Allred provided substantial assistance or support to Acima's CFPA violations (Counts I-II, IV-VIII). The CFPA prohibits any person from "knowingly or recklessly provid[ing] substantial assistance to a covered person … in violation of [the CFPA], or any rule or order issued thereunder." 12 U.S.C. § 5536(a)(3). To state a claim for substantial assistance, the CFPB must allege: (1) a primary violation of the CFPA; (2) Allred's knowledge or reckless disregard of the primary violation; and (3) Allred's substantial assistance in the primary violation. *See CFPB v. Nexus Servs., Inc.*, No. 5:21-CV-00016, 2024 WL 1461382, at *6 (W.D. Va. Apr. 2, 2024) (unpublished) (citations omitted). "Recklessness sufficient to establish scienter involves conduct that is highly unreasonable and represents an extreme departure from the standards of ordinary care." *CFPB v. RD Legal Funding, LLC,* 332

F. Supp. 3d 729, 772 (S.D.N.Y. 2018) (internal quotation marks and citation omitted); *CFPB v. Universal Debt & Payment Sols., LLC*, No. 1:15-CV-0859-RWS, 2019 WL 1295004, at *15 (N.D. Ga. Mar. 21, 2019) (unpublished). Of note, "if a defendant has 'a high degree of actual knowledge, this lessens the burden [the CFPB] must meet in alleging substantial assistance,'" and "[c]onversely, a high degree of substantial assistance may lessen the burden of showing scienter." *Universal Debt*, 2015 WL 11439178, at *12 (*citing SEC v. Apuzzo*, 689 F.3d 204, 214-15 (2d Cir. 2012)). To adequately plead the "substantial assistance" element, the CFPB must plausibly allege that Allred in some manner "associated himself" with Acima's conduct, that he "participated in it as something [he] wished to bring about," and that he "sought by [his] actions to make it succeed." *CFPB v. Manseth*, No. 22-CV-29-LJV, 2023 WL 5400235, at *18 (W.D.N.Y. Aug. 22, 2023) (unpublished).

First, the CFPB alleges sufficient facts demonstrating primary violations of the CFPA by Acima. (*See generally*, FAC; CFPB Acima Br.) Second, as discussed above (p. 7-15), the FAC adequately alleges Allred knew of Acima's unfair, deceptive, and abusive acts per Counts I-II and IV-VIII, or recklessly disregarded them.[9] Indeed, the CFPB alleges a high degree of actual knowledge by Allred of the misconduct in question, thus "lessen[ing] the burden [the CFPB] must meet in alleging substantial assistance." *Universal Debt*, 2015 WL 11439178, at *12 (quotation marks and citation omitted).

Third, as discussed in depth above (p. 6-11), the FAC plausibly alleges that Allred "assisted" in Acima's CFPA violations. Indeed, the CFPB alleges that Allred knew of Acima's conduct because he was instrumental in creating and implementing the company's policies and

---

[9] *See also* FAC ¶¶ 22-26, 37-40, 45, 49-50, 54, 80, 86, 104, 107, 121, 128, 131, 133, 144, 180, 188, 200, 208, 217, 221, 227, 232, 233 (alleging Allred's knowledge and/or participation in the misconduct in question).

practices. Allred associated himself with Acima for years as its founder, CEO, and point person for all major decision making, and he participated in Acima's violations "as something he wished to bring about" by doing "everything" at Acima in the early years, designing the nature of Acima's product, setting Acima policy, and making major company decisions even in the later years. (FAC ¶¶ 23-25) *See Manseth*, 2023 WL 5400235, at *18.

Allred "sought by his action[s] to make [Acima] succeed" by founding it, acting as its leader and, as a leader naturally would, attempting to bring about its growth and profitability over the years. And more specifically, he directly involved himself in its marketing campaigns (FAC ¶¶ 25, 38, 40, 45, 49-50, 54, 121, 144), personally emailed stores to solicit partnership opportunities (FAC ¶ 49), determined the economic structure of Acima agreements (FAC ¶¶ 37-38), reviewed and approved merchant marketing and training materials (FAC ¶ 121), authorized Acima's obstructive return policies and practices (FAC ¶ 107), and even authorized and supervised Acima's policies and procedures with respect to prescreened lists and signing the associated contracts (FAC ¶ 144).

Contrary to Allred's assertions, the FAC does not simply allege substantial assistance liability by virtue of Allred's position as CEO. (Def. Br. at 22) Nor does the CFPB allege substantial assistance liability based on perfunctory knowledge applicable to "everyone else in the Company." (*Id.*) Rather, the totality of the allegations in the FAC present Allred as having been heavily involved in all aspects of Acima's policies and practices, including those which violated the CFPA. Allred's repeated attempts to minimize his involvement in the company he co-founded and led for years, his mischaracterizations of the allegations in the FAC, and his efforts to insert issues of fact and credibility at this stage of the litigation should not be permitted.

