Matthew P. Previn*
Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6049
Facsimile: (212) 303-7049
**admitted pro hac vice*

Bradley J. Bondi*
Paul Hastings LLP
2050 M Street NW
Washington, DC 20036
Telephone: (202) 551-1700
Facsimile: (202) 303-7049
**admitted pro hac vice*

Benson L. Hathaway, Jr. (Bar No. 4219)
Alyssa Nielsen (Bar No. 18066)
KIRTON McCONKIE
50 East South Temple, 4th Floor
P.O. Box 45120
Salt Lake City, Utah 84145-0120
Telephone: (801) 328-3600
bhathawa@kmclaw.com
anielsen@kmclaw.com

*Counsel for Defendants Acima Digital, LLC and Acima Holdings, LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Plaintiff,<br><br>v.<br><br>ACIMA HOLDINGS, LLC, ACIMA DIGITAL, LLC (F/K/A ACIMA CREDIT, LLC, D/B/A ACIMA LEASING), and AARON ALLRED,<br><br>Defendants. | **DEFENDANTS ACIMA DIGITAL, LLC AND ACIMA HOLDINGS, LLC'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS**<br><br>Case No. 2:24-CV-00525-DBB |

Pursuant to Federal Rules of Civil Procedure 12(b)(6) and DUCivR 7-1(a), Defendants Acima Digital, LLC and Acima Holdings, LLC hereby respectfully submit this reply in support of their motion to dismiss the CFPB's complaint in its entirety. ECF No. 45. Pursuant to DUCivR 7-1(a)(1), the foregoing motion (the "Motion") is supported by the following memorandum of law.

# TABLE OF CONTENTS


INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................ 2

I. The CFPB's Funding Method Violates the Dodd-Frank Act and the Appropriations Clause. ........................................................................................................ 2

II. Acima's Lease-To-Own Transactions Do Not Meet the Statutory Definition of Credit. ... 5

A. The CFPB May Not Rewrite Acima's Rental Purchase Agreements. .................... 5

B. Acima's Lease-To-Own Transactions Are Not "Credit" Transactions Under the CFPA, TILA, and EFTA (Counts I-IX, XI, XIII, XIX). .................................. 7

C. The CFPB's Alternate Theories of Applying the CFPA to Acima's Lease-To-Own Transactions Are Unavailing. ............................................................ 8

D. Acima's Lease-To-Own Transactions Are Not the "Functional Equivalent" of Purchase Finance Arrangements under the CFPA. ........................................ 10

E. Acima Does Not Offer "Credit Sales" Under the TILA. .................................... 11

F. Acima Is Not a "Financial Institution" Under The FCRA. .................................. 12

III. The CFPB's Sudden Reinterpreation of the Consumer Protection Statutes Violated Acima's Due Process RightS. ........................................................................ 12

IV. The Court Should Dismiss Counts I–VIII For Failure To Allege Any Deceptive, Unfair, or Abusive Practices. ............................................................................ 13

A. The CFPB Fails To Allege Plausibly that Acima's "90 Day Same As Cash" Marketing Is Deceptive (Count I). ............................................................ 13

B. The CFPB Fails To Allege that Acima Deceptively Represented to Customers an Obligation To Maintain "Autopay" (Counts II and III). ................................. 13

C. The CFPB Fails To Allege that Acima Misrepresented Consumers' Ability To Return Goods or Created Unfair Barriers to Returns (Counts IV and V). ............ 14

D. The CFPB Fails To Allege that Acima Made Unfairly Deceptive Statements or Failed To Train and Monitor its Third-Party Retailers (Count VI). ................. 14

E. The CFPB Fails To Allege Any Abusive Acts or Practices with Respect to Acima's "Text To Apply" Process (Count VII). ................................................ 14

F. The CFPB Fails To Allege that Acima Misrepresented Its Lease-To-Own Transactions as Credit (Count VIII). ........................................................... 15

V. Assuming the TILA Applies to Acima's Transactions, Acima Made All Possible required Disclosures (Counts X and XI). .......... 15

VI. Counts X and XIII are Time-Barred. .......... 15

CONCLUSION .......... 15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*,
501 U.S. 104 (1991)....................8

*CFPB v. Cmty Fin. Servs. Ass'n of Am., Ltd.*,
601 U.S. 416 (2024)....................4

*CFPB v. Snap Fin. LLC*,
No. 2:23-cv-00462-JNP-JCB, 2024 WL 3625007 (D. Utah Aug. 1, 2024) .................... *passim*

*CounselNow, LLC v. Deluxe Small Business Sales Inc.*,
430 F. Supp. 3d 1247 (D. Utah 2019)....................6, 11

*Credit Suisse Secs. (USA) LLC v. Simmonds*,
566 U.S. 221 (2012)....................6