**IV.    The CFPB Sufficiently Alleges that, if Acima Did Not Extend Credit, Allred Is Individually Liable for Violating the FCRA (Count XVIII) and Therefore the CFPA (Count XIX).**

If this Court determines that Acima did not extend credit to consumers, Counts XVIII and XIX plausibly allege an alternative theory of liability for both Acima and Allred under FCRA. Under the statute, "[a] person shall not use or obtain a consumer report for any purpose unless … the consumer report is obtained for a [permissible] purpose." 15 U.S.C. § 1681b(f). FCRA provides only two permissible purposes for obtaining or using a consumer report in the context of direct marketing to consumers "not initiated by the consumer": (1) "the consumer authorizes the … report" or (2) the transaction in question "consists of a firm offer of credit or insurance." 15 U.S.C. § 1681b(c)(1). The CFPB alleges that Acima obtained and used consumer reports (in the form of prescreened lists) without consumer authorization. (FAC ¶ 143) Therefore, to avoid liability under FCRA, Acima needed to have obtained and used these reports in connection with a "firm offer of credit or insurance." (FAC ¶¶ 276-279) Thus, if Acima did not extend credit (as it claims), then it violated the FCRA.[10] (FAC ¶ 279)

The CFPB further alleges that Allred is also liable for these FCRA violations. Allred argues that Count XVIII should be dismissed against him because the CFPB has failed to allege facts to establish his personal involvement in any alleged wrongdoing. (Def. Br. at 23) Specifically, Allred asserts that while the CFPB alleges he authorized Acima's policies and procedures governing prescreened lists and signed the CRA contracts enabling Acima's prescreened list activity, "this says nothing about the purported 'wrongdoing' of using prescreened lists without a permissible purpose." (*Id*.) Allred's argument is meritless.

---

[10] Allred complains that the CFPB "does not allege facts to show that Acima did not have any other 'permissible purpose' for using or obtaining consumer reports" (Def. Br. at 23), but the CFPB is merely required to make a plausible allegation that Acima lacked a permissible purpose, as it has done.

For one, the FAC contains ample allegations about Allred's personal involvement, so the CFPB has adequately alleged Allred's liability even assuming direct "personal involvement" is required.[11] The CFPB alleges that "between at least 2015 and 2019, Acima Credit obtained numerous 'prescreened' lists from CRA(s), based on certain criteria Acima Credit specified, that provided information about consumers who had not authorized these reports, such as their names, contact information, creditworthiness and credit standing," and that Acima "targeted at least hundreds of thousands of consumers with marketing and solicitation materials using these lists." (FAC ¶ 143)[12] The FAC further alleges that "Allred was directly involved with and knowledgeable about Acima Credit's prescreened list practices"; "authorized" Acima's "policies and procedures governing prescreened lists"; "signed the CRA contract(s) enabling the [prescreened list] activity"; and "directed and supervised Acima Credit's retrieval and use of particular prescreened lists." (FAC ¶ 144)[13] The CFPB also alleges that Allred was so "personally involved" in Acima's prescreened list campaigns that, on at least one occasion, he "email[ed] individual store owners to offer them the chance to participate in what he described as

---

[11] In actuality, direct personal involvement is not required, and instead Allred can be liable if he either "participated directly in the [misconduct]" *or* "had the authority to control [it]" and "had knowledge of the [misconduct], was recklessly indifferent to [it], or was aware of a high probability of [it] with an intentional avoidance of the truth." *See Gordon*, 819 F.3d at 1193 (applying that standard to hold individuals liable for violations of the CFPA); *see FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1104 (9th Cir. 2014) (holding that individual liability standard applies where statute provides that violation "shall be deemed to be" a violation of the FTC Act); *see* 15 U.S.C. § 1681s(d) (providing that violations of FCRA "shall be deemed" violations of the CFPA).

[12] Allred does not challenge the CFPB's allegation that that these prescreened lists were "consumer reports" for the purposes of FCRA. (FAC ¶¶ 174-75)

[13] Allred argues that while the CFPB alleges that he "directed and supervised" Acima's retrieval and use of "particular prescreened lists," its allegations do not specify that there were no "permissible purposes" for these *particular* lists. (Def. Br. at 24) But, when the CFPB alleges that Acima obtained prescreened lists of consumers without consent and used them without a permissible purpose (FAC ¶ 143), it is reasonable to infer when reading the next paragraph (FAC ¶ 144) that Allred personally directed and supervised the use of some of those lists.