*Dorton v. Kmart Corp.*,
229 F. Supp. 3d 612 (E.D. Mich. 2017)....................5, 6

*Edwards v. Valdez*,
789 F.2d 1477 (10th Cir. 1986) ....................6

*FTC v. DirecTV, Inc.*,
No. 15-cv-01129-HSG, 2018 WL 3911196 (N.D. Cal. Aug. 16, 2018)....................13

*Gorsuch, Ltd., B.C. v. Wells Fargo Nat. Bank Ass'n*,
771 F.3d 1230 (10th Cir. 2014) ....................6

*Henson v. Santander Consumer USA Inc.*,
582 U.S. 79 (2017)....................4

*Ide v. British Airways PLC*,
529 F. Supp. 3d 73 (S.D.N.Y. 2021)....................8

*In re Bankers Trust Co.*,
450 F.3d 121 (2d Cir. 2006)....................8

*In re Phoenix Equip. Co.*,
No. 2:08-BK-13108-SSC, 2009 WL 3188684 (Bankr. D. Ariz. Sept. 30, 2009) ....................9

*In re VistaPrint Corp.*,
MDL No. 4:08–md–1994, 2009 WL 2884727 (S.D. Tex. Aug. 31, 2009) ....................13

*Liberty Leasing Co. v. Machamer*,
6 F. Supp. 2d 714 (S.D. Ohio 1998) ....................5

*Loper Bright Enters. v. Raimondo*,
144 S. Ct. 2244 (2024) .......... 6

*Maul v. Aaron's, Inc.*,
No. CIV-12-924-M, 2013 WL 12090304 (W.D. Okla. Mar. 19, 2013) .......... 5

*Remco Enters., Inc. v. Houston*,
677 P.2d 567 (Kan. Ct. App. 1984) .......... 11

*SAS Inst., Inc. v. Iancu*,
584 U.S. 357 (2018) .......... 4

*TKO Equipment Co. v. C & G Coal Co., Inc.*,
863 F.2d 541 (7th Cir. 1988) .......... 5

*United States v. Locke*,
471 U.S. 84 (1985) .......... 6

*United States v. Hext*,
444 F.2d 804 (5th Cir. 1971) .......... 8

*United States v. Radley*,
632 F.3d 177 (5th Cir. 2011) .......... 2

**STATUTES**

12 U.S.C. § 5345 .......... 3

12 U.S.C. § 5481 .......... 7

12 U.S.C. § 5497 .......... 2

12 U.S.C. § 5531 .......... 14

15 U.S.C. § 1602 .......... 7

15 U.S.C. § 1681 .......... 12

15 U.S.C. § 6809 .......... 12

**REGULATIONS**

12 C.F.R. § 1005.2(f) .......... 7

12 C.F.R. § 1026.2(a) .......... 7, 9

**OTHER AUTHORITIES**

Charles J. Woelfel, *Encyclopedia of Banking & Finance* 320 (10th ed. 1994) ..........................2, 3

*Merriam-Webster's Collegiate Dictionary* 391 (11th ed. 2007) ...................................................3

UCC § 1-203 ..........................................................................................................................9

*Webster's Third New International Dictionary* 714 (2002) ..........................................................3

## INTRODUCTION

The CFPB's Opposition cannot refute the fact that its current funding—out of the Federal Reserve's deficit, and not earnings—violates the Dodd-Frank Act and the Appropriations Clause. For this reason alone, this action must be dismissed because, absent valid funding, the CFPB is prohibited by law from pursuing its enforcement action.

Regardless, the CFPB lacks the statutory authority to police Acima's lease-to-own transactions under the Consumer Financial Protection Act ("CFPA"), the Truth in Lending Act ("TILA"), the Electronic Fund Transfer Act ("EFTA"), and Section 1681s-2(a)(7) of the Fair Credit Reporting Act ("FCRA"). Indeed, the CFPB's Opposition does not cite even a single case supporting the applicability of any of these statutes to lease-to-own transactions. On the contrary, as the CFPB concedes, another court in this District recently held that lease-to-own transactions are not "credit" or "credit sale[s]" under the CFPA, TILA, and EFTA. *CFPB v. Snap Fin. LLC*, No. 2:23-cv-00462-JNP-JCB, 2024 WL 3625007, at *5–8, *12–13 (D. Utah Aug. 1, 2024). Other courts similarly have rejected attempts to stretch the meaning of "credit" beyond the statutory language to encompass lease-to-own transactions. Acima's Mot. to Dismiss, ECF No. 45 ("Mot.") at 13-14.

The CFPB has no response to these arguments. Instead, the CFPB attempts to shoehorn Acima's lease-to-own transactions into the definition of "credit" by arguing that Acima's leases operated "functionally" as "credit." Even if this end-run around the statutory text were permissible (and it is not), it flatly contradicts express terms of Acima's Rental Purchase Agreement ("RPA"), which this Court may consider on a motion to dismiss.