a 'firm offer of credit,'" (FAC ¶ 49), and that "Allred participated directly in or had the authority to control [Acima's obtaining and using prescreened lists without consumer authorization], and was or should have been aware of it." (FAC ¶ 280) Thus, the FAC amply alleges that Allred was personally "involve[d]" in the conduct in question and therefore liable for violating the FCRA. *CFPB v. Nesheiwat*, No. 21-56052, 2022 WL 17958636, at *1 (9th Cir. Dec. 27, 2022) ("Undisputed record evidence shows that Nesheiwat recklessly violated the FCRA by using and obtaining consumer reports for unauthorized purposes.") (unpublished); *Zellerino v. Roosen*, No. SACV 16-485-JLS (AJWx), 2016 WL 10988763, at *9 (C.D. Cal. Aug. 22, 2016) (unpublished).[14]

Finally, Allred argues that Count XIX—which alleges a CFPA violation based on Allred's violation of the FCRA—is untenable because it is premised on a FCRA violation that presumes Acima did not extend credit. Allred asserts that if Acima did not extend credit, it is not a "covered person" under the CFPA, and Allred is not a "related person" subject to the CFPA. (Def. Br. at 25) However, the CFPB plausibly alleges, among other grounds, that Acima is a "covered person" under the CFPA because Acima "offered" credit, even if it did not "extend" it. (*See* CFPB Acima Brief at 12-14.) Indeed, as the CFPB alleges, Acima purported to offer "credit" in the context of direct marketing to consumers based on prescreened lists. (FAC ¶ 48)

---

[14] The cases Allred cites in support of his argument for the dismissal of Count XVIII are distinguishable. For example, in both *Watson v. Caruso* and *McNack v. Smith*, the plaintiff named a corporation and its CEO as defendants but then—unlike the CFPB in this matter—made no allegation that the CEO had participated in any manner in the corporation's FCRA activities or the alleged FCRA wrongdoing in question. *Watson*, 424 F. Supp. 3d 231, 251 (D. Conn. 2019) (finding that "besides naming [the CEO] in the complaint, there is no evidence that she was personally involved in any alleged wrongdoing."); *McNack,* No. 2:14-cv-04810-CAS(SPx), 2015 WL 7302218, at *5 (C.D. Cal. Nov. 16, 2015) ("[A]part from being named in the caption of plaintiff's complaint, the complaint contains no allegations against [the CEO]" generally.).

Thus, if Acima "offered" credit but did not actually "extend" it, Allred is still a "related person" subject to CFPA liability for the alleged FCRA violation. Accordingly, the Court should deny Allred's Motion as to Count XIX.

**V.    The CFPB's Funding Is Valid and Provides No Grounds for Dismissal.**

Allred contends that this case must be dismissed because the CFPB's "funding is unconstitutional and unlawful" (Def. Br. at 4)—despite the Supreme Court's recent decision "conclud[ing] that the Bureau's funding mechanism does not violate the Appropriations Clause." *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425 (2024). On this point, Allred joins his co-defendant's argument that the CFPB may only draw funds from the Federal Reserve System's "earnings"—which Defendants take to mean the excess income that, by statute, Federal Reserve Banks must send to the general fund of the Treasury. (*See* Def. Br. at 4-5.) For the reasons laid out in the Bureau's opposition to Acima's motion to dismiss, this argument fails. (*See* CFPB Acima Br. at 31-35.) The plain meaning of "earnings"—income or money earned— applies to the Bureau's statutory funding mechanism, 12 U.S.C. § 5497(a). Acima and Allred's approach to "earnings" is contrary to statutory context, is inconsistent with the Federal Reserve System's own treatment of the money it earns, and would be unworkable in practice. The Court should reject this argument, as every other court to consider the issue has easily done. *See SoLo Funds, Inc.*, 2024 WL 4553110, at *2; *Texas v. Colony Ridge, Inc.*, 2024 WL 4553111, at *4 (S.D. Tex. Oct. 11, 2024), *report and recommendation adopted* (S.D. Tex. Nov. 26, 2024) (unpublished); *CFPB v. Active Network, LLC*, 2024 WL 4437639, at *2 (E.D. Tex. Oct. 7, 2024).

## CONCLUSION

For the foregoing reasons, the Court should deny Allred's motion to dismiss in its entirety.

Dated: January 24, 2025                    Respectfully submitted,

                                           _/s/Sarah E. Trombley_____
                                           SARAH E. TROMBLEY
                                           JAMES D. RENNER
                                           FRANCESCA L. BARTOLOMEY
                                           ALEXANDER BROCHE
                                           Consumer Financial Protection Bureau
                                           1700 G Street, NW
                                           Washington, DC 20552
                                           202-435-9735
                                           sarah.trombley@cfpb.gov
                                           james.renner@cfpb.gov
                                           francesca.bartolomey@cfpb.gov
                                           alexander.broche@cfpb.gov
                                           *Attorneys for the Consumer Financial Protection Bureau*

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7-1(g), the CFPB requests oral argument on this case due to the many complex issues involved.