The CFPB then turns to two equally unpersuasive theories of liability under the CFPA. *First*, the CFPB relies on cases interpreting the Uniform Commercial Code ("UCC") to advance two "tests" for so-called "disguised security interests," Opp. 10-11, ignoring that no court ever has

used the UCC to interpret "credit" under the CFPA, TILA, and EFTA—and Acima's leases do not meet these "tests" anyway. *Second*, the CFPB raises a novel theory that it can bring a claim under the CFPA because a lessor "offers credit"—and therefore becomes a "covered person"—where the CFPB has posited subjectively that customers may be at risk of potential confusion. The CFPB concedes this pure *ipse dixit* argument has "little" foundation in case law and has already been rejected by the *Snap* court. Opp. 13. The CFPB also fails to marshal any argument grounded in case law that Acima engaged in any activities rendering it a "financial institution" under Section 1681s-2(a)(7) of FCRA.

The Court therefore should dismiss the CFPB's claims under the CFPA, TILA, EFTA, and Section 1681s-2(a)(7) of FCRA. The CFPB's CFPA allegations, in any event, also should be dismissed for lack of sufficiency and for timeliness. For all these reasons, this Court should dismiss the Amended Complaint in its entirety.

## ARGUMENT

### I. THE CFPB'S FUNDING METHOD VIOLATES THE DODD-FRANK ACT AND THE APPROPRIATIONS CLAUSE.

The CFPB's authorizing statute, the Dodd-Frank Act, provides that the Federal Reserve "shall transfer to the Bureau from *the combined earnings of the Federal Reserve System*, the amount determined by the [CFPB] Director to be reasonably necessary to carry out the authorities of the Bureau." 12 U.S.C. § 5497(a)(1) (emphasis added). The CFPB acknowledges that the word "earnings" is not statutorily defined, and in those situations "dictionary definitions inform the plain meaning of a statute." *United States v. Radley*, 632 F.3d 177, 182 (5th Cir. 2011). Accounting dictionaries invariably define "earnings" as net income or profit. *See, e.g.*, Charles J. Woelfel, *Encyclopedia of Banking & Finance* 320 (10th ed. 1994) (defining "earnings" as "[p]rofits; net income"); Mot. 8-9 (collecting accounting dictionary definitions).

The CFPB attempts to side-step these definitions by limiting them to the context of "private-sector companies." Opp. 33. But there is no basis for this distinction. Although the Federal Reserve, as a central bank, operates differently in some respects than a central bank, it applies common financial and accounting terms and principles. Banking treatises and dictionaries do not limit themselves to terms applicable only to private banks. *See, e.g.*, Charles J. Woelfel, *Encyclopedia of Banking & Finance* 320 (discussing the Federal Reserve banks when defining "earmarking"). In any event, the definitions of "earnings" in accounting dictionaries is consistent with the definitions of that term in dictionaries of general usage. *See, e.g.*, *Webster's Third New International Dictionary* 714 (2002) (defining "earnings" as "the balance of revenue for a specific period that remains after deducting related costs and expenses incurred"); *Merriam-Webster's Collegiate Dictionary* 391 (11th ed. 2007) (defining "earnings" as "the balance of revenue after deduction of costs and expenses").[1]

The CFPB's definition of "combined earnings" would read congressional designation of a specific funding source out of the statute. Under the CFPB's construction, Congress simply could have required the Federal Reserve to "transfer to the Bureau … the amount determined by the [CFPB] Director," and remained silent as to the source of that funding. In fact, that is precisely what Congress provided elsewhere in the Dodd-Frank Act, when it established a new agency, the Office of Financial Research, and mandated that "[d]uring the 2-year period following the date of enactment of this Act, the Board of Governors shall provide to the Office an amount sufficient to cover the expenses of the Office." 12 U.S.C. § 5345(c). Congress meant something more specific

[1] While general dictionaries also define "earnings" as "something (as wages or dividends) earned as compensation for labor or the use of capital," *Webster's Third New International Dictionary* 714 (2002), that definition is less relevant to the operation of a bank than the definition that comports with the accounting understanding of the term.

than "any revenues" when it chose to designate the "combined earnings of the Federal Reserve System" as the source of the CFPB's funding.

The canon of constitutional avoidance further counsels against a broad reading of "combined earnings" that the CFPB advocates. As the Supreme Court underlined, "the Bureau's funding must comply with the Appropriations Clause, and "[t]he Appropriations Clause applies to money 'drawn from the Treasury.'" *CFPB v. Cmty Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425 (2024) (quoting Art. I, § 9, cl. 7); *see also* Mot. 8. The Supreme Court further explained that "surplus funds in the Federal Reserve System would otherwise be deposited into the general fund of the Treasury," and "money otherwise destined for the general fund of the Treasury qualifies" as money that Congress may constitutionally appropriate. *Id.* Under the CFPB's construction, however, Congress authorized the Federal Reserve to fund the CFPB *outside* of the Appropriation Clause, out of funds that would never be deposited into the Treasury's general fund. This Court should not presume that Congress intended a constitutionally suspect result.

Finally, the CFPB intones that Congress could not have intended to subject it to "intermitten[t]" funding. Opp. 34. "Policy arguments are properly addressed to Congress, not this Court." *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 368 (2018). Congress may not have anticipated that the Federal Reserve would run a deficit, but it is the job of the courts "to apply faithfully the law Congress has written," and not to "speculat[e] about what Congress might have done." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017).

## II. ACIMA'S LEASE-TO-OWN TRANSACTIONS DO NOT MEET THE STATUTORY DEFINITION OF CREDIT.

### A. The CFPB May Not Rewrite Acima's Rental Purchase Agreements.

The CFPB asks the Court repeatedly to disregard the express terms of Acima's rental agreements in favor of "the economic substance of the transactions." Opp. 6. The Court should decline this invitation.

Courts traditionally look to the language of lease agreements when determining whether those agreements are subject to federal consumer financing laws. "The issue of whether a lease transaction constitutes 'credit'" is "most fairly determined by the terms of the leasing agreement, interpreted within the context of applicable state and federal law." *See, e.g.*, *Liberty Leasing Co. v. Machamer*, 6 F. Supp. 2d 714, 717 (S.D. Ohio 1998) (evaluating liability under the Equal Credit Opportunity Act ("ECOA")); *Maul v. Aaron's, Inc.*, No. CIV-12-924-M, 2013 WL 12090304, at *3 (W.D. Okla. Mar. 19, 2013) (rejecting plaintiff's attempt to re-characterize a lease agreement as a "consumer credit sale" because "the Agreements themselves directly contradict any finding that [defendant] granted plaintiff credit").

The CFPB's insistence that the Court disregard this principle in favor of its assessment of the "economic substance" of Acima's lease-to-own transactions, *see* Opp. 6-7, founders upon the very case law it invokes. Thus, the court in *TKO Equipment Co. v. C & G Coal Co., Inc.*, rejected a post-hoc effort to *recharacterize* a lease agreement as a sale with a security interest in an attempt to secure favorable priority in bankruptcy, as an impermissible attempt at "having and eating one's cake simultaneously." 863 F.2d 541, 544-46 (7th Cir. 1988) (Easterbrook, J.). If anything, this principle cautions against the CFPB's attempt to recharacterize Acima's lease-to-own agreements as credit instruments in an effort to extend its regulatory reach over transactions regulated by state law. And while (as the CFPB intones, *see* Opp. 7) the court in *Dorton v. Kmart Corp.*, observed

that "how [a lease p]rogram *actually operates* is dispositive," the court then answered that question by examining the program's written description in its "Frequently Asked Questions" and advertisements before concluding that the challenged transaction was a lease agreement and not a system of "deferred payments" on an "installment plan." 229 F. Supp. 3d 612, 624-25 (E.D. Mich. 2017). Here, too, Acima's RPA demonstrates that its lease-to-own transactions are leases and not credit plans. *See* Mot. 12-18.

The CFPB is wrong to argue that a "liberal[]" construction of the CFPA, EFTA, and TILA "best[] serve[s] Congress's intent." Opp. 6-7 (internal quotation marks and citations omitted). On the contrary, "legislative purpose is reflected by the ordinary meaning of the language used in the statute." *Edwards v. Valdez*, 789 F.2d 1477, 1482 (10th Cir. 1986) (citing *United States v. Locke*, 471 U.S. 84 (1985). Here, Congress expressly *excluded* leases from the definitions of "credit" in the CFPA, TILA, and EFTA, and the CFPB cannot countermand that congressional command through a creative interpretation of what constitutes "credit." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2257 (2024). If Congress had intended that leases with short-term, renewable lease terms are "credit," it would have said so. *See Credit Suisse Secs. (USA) LLC v. Simmonds*, 566 U.S. 221, 228 (2012).

The CFPB's attempt to recharacterize Acima's lease-to-own transactions to fit the statutory definition of "credit" does not plausibly state a claim sufficient to survive a motion to dismiss. "'[A]llegations do not overcome contradictory statements in the text of a contract.'" *CounselNow, LLC v. Deluxe Small Business Sales Inc.*, 430 F. Supp. 3d 1247, 1257 n.4 (D. Utah 2019) (quoting *Gorsuch, Ltd., B.C. v. Wells Fargo Nat. Bank Ass'n*, 771 F.3d 1230, 1238 (10th Cir. 2014)). The CFPB cannot evade the express terms of the RPA through conclusory and unsubstantiated

allegations that Acima's lease-to-own transactions operated differently from their contractual terms.[2]

**B. Acima's Lease-To-Own Transactions Are Not "Credit" Transactions Under the CFPA, TILA, and EFTA (Counts I-IX, XI, XIII, XIX).**

Acima's lease-to-own transactions do not enable customers to "purchase property … and defer payment." 12 U.S.C. § 5481(7) (CFPA); 12 C.F.R. § 1005.2(f) (EFTA). The CFPB argues otherwise, contending that Acima "enrolled [its customers] into a payment schedule enforced by mandatory … autopayments" and "made it absurdly difficult" to terminate their rental agreements. Opp. 7. But the CFPB does not contest that Acima's customers had a contractual right to "terminate th[e] Agreement at any time *without penalty* by returning the Property in accordance with our directions." Mot. 19-20 (citing Mot. Ex. A at 4) (emphasis added). The CFPB cites no authority for the proposition that automatic renewal of lease payments or maintenance of return policies converts a lease agreement into an extension of "credit." Likewise, the CFPB cites no case law for the proposition that having a customer take action to terminate a lease at the end of a renewal period transforms a contemporaneous exchange of payment and possession into an extension of "credit" or creates a term of longer than each individual rental period.

The CFPB argues next that Acima's return practices "frustrated a customer's supposed right to terminate an agreement at any time without penalty." Mot. 8. Again, the CFPB offers not a single case—nor is Acima aware of one—to support the argument that implementing customer

[2] The CFPB's argument that the Court should disregard Acima's standard RPA (Mot. Ex. A) as "cherry-picked provisions" of Acima's lease-to-own transactions is unavailing. The CFPB has not alleged—nor can it—that any RPA had a contract term that subjected it to the definition of "credit" under the CFPA, TILA, and EFTA. For example, the CFPB has not factually alleged that any lease-to-own transaction contained contract provisions (i) creating a term of at least 90 days or requiring a purchase at the inception of a lease, *see* 12 U.S.C. § 5481(15)(A)(ii) (CFPA), (ii) imposing a termination penalty, *see* 12 C.F.R. § 1026.2(a)(16) (TILA's implementing Regulation Z), or (iii) deferring the payment of a debt, *see* 12 U.S.C. § 5481(7) (CFPA); 15 U.S.C. § 1602(f) (TILA); 12 C.F.R. § 1005.2(f) (EFTA). The CFPB likewise has never alleged that any contract term offered a financial service rendering Acima a "financial institution" under Section 1681s-2(a)(7) of the FCRA.

return practices to facilitate returns and mitigate fraud risk converts a lease into an extension of "credit" under the CFPA, TILA, or EFTA.[3] Acima cannot be punished for making a business decisions regarding the form and method of return—which does not change the contractual right to return—and the CFPB does not contest that consumers had a contractual right to terminate the agreement without penalty and return the goods at the end of any renewal period.

### C. The CFPB's Alternate Theories of Applying the CFPA to Acima's Lease-To-Own Transactions Are Unavailing.

Absent valid support for its attempt to broaden the CFPA, EFTA, and TILA to cover Acima's lease-to-own transactions, the CFPB urges next that the Court find that the transactions function as "disguised security interests" (thereby rendering them "credit") by "appl[ying] the Uniform Commercial Code ("UCC")." Mot. 9-10. The CFPB cites no authority for using the UCC to interpret the definition of "credit" under the CFPA, EFTA, or TILA. While the UCC may be used as a guide to fashion federal *common* law where the UCC is "the principal fount of general commercial law governing [specific] transactions," *United States v. Hext*, 444 F.2d 804, 809-10 (5th Cir. 1971), it does not make sense to use the UCC—a model for *state* law—to construe a federal *statute* that prescribes rules for a specific field of commercial activity. Congress "legislate[s] against a background of common-law adjudicatory principles," *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991), not against the minutes of the UCC Permanent Editorial Board meetings. In fact, another court in this District recently rejected the CFPB's invitation to apply UCC analysis to federal consumer-protection statutes. *Snap*, 2024 WL 3625007, at *8 n.13 ("[T]he consumer-protection statutes at issue here, unlike the UCC, do not

[3] The cases the CFPB cites are inapposite. *Ide v. British Airways PLC*, 529 F. Supp. 3d 73 (S.D.N.Y. 2021), involved a breach of contract claim over whether an airline's refund practices breached customers' contractual right to receive a refund, not whether those practices vitiated the contractual right to refund altogether. *In re Bankers Trust Co.*, 450 F.3d 121 (2d Cir. 2006) (per curiam) concerned whether an indenture trustee violated its contractual, statutory, and fiduciary duties by failing to give notice of events of default; the decision does not remotely suggest that this violation somehow converted the securities at issue into a different financial instrument.

invite courts to consider the economic realities or functional operation of the lease agreements at issue when determining whether certain instruments create credit. … If Congress wanted economic realities to plug into the statutory definition of credit, the court presumes that it would have said so.”). This Court should do likewise.

Regardless, the UCC “tests” do not help the CFPB’s cause. The “Bright Line” test seeks to determine whether transactions constitute a “true lease” or a “disguised security agreement.” *In re Phoenix Equip. Co.*, No. 2:08-BK-13108-SSC, 2009 WL 3188684, at *7-8 (Bankr. D. Ariz. Sept. 30, 2009). The “first prong …requires the Court to determine whether the contract is terminable by the lessee” by reviewing “the explicit terms of the underlying agreements.” *Id.* at *8. Here, the analysis ends where it begins: the express language of Acima’s rental agreements give customers the right to terminate at the end of any lease period, without penalty. *See* Mot. 19-20; Mot. Ex. A at 4. The CFPB points to no contract term stating otherwise, only asserting that Acima’s contracts are “as a *practical matter*, not terminable.” Opp. 10 (emphasis added).

Acima’s leases also fail to meet the second prong of the “Bright-Line” test, which applies four conditions enumerated in UCC § 1-203(b). The CFPB points to just one condition (implicitly conceding the other three are not satisfied): whether the lessee has an option to become the owner of the goods for no (or nominal) additional consideration. Mot. 10-11. But the UCC “Bright-Line” test contains only two of the four “credit sale” requirements under Regulation Z, the relevant implementing regulation. *Compare* UCC 1-203(b), *with* 12 C.F.R. § 1026.2(a)(16). Because Acima’s rental purchase agreements are not “credit sales” as defined in Regulation Z, here, Acima’s agreements likewise fail to qualify. *See* Mot. 21; Section II.E *infra*.

The CFPB argues further that under the second UCC “test,” Acima’s lease-to-own agreements are disguised security agreements because they contain no “reversionary interest,” so

that the lessor "cannot expect to receive anything of value at the end of the lease." Opp. 11 (internal quotation marks and citation omitted). Not true. Acima's rental agreements expressly contemplate a return of the product at the end of any lease period where the customer elects to terminate the lease without making the full number of rental period payments. FAC ¶ 88.

The CFPB contends next that even if Acima did not "'provide' credit," it nevertheless "offered credit" because its consumers "likely believe[d] the company's product is credit." Opp. 13. As the CFPB concedes, the *Snap* court rejected the argument that "consumers' expectations regarding the nature of a financial service—rather than the actual terms or operation of that service—should determine a statute's regulatory coverage," 2024 WL 3625007, at *9, and no other court has adopted the unbounded interpretation of "offering credit" that the CFPB proposes. This Court should not be the first. As the *Snap* court observed, "'offering' should be understood in contradistinction to 'providing,' not as a broad invitation to subject regulatory schemes to consumers' subjective understanding of financial arrangements." *Id.*

**D. Acima's Lease-To-Own Transactions Are Not the "Functional Equivalent" of Purchase Finance Arrangements under the CFPA.**

Acima's lease-to-own transactions are not the "functional equivalent of" a purchase finance arrangement under the CFPA because they do not have an initial term of at least 90 days. Rather, Acima's RPAs create an initial term of never longer than sixty days. Mot. 18. The CFPB seems to accept that, as the *Snap* court held, the length of the initial lease term is determinative, 2024 WL 3625007, at *11, but asks this Court to credit its allegations that Acima "described its agreements to consumers" as having a twelve-month period and contends that "some Acima agreements explicitly identify their 'term' as '365 days.'" Opp. 15. These cursory allegations, however, are refuted by the RPA's express terms, and so cannot survive a motion to dismiss. *CounselNow*, 430 F. Supp. 3d at 1257 n.4; Section II.A, *supra*.

**E. Acima Does Not Offer "Credit Sales" Under the TILA.**

Acima's lease-to-own transactions are not "credit sales." *See* Mot. 18-22. The CFPB argues otherwise by pointing to its allegation that some of Acima's customers pay at or above the retail price either upon making all rental payments or upon executing the early purchase option. Opp. 17. This conclusion also flies in the face of the RPA's express terms. Acima's customers are obligated only to make rental payments in advance of each short-term lease period and are free to terminate the lease at any time after the initial period, with no obligation to make future lease payments. *See* Mot. 5; Mot. Ex. A at 1. Each term, including the initial term, represents a fraction of the total value of the property or service involved.[4]

The CFPB argues next that there was "no practicable way to terminate for many Acima consumers" without "incurring a penalty." Opp. 18. Again, this allegation founders upon the plain terms of the RPA, which expressly gives Acima's customers the right to terminate the RPA at the end of any rental period without penalty. Mot. 19-20; *see also Remco Enters., Inc. v. Houston*, 677 P.2d 567, 570 (Kan. Ct. App. 1984) (no "credit sale" under TILA where lessee permitted to terminate "at the end of any rental period"). The CFPB also invites the Court to consider the "practical conditions" placed on termination, including that customers "effectively incur[]" a penalty. Opp. 18. As the CFPB concedes, the *Snap* court rejected this effort in analogous circumstances. 2024 WL 3625007, at *13. This Court similarly should decline the invitation to entertain the CFPB's subjective assessment of "practical considerations" at the expense of the lease's express terms.

[4] For this reason, the CFPB's attempt to distinguish *Snap* on the basis that "Acima's agreements were for a 12-month term" fails. Opp. 18. The CFPB misstates the plain language of Acima's RPA, which creates an initial term and renewable short-term rental periods.

Finally, the CFPB contends that Acima "treated the customer as owning the goods for no additional consideration than what was contemplated at the outset." Opp. 19. That contradicts the plain terms of the RPAs, which obligated customers only to make an initial payment and therefore must make *additional payments* to obtain ownership eventually. Mot. Ex. A at 1.

### F. Acima Is Not a "Financial Institution" Under The FCRA.

Acima is not a "financial institution" under the FCRA because it does not engage in any of the financial activities required under the statutory definition of that term. Mot. 22-23. The CFPB contends that Acima engages in activities that are "financial in nature" because they are "closely related to banking," Opp. 19, but points to no authority (or allegations) that any service Acima does provide meets the FCRA's enumerated list of activities that a "financial institution" must provide. *See* Mot. 21-22; 15 U.S.C. § 1681s-2(a)(7)(G)(ii) (adopting definition in 15 U.S.C. § 6809). Count XVII must be dismissed with prejudice.

## III. THE CFPB'S SUDDEN REINTERPREATION OF THE CONSUMER PROTECTION STATUTES VIOLATED ACIMA'S DUE PROCESS RIGHTS.

Due process protects Acima from being charged with violating the consumer protection statutes when it acted in conformity with the CFPB's public interpretation of lease-to-own transactions. Mot. 28-29. The CFPB's only response is to dismiss its own prior guidance that "rent-to-own transactions are not credit" as merely "a general statement," a report "from an advisory committee," and as post-dating the commencement of Acima's operations. Opp. 29 & nn.26-27. Notably, the CFPB offers no explanation how its enforcement action against Acima is remotely consistent with its prior public guidance.

## IV. THE COURT SHOULD DISMISS COUNTS I–VIII FOR FAILURE TO ALLEGE ANY DECEPTIVE, UNFAIR, OR ABUSIVE PRACTICES.

### A. The CFPB Fails To Allege Plausibly that Acima's "90 Day Same As Cash" Marketing Is Deceptive (Count I).

Providing text that is "clear and easily understandable by anyone capable of making an online purchase" when the consumer signs an agreement negates any alleged deceptive marketing. Mot. 25-26 (quoting *In re VistaPrint Corp.*, MDL No. 4:08–md–1994, 2009 WL 2884727, at *6 (S.D. Tex. Aug. 31, 2009)). This is exactly the type of messaging Acima's RPA provides to consumers in bold, underlined text: "**<u>This is not a loan</u>**." Mot. 26. The CFPB's argument that *VistaPrint* "did not concern whether a misleading statement could be cured by a subsequent disclosure," Opp. 21, is a non-sequitur. There was no "misleading statement." In light of the RPA's express and clear disclosure, it was not reasonable for consumers to interpret "90 Day Same as Cash" as offering a loan.

### B. The CFPB Fails To Allege that Acima Deceptively Represented to Customers an Obligation To Maintain "Autopay" (Counts II and III).

The CFPB first contends that Acima "mischaracterizes" its allegations. Opp. 21. Not so. *See* Mot. 27 (discussing allegations that "Acima deceptively misrepresented to customers that they were obliged contractually to maintain auto-pay").

The CFPB's attempt to distinguish *FTC v. DirecTV, Inc.*, No. 15-cv-01129-HSG, 2018 WL 3911196 (N.D. Cal. Aug. 16, 2018), is similarly unavailing. Although it examined evidence adduced at trial, *DirecTV*'s principle that an agency may not "characteriz[e] the advertisements at a high level of generality and assert[] that conclusions regarding one advertisement apply uniformly to tens of thousands of others," *id.* at *16, apply equally at a motion-to-dismiss stage.

The CFPB cannot demonstrate how requiring consumers to keep a valid account on file constitutes substantial injury. Mot. 28-29. The CFPB intones that Acima "'caus[ed] [consumers] to have to maintain money in accounts they no longer wanted to use or experience nonsufficient-

funds fees,'" Opp. 22 (quoting FAC ¶ 192), but that harm allegation is purely speculative. Nor does the CFPB allege that Acima charged customers who did not owe money.

### C. The CFPB Fails To Allege that Acima Misrepresented Consumers' Ability To Return Goods or Created Unfair Barriers to Returns (Counts IV and V).

The CFPB claims it provided "extensive detail" of Acima creating "unfair barriers to returns." Opp. 23 (citing FAC ¶¶ 32, 89, 91-93, 96 197-98, 204). But those portions of the complaint state only that Acima provided a myriad of return options; they do not allege sufficiently *why* those return options were barriers. In fact, they were basic good business practices. *See* Mot. 29-30.

### D. The CFPB Fails To Allege that Acima Made Unfairly Deceptive Statements or Failed To Train and Monitor its Third-Party Retailers (Count VI).

The CFPB's claims of Acima's allegedly deceptive statements to its third-party retailers do not allege substantial injury to consumers or that any such injury is not outweighed by countervailing benefits. Mot. 30-31. In response, the CFPB rehashes the litany of its allegations, but they still are not sufficient to allege that any purportedly misleading statements in certain merchant training materials were likely to cause substantial injury to consumers. Moreover, the express language in Acima's RPA corrects any alleged deficiency, and there can be no harm where the customer received all correct disclosures in the agreement itself. Mot. 30-31.

### E. The CFPB Fails To Allege Any Abusive Acts or Practices with Respect to Acima's "Text To Apply" Process (Count VII).

The CFPB does not explain how any of Acima's "acts or practices with respect to its mobile application process … 'materially interfere[d] with the ability of a consumer to understand a term or condition of'" the RPA. Opp. 26 (quoting 12 U.S.C. § 5531(d)(1)).[5]

[5] The CFPB claims Acima "waived" its motion to dismiss "the category of consumer contracts signed via the merchant's computer (FAC ¶ 63)," Opp. 26 n.24, but that is incorrect. Acima's motion *does* expressly address FAC ¶ 63. Mot. 30 (discussing allegations "that a consumer could obtain the RPA from the merchant, FAC ¶ 63, or on their mobile phones, *id.* ¶¶ 65–70").

### F. The CFPB Fails To Allege that Acima Misrepresented Its Lease-To-Own Transactions as Credit (Count VIII).

The vast majority of the CFPB's complaint contends that Acima violated consumer protection statutes because its RPAs constitute an offer of "credit". Here, the CFPB switches horses and asserts that Acima "engaged in deceptive practices by misrepresenting the product in their marketing and advertising to consumers as credit." Opp. 27. This allegation likewise fails. The RPA on its face informs consumers that the "transaction is a rental-purchase agreement" and "is not a loan or credit transaction." Mot. 33.

## V. ASSUMING THE TILA APPLIES TO ACIMA'S TRANSACTIONS, ACIMA MADE ALL POSSIBLE REQUIRED DISCLOSURES (COUNTS X AND XI).

Acima could not plausibly provide consumers with all the information the CFPB claims is required under TILA. *See* Mot. 33-34. Thus, the CFPB asserts Acima should have provided consumers with the "amount financed, the finance charge, or the annual percentage rate." Opp. 27-28. But because Acima's lease-to-own transactions do not offer or provide credit, there is no "amount financed," "finance charge," or "annual percentage rate" to disclose. Mot. 34. The TILA does not require compliance with disclosure obligations when such compliance is impossible.

## VI. COUNTS X AND XIII ARE TIME-BARRED.

This Court should reject the CFPB's invitation—based solely on nonbinding out-of-circuit cases, Opp. 30—to apply a three-year limitations period. Under the express statutory language, the TILA and EFTA claims (Counts X and XIII) are time-barred in part to the extent any claim involves pre-July 15, 2021 conduct (i.e., one year before the tolling date). Mot. 34-35.

## CONCLUSION

The Court should dismiss all of the CFPB's claims against Acima.

Dated: February 21, 2025

Respectfully submitted,

By: */s/ Matthew P. Previn*
Matthew P. Previn*
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6049
Facsimile: (212) 303-7049
**admitted pro hac vice*

By: */s/ Bradley J. Bondi*
Bradley J. Bondi*
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C. 20036
Telephone: (202) 551-1701
Facsimile: (202) 551-0201
**admitted pro hac vice*

By: */s/ Benson L. Hathaway, Jr.*
Benson L. Hathaway, Jr.
Alyssa K. Nielsen
KIRTON MCCONKIE PC
50 E. South Temple, Ste. 400
Salt Lake City, UT 84111
Telephone: (801) 328-3600
Facsimile: (801) 321-4893

*Counsel for Defendants Acima Digital, LLC and Acima Holdings, LLC